# UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

MOVE TEXAS CIVIC FUND;　　　　　　 )
JOLT INITIATIVE;　　　　　　　　　　 )
LEAGUE OF WOMEN VOTERS　　　　　 )
OF TEXAS; and NIVIEN SALEH,　　　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　　　Plaintiffs,　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　　　v.　　　　　　　　　　　　　 )　　Case No. 3:19-cv-00041
　　　　　　　　　　　　　　　　　　 )
DAVID WHITLEY, Texas Secretary of　　 )
State, in his official capacity; KEITH　　　 )
INGRAM, Texas Director of Elections,　　 )
in his official capacity; CHERYL　　　　　 )
JOHNSON, Voter Registrar for Galveston　 )
County, in her official capacity; PAMELA　 )
OHLENDORF, Elections Administrator for　 )
Caldwell County, in her official capacity;　 )
KIRSTEN SPIES, Tax Assessor and　　　　 )
Voter Registrar for Blanco County, in her　 )
official capacity; TERRI HEFNER,　　　　 )
Elections Administrator for Fayette County, )
in her official capacity; BETH　　　　　　 )
ROTHERMEL, County Clerk and Voter　　 )
Registrar for Washington County, in her　　 )
official capacity; JANET TORRES, District )
and County Clerk for Hansford County, in　 )
her official capacity; Elections　　　　　　 )
Administrator for Harrison County,　　　　 )
in his or her official capacity; and　　　　 )
KAREN NELSON, Elections Administrator )
for Smith County, in her　　　　　　　　 )
official capacity,　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　　　Defendants.　　　　　　　　　 )

1

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT

1.      Plaintiffs, by their undersigned counsel, bring this Action to prevent the Secretary of State along with Texas counties from following through on an unlawful purge of the voting rolls that, by design, will target and threaten the voting rights of eligible naturalized citizens and people of color.

2.      The right to vote is a fundamental and foundational right, possessed equally by U.S. born and naturalized citizens.  The Secretary of State's purge treats those who have been naturalized as second-class citizens whose right to vote can be uniquely threatened and burdened solely because at some point in the past, these individuals were not U.S. citizens.

3.      On January 25, 2019, David Whitley, the Texas Secretary of State, issued a press release (hereinafter, "the Press Release") announcing that his office had identified approximately 95,000 individuals whom he claimed were "Possible Non U.S. Citizens" registered to vote (hereinafter, "the Purge List").  According to the Press Release, the Purge List had been created in order to facilitate and assist counties purging these individuals from their voter rolls.

4.      In conjunction with this announcement, Keith Ingram, the Texas Director of Elections, sent the counties an Advisory titled Election Advisory No.

2019-02 (hereinafter, the "Advisory").  The Advisory told the counties that the Secretary's office had attempted to provide them with "actionable information" and gave specific instructions on how counties could begin investigating the individuals on the Purge List.

5.     The Purge List was created by identifying individuals who had presented documents to the Department of Public Safety ("DPS") indicating that they were not citizens at the time of obtaining or renewing a Texas Driver License or personal identification card, and comparing those individuals' information to voter registration information.

6.     The Advisory noted that the matches generated by this comparison were "WEAK" matches under state law.

7.     Critically, in creating the Purge List, no effort was undertaken to account for the fact that an individual could have become a naturalized citizen after submitting documentation to DPS but before registering to vote, despite the large number of Texans who naturalize every month and the amount of time, sometimes years, between DPS transactions.

8.     Numerous civil rights groups immediately recognized the fundamental flaw in the creation of the Purge List.  On January 28, 2019, these groups sent a letter to the Secretary of State urging him to rescind the Advisory, and sent letters to all 254 counties urging them not to act on it.

3

9.     Despite this warning, the Secretary of State forged ahead with deployment of the Purge List.  Defendant counties, without further investigation, began sending out notices to individuals on the list—*including naturalized citizens*—telling them that their eligibility to vote was being investigated and that they had 30 days to provide one of three specified forms of documents proving their citizenship or else they would be removed from the voter rolls.

10.     Almost as soon as the Purge List was released, it was revealed that the data was flawed even beyond its fundamentally wrong-headed methodology.  By Tuesday, January 29, 2019, the Secretary of State had retracted approximately 20,000 individuals from the Purge List because they were citizens who had been included due to an alleged "coding error."  Some of those citizens had already been sent Notices threatening them with removal from the rolls.

11.     With mounting evidence that the Purge List was issued with no care for its inclusion of citizens, former Texas Secretary of State Carlos Cascos called for the Purge List to be rescinded.

12.     Governor Greg Abbott, after earlier applauding Defendant Whitley for "uncovering and investigating this illegal voter registration," called the Purge List a "work in progress," but insisted that the fundamentally flawed exercise should continue.

13.    The Purge List and its subsequent enactment through the Advisory is a thinly veiled attempt to decrease minority voter participation by targeting one particular group of minorities—naturalized citizens.

14.    According to the U.S. Census Bureau, Texas is home to over 1.6 million naturalized citizens.  Naturalized citizens in Texas come overwhelmingly from minority racial and ethnic groups, with the largest group of naturalized citizens—by far—coming from Mexico.  Over 87% of Texas's naturalized citizens are Black or of Latino or Asian origin according to Census data.

15.    The Purge List issued by the Secretary of State uniquely targets naturalized citizens.  A large number of naturalized citizens will have obtained a Texas driver's license prior to becoming a U.S. Citizen, at which time they may have been required to provide documents to DPS showing that they were not a citizen but were lawfully residing in the United States.  After naturalizing, those individuals would be eligible to register to vote, even though the out-of-date documentation in DPS's records still incorrectly indicated they were non-citizens.

16.    Defendant Whitley declined to include safeguards to ensure such naturalized citizens would not erroneously be included on his Purge List solely because they formerly were not U.S. citizens.

17.     The Secretary of State's determined insistence on following through with the purge, despite knowledge that it will disproportionately burden naturalized citizens, demonstrates his intention to suppress their fundamental right to vote.

18.     Indeed, the consequences of not responding to a Notice issued by a county within the required 30 days are severe: removal from the rolls and, consequently, a deprivation of the right to vote.  An official from Hidalgo County bluntly summarized what is at stake for those citizens who receive Notices: "Come into the office.  Show your documents because you will be cancelled if you receive this letter of examination and you don't respond."

19.     As set forth in the Advisory, Defendant Whitley does not intend for the purge to be a one-time event.  Rather, using the flawed methodology that uniquely targets naturalized citizens, he intends to provide Purge Lists to counties on a monthly basis, thus regularly subjecting naturalized citizens to voter registration requirements to which native-born citizens are not subject, and exposing them to a continuing and ongoing threat of being purged from the voter rolls.

20.     Because it is discriminatory and arbitrary in its design, purpose, and effect, the program outlined in the Advisory violates the U.S. Constitution and the Voting Rights Act of 1965.

## JURISDICTION AND VENUE

21.   Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for violations of civil rights under the First and Fourteenth Amendment to the United States Constitution.

22.   The case presents a federal question within this Court's jurisdiction under Article III, § 2 of the United States Constitution, 28 U.S.C. §§ 1331, 1343, and 1357.

23.   Declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202.

24.   Venue is proper in this Court under 28 U.S.C. § 1391 because some of the parties, including at least one of the Defendants, reside in this District, and a substantial part of the events giving rise to this claim occurred in this District.

## PARTIES

25.   Plaintiff MOVE Texas Civic Fund ("Plaintiff MOVE Texas") is a non-profit organization, tax exempt under section 501(c)(3) of the Internal Review Code, with its principal place of business in San Antonio, Texas.  Plaintiff MOVE Texas is a grassroots nonpartisan, nonprofit organization building power in underrepresented youth communities through civic education, leadership development, and issue advocacy.   Plaintiff MOVE Texas conducts voter

7

registration in multiple counties in Texas, including at naturalization ceremonies, where Plaintiff MOVE Texas employees and volunteers offer new citizens their first opportunity to register to vote.  Since the Texas Secretary of State's Advisory, Plaintiff MOVE Texas' staff and volunteers have diverted resources from mission activities toward fielding questions from the public about the status of their voter registration.  Plaintiff MOVE Texas's communications team has been using social media and interacting with press contacts to explain the impact of the advisory and distribute accurate information to the public.  Plaintiff MOVE Texas is closely monitoring the election officials in each county in which it operates to be aware of activities the counties undertake pursuant to the Advisory and to respond to those activities.  If Plaintiff MOVE Texas obtains any information about eligible voters purged because of the Advisory, Plaintiff MOVE Texas will contact them to offer voter registration services and/or connect them to community partners for legal services.   Plaintiff MOVE Texas will not be able to provide as much voter registration services because it will spend time and resources addressing the Advisory.  Plaintiff MOVE Texas will also expend resources to distribute accurate voter registration information to young people and naturalized citizens, counteracting the misinformation spread by the Texas Secretary of State and other elected officials.   Using communication channels and organizers in the field, Plaintiff MOVE Texas will help educate naturalized citizens on their voting rights,

assist them in verifying their voter registration status, and help them re-register if they have been irresponsibly and illegally purged by the Texas Secretary of State. Defendants' actions have frustrated and, if not stopped, will continue to frustrate Plaintiff MOVE Texas' mission.

26.    Plaintiff Jolt Initiative ("Plaintiff Jolt") is a non-profit organization, organized under section 501(c)(3) of the Internal Revenue Code, with its principal place of business in Austin, Texas.  Plaintiff Jolt is an organization that increases the civic participation of Latinos in Texas to build a stronger democracy and ensure that everyone's voice is heard.  Plaintiff Jolt registers to vote individuals across multiple counties in Texas.  Defendants' actions have frustrated and, if not stopped, will continue to frustrate Plaintiff Jolt's mission.

27.    Plaintiff the League of Women Voters of Texas ("Plaintiff LWVTX") is a non-profit organization, tax exempt under section 501(c)(3) of the Internal Revenue Code, with its principal place of business in Austin, Texas.  Plaintiff LWVTX's mission includes empowering voters, defending democracy and envisioning a democracy where every person has the desire, the right, the knowledge and the confidence to participate.  Plaintiff LWVTX registers eligible individuals to vote across Texas, including at naturalization ceremonies, where LWVTX members offer new citizens their first opportunity to register to vote. Plaintiff LWVTX has members across the state that provide voter registration

services, including in Galveston County.  Plaintiff LWVTX has diverted resources from mission activities in order to respond to the Secretary of State's Advisory, including issuing a press release and providing information directly to its local League of Women Voters chapters regarding the Advisory.  Further, some of LWVTX members are naturalized citizens and may be on Purge List provided to Texas counties by the Secretary of State.  Defendants' actions have frustrated and, if not stopped, will continue to frustrate Plaintiff LWVTX's mission.

28.   Plaintiff Nivien Saleh is a naturalized U.S. citizen and a registered voter in Harris County, Texas.  She immigrated to the United States in or around 1996 on a student visa to earn a Ph.D in Political Science, and subsequently obtained an H1B visa.  She remained in the country legally, working, abiding by the law, and contributing to society, while she pursued the process of becoming a U.S. citizen.  In or around 2007, Plaintiff Saleh first obtained a Texas Driver License.  Her most recent driver license was issued on July 27, 2015.  When she applied for her license, she supplied her H1B visa as proof that she was legally present in the United States.  In January 2018, Plaintiff Saleh became a U.S. citizen, and was sworn in by U.S. District Judge Al Bennett, a moment of great pride and meaning to her.  That same day she registered to vote. Plaintiff Saleh treasures the right to vote as one of the most valuable fundamental rights of citizenship. To the best of her knowledge, Plaintiff Saleh has voted in every

election for which she was eligible, including the November 2018 General Election.  When she became aware of Defendant Whitley's Advisory she was immediately alarmed because she believed that she might be one of the people on the Purge List, given that she had obtained her driver license before she became a citizen.  Her husband contacted the Harris County Voter Registrar's office, which confirmed that Plaintiff Saleh was on the list.  When she learned that the Secretary of State had targeted her like this, she was scared, insulted, and angry.  Although she has not yet been issued a notice requiring her to prove her citizenship, the Secretary has not cancelled the Purge List and she therefore remains in danger of receiving such a letter.  Plaintiff Saleh and her husband will be leaving the country for approximately a month, beginning on February 23 of this year, and she is worried that the letter could arrive while she is away, and she may not be able to respond by the deadline and her voter registration will be cancelled.  She is concerned that this could prevent her from voting in the upcoming May elections for Mayor and City Council in Houston.  She also feels deeply insulted that she, and thousands of others like her, are being accused of voter fraud and of having broken the law by registering to vote. She feels that her name and reputation is being smeared without any evidence, and is hurt and disturbed by this false accusation.

29.     Defendant David Whitley is the Texas Secretary of State and the state's chief election officer.  Defendant Whitley is sued in his official capacity.

30.     Defendant Keith Ingram is the Director of Elections for Texas and serves under the Texas Secretary of State.  Defendant Ingram is sued in his official capacity.

31.     Defendant Cheryl Johnson is the Voter Registrar in Galveston County and is charged with maintaining the voter rolls in Galveston County.  Defendant Johnson is sued in her official capacity.

32.     Defendant Pamela Ohlendorf is the Elections Administrator for Caldwell County and is charged with maintaining the voter rolls in Caldwell County.  Defendant Ohlendorf is sued in her official capacity.

33.     Defendant Kristen Spies is the Tax Assessor-Collector and Voter Registrar for Blanco County and is charged with maintaining the voter rolls in Blanco County.  Defendant Spies is sued in her official capacity.

34.     Defendant Terri Hefner is the Elections Administrator for Fayette County and is charged with maintaining the voter rolls in Fayette County. Defendant Hefner is sued in her official capacity.

35.     Defendant Beth Rothermel is the County Clerk and Voter Registrar for Washington County and is charged with maintaining the voter rolls in Washington County.  Defendant Rothermel is sued in her official capacity.

36.     Defendant Janet Torres is the District and County Clerk for Hansford County and is charged with maintaining the voter rolls in Hansford County. Defendant Torres is sued in her official capacity.

37.     Defendant Elections Administrator for Harrison County is charged with maintaining the voter rolls in Harrison County, and is named in his or her official capacity pursuant to Federal Rule of Civil Procedure 17(d).

38.        Defendant Karen Nelson is the Elections Administrator for Smith County and is charged with maintaining the voter rolls in Smith County. Defendant Nelson is sued in her official capacity.

## STATEMENT OF FACTS

### The Roll-Out Of The Purge List

39.     On Friday, January 25, 2019, Texas Secretary of State David Whitley and Director of Elections Keith Ingram issued the Advisory to county voter registrars.

40.     The Advisory states that the Secretary of State had been working with DPS to obtain information regarding individuals who, during the process of obtaining or acquiring a Texas driver license or personal identification card, provided documentation to DPS showing that they were not a citizen of the United States.

41.   The Advisory further states that the Secretary of State compared that DPS information with voter registration rolls.

42.   The Advisory states that "the goal was to produce actionable information voter registrars could use to assist in their list maintenance responsibilities."

43.   In the Press Release, the Secretary of State stated that the Purge List and Advisory were created as a "voter registration list maintenance activity," and to ensure that "only qualified voters – who must first and foremost be U.S. citizens – are registered to vote in Texas elections."

44.   The Press Release claimed that, through his evaluation, the Secretary of State had discovered approximately 95,000 individuals who were identified by DPS and, using its matching methodology, had a matching voter registration in Texas.  It further stated that 58,000 of those individuals had voted one or more times in Texas elections, baselessly suggesting that these individuals had voted illegally.

45.   The Press Release advised that the Secretary of State had turned all of this information over to the Texas Attorney General for potential prosecutions for illegal voting.

46.   The Press Release also confirmed that the Secretary of State intends to continue providing such information to counties on a monthly basis.

**The Purge List Does Not Accurately Identify Non-Citizens**

47.    The Advisory explains that the list of individuals it acquired from DPS was created by reviewing unexpired driver licenses and identifying individuals who purportedly at some point provided valid documentation indicating they were not a citizen at the time that they obtained their Driver License.

48.    Individuals are not required to submit any documentation to DPS at the time they are naturalized to demonstrate a change in status.

49.    Therefore, the DPS database cannot differentiate between an individual who was a non-citizen when they obtained or renewed their driver license and was subsequently naturalized and an individual who remains a non-citizen.

50.    Under a section entitled "Impact of Data being obtained," the Advisory sets forth the requirements of Section 16.033 of the Texas Election Code, which allows county voter registrars to send notices to a registrant regarding that individual's eligibility to vote only in the event they have "reason to believe" the individual is not eligible.

51.    The Advisory then states that the data from DPS was matched with voter records.

52.    The Advisory specified that the Secretary of State created a match where the following criteria were met:

- Last Name (including Former Last Name on the Voter Record), First Name, and Full Social Security Number (SSN) (9 digits);

- Last Name (including Former Last Name on the Voter Record), First Name, and Texas Department of Public Safety (DPS)-Issued Driver License, personal identification card, or Election Identification Certificate Number; or

- Last Name (including Former Last Name on the Voter Record), First Name, Last Four Digits of the SSN, and Date of Birth

53.    Those matches constitute the Purge List.   The Advisory does not address any other criteria for determining a match.

54.    Public reports indicate that no additional work was done to determine a match.  A spokesperson for the Secretary of State stated that: "We didn't perform any analysis other than the number registered and the number who had voting history."

55.    The Advisory specifies that the Secretary of State's goal in using the above-matching criteria was to "produce **actionable information** for voter registrars, while producing the least possible impact on eligible voters, meaning we believe the data we are providing **can be acted on in nearly all circumstances**." (emphasis added).

56.    The Advisory noted that the matches should be considered "WEAK" but nevertheless advised that the county could initiate an investigation of the identified voters.

## The Removal Procedure Set Out in the Advisory

57.    For those registrants identified as a match with the DPS Data, the Advisory provides that counties could issue a Notice of Examination of Citizenship (Proof of Citizenship) Letter (the "Notice") to the individual.

58.    The Advisory tells counties that they have a "choice" to either send the Notice, thereby starting the 30-day countdown clock before cancellation, or to take no action on the voter record and "close the task as RESOLVED."

59.    On information and belief, at least until the Secretary issued revised guidance on February 1, 2019, some counties understood that sending the Notice to registrants identified as part of the Advisory was mandatory and not optional.

60.    The Notice states that an individual has 30 days to respond and must re-establish their citizenship by submitting one of three documents: (1) a certified copy of the voter's birth certificate; (2) a U.S. passport; or (3) a certificate of naturalization.

61.     Because a naturalized citizen's birth certificate by definition does not establish citizenship, naturalized citizens only have two options for proving their eligibility.

62.     Further narrowing the options for a naturalized citizen to comply with the Advisory's demands, on information and belief, only about 40% of Texans have a U.S. Passport.

63.     The required documentary proof of citizenship set forth by the Secretary of State in the Advisory is not consistent with what Texas has ordinarily required when a county is investigating whether a registrant is a citizen.

64.     Indeed, as of the filing of this complaint, on the Secretary of State's own webpage, there exists a form for individuals to respond to an investigation into their citizenship status whereby they would need only attest before a notary that they are a citizen.  The form specifies that it arises under Section 16.033 of the Texas Election Code, which is the statute that governs the counties' general investigations into voter eligibility.

65.     In the Advisory, the Secretary of State references Section 16.0332 of the Texas Election Code, rather than Section 16.033, as authority for the new documentary requirements.   However, Section 16.0332 is specific to the documentary requirement that may be requested from a registrant who was

excused from Jury Duty on the basis of that individual's self-reported status as a non-citizen.  On its face, it does not apply to the individuals on the Purge List.

66.    If an individual does not respond to the Notice and submit one of the requisite documents within 30 days, the individual's voter registration will be canceled.

67.    Even if the Notice is returned as undeliverable—meaning the county has knowledge that the individual received no notice at all that his or her registration was in jeopardy and that he or she needed to provide one of the specified documents demonstrating citizenship—the Advisory instructs the county to cancel the individual's registration.

68.    The Advisory does not provide for a hearing or other opportunity for an individual who may not have one of the required documents to re-establish his or her citizenship or explain why DPS's information is inaccurate or outdated.

## **The Advisory's Effects on Naturalized Citizens**

69.    On information and belief, neither DPS nor the Secretary of State employed any method to determine whether any of the individuals on the Purge List were naturalized as U.S. citizens at a date following their submission of information to DPS.

70.    Many lawful permanent residents obtain driver licenses or personal identification cards soon upon entering the United States.

71.     Tens of thousands of Texas residents naturalize every year.  Based on data reported by the Department of Homeland Security, between 2002 and 2017, approximately 823,660 Texas residents became naturalized citizens.  In 2015, 65,467 Texas residents became naturalized citizens; in 2016, 63,495; and in 2017, 50,552.

72.     Naturalized citizens in Texas overwhelmingly come from minority populations that have historically been subject to discrimination.  For instance, in 2017, of the 50,552 citizens naturalized, 22,167 came from Mexico, 1,233 from China, 1,625 from El Salvador, 3,770 from India, 1,225 from Nigeria, 1,207 from Pakistan, 1,391 from Philippines, and 2,248 from Vietnam.  In 2016, 22,687 of the 64,495 naturalized citizens came from Mexico, 1,710 from China, 1,134 from Colombia, 2,136 from El Salvador, 4,670 from India, 1,020 from Iraq, 2,038 from Nigeria, 1,980 from Pakistan, 2,005 from Philippines, and 3,603 from Vietnam.

73.     Preventing naturalized citizens in Texas from voting thereby suppresses the votes of minority populations.

74.     Because the Secretary of State's matching method does not account for individuals who were not U.S. citizens when they obtained their driver license or personal identification card but subsequently became naturalized U.S. citizens, the lists derived from the Purge List provided by the Secretary of State to counties inevitably contain many naturalized U.S. citizens.

75.    On Monday, January 28, 2019, certain counties began sending out Notices to individuals identified on the lists provided by the Secretary of State without conducting any additional investigation into those individuals' eligibility to vote.

76.    Based on public reports, Galveston County received a list of 837 voters flagged by the Secretary of State.  On Monday, January 28, 2019, Galveston County sent notices to 92 of those individuals.

77.    On information and belief, Caldwell County, Blanco County, Fayette County, Hansford County, Harrison County, and Washington County also began immediately sending out Notices to individuals on the list provided by the Secretary of State without doing any additional investigation or inquiry.

78.    Based on public reports, Smith County received a list of 297 voters flagged by the Secretary of State.  On or before February 4, 2019, Smith County sent Notices to 239 of these individuals.

79.    On or before Tuesday, January 29, 2019, the Secretary of State began backtracking on the initial numbers and reports he had distributed regarding supposed non-citizens on the voter rolls.

80.    On information and belief, and based on public reports, the Secretary of State began calling counties on Tuesday to tell them that a coding error had led

to citizens being included on the Purge List.  That error was not communicated to the counties in writing.

81.     On information and belief, the revised numbers given by the Secretary of State were significantly different from those on the original Purge List.  Reports indicate that the revised numbers removed tens of thousands of individuals from the Purge List.   For instance, Harris County initially received a list of approximately 30,000 individuals.  The revised list removed approximately 60% of those previously identified (approximately 18,000 individuals).

82.     In Galveston County, 64 of the 92 people who had already been sent the Notice on Monday, January 28, 2019, were identified as having been erroneously included on the initial list.

83.     On information and belief, the revision of the Purge List to account for the coding error did not account for the prospect that an individual may have obtained a driver license or personal identification card as a non-citizen and, sometime later, registered to vote as a naturalized U.S. citizen.

84.     On February 1, 2019, one week after the Advisory was issued, after some counties had already issued Notices to flagged individuals, and after substantial errors had been discovered in the Purge List, the Secretary of State sent an email to the counties.  This email stated that the data initially provided by the Secretary was meant to be a "starting point" for counties.  It did not explain how

this statement was consistent with the Advisory's statement that the information provided was meant to be "actionable" and could be "acted on in nearly all circumstances."   The email also tacitly conceded that many individuals on the Purge List are naturalized citizens by informing counties that they should check the list against any records they have of naturalization ceremonies.

85.    On information and belief, not all counties conduct voter registration at naturalization ceremonies and not all counties who do also keep a record of which voters they registered at a naturalization ceremony.  Moreover, even if every county created and retained such records, not every naturalized citizen is naturalized at local ceremonies in their resident county.  For example, college students might naturalize in the county of their university rather than their home county.

86.    Because it singles out individuals who were once non-citizens and subjects them to scrutiny not faced by native-born citizens, the purge program created by the Texas Secretary of State discriminates against naturalized citizens.

87.    Pursuant to the Advisory, to make it onto the Secretary of State's list only three criteria need to be met (1) the individual must have a current driver license or personal identification card issued by DPS; (2) the individual needs to have at some point submitted information to DPS indicating that they were a noncitizen; and (3) the individual needs to have registered to vote.

88.     Because one of the criteria for inclusion on the Purge List appears to be that at one point the individual submitted documentation to DPS indicating that they were a non-citizen legally residing in the United States, native-born citizens are categorically excluded from the Purge List.

89.      In stark contrast, the process to create the Purge List will, by design, inevitably capture many naturalized citizens who naturalized sometime after obtaining a driver license.

90.     Once an individual obtains a Texas driver license or personal identification card, there is no obligation to update DPS as to one's citizenship status at least until the license or identification card expires.  In Texas, driver licenses and personal identification cards are typically valid for six-year periods. *See* 37 Tex. Admin. Code § 15.30.

91.     Some individuals who previously obtained a driver license or personal identification card from DPS as non-citizens may choose not to renew those credentials after naturalizing.  Yet once naturalized, so long as they are otherwise qualified, these citizens have a fundamental right to vote, even without a driver license.

92.     Thus, naturalized registered citizens who, in registering to vote had already attested to their U.S. citizenship under penalty of perjury, are included on the Purge List and will be forced to produce additional documentary proofs of their

citizenship to a Voter Registrar, solely because, at some date in the past, they were not U.S. citizens.

93.    On information and belief, the Secretary of State took no measures to ensure that naturalized citizens were not included on the list.  For instance, the Secretary of State did not limit the "matches" to only those individuals who registered to vote at a date prior to providing DPS with documentation that they were a non-citizen.  Nor did the Secretary of State attempt to coordinate with counties or otherwise seek to obtain information about individuals who had been naturalized in the past 20 years.

94.    El Paso County's Election Administrator immediately noticed the problem with the Purge List because it included a staff member in her office whose naturalization party she had attended only a few years prior.  Of course, county officials cannot expect to have such personal knowledge about every naturalized citizen included on the Purge List.  Indeed, Defendant Johnson in Galveston County has admitted that her primary tool to determine whether individuals on the list are naturalized citizens will be to force them to comply with the Notices at risk of being purged from the rolls.

95.    On information and belief, the Secretary of State knew that the methodology employed to create the Purge List would sweep in a large number of naturalized citizens.

96.     On information and belief, employees within the Secretary of State's office were aware that using DPS data to identify potential non-citizens was inherently unreliable and had led to disastrous consequences in other states.  On information and belief, these employees voiced their concerns within the office of the Secretary of State and to members of the news media.

97.     Indeed, at least one county election official has reported that the Secretary of State specifically told him that the Purge List could contain individuals who naturalized sometime after submitting information to DPS and only then registered to vote.   Bruce Elfant, Travis County's Tax Assessor, described a call with the Secretary of State's office as follows: "During this call, the Secretary of State's office confirmed that the records we received may include voters who were not citizens at the time they applied for a driver's license but have since become citizens."

98.     Recent efforts by other states to purge their voter rolls also demonstrate that the Secretary of State knew or should have known that his methodology for creating his Purge List would ensnare a large number of naturalized citizens.  In 2012, Florida conducted a similar exercise, and purported to identify 180,000 non-citizen U.S. voters.  However, after numerous errors on the list were discovered, only 85 individuals were ultimately removed from the rolls.  One of the critical errors in the compilation of the list in Florida was that it relied

on data from the Department of Highway Safety and Motor Vehicles to determine citizenship, but many people became citizens after obtaining a driver license. A similar program in Colorado initially flagged more than 11,000 supposed non-citizen voters. Upon further scrutiny, that list was reduced to just 35.

99.   The process put in place by the Secretary of State was designed to ensure that naturalized citizens who have already attested to their eligibility to vote, including U.S. citizenship, would be burdened with producing additional documents demonstrating their citizenship in order to remain registered to vote, whereas no native-born citizen is at risk of being flagged by the Purge List.

100.   If counties act on the lists provided by the Secretary of State, as defendant counties have already begun doing, naturalized citizens will be sent Notices forcing them to demonstrate again their eligibility to vote with further proof in order to remain on the rolls.

101.   Pursuant to theses Notices, naturalized citizens have only 30 days to provide one of three specified forms of citizenship documentation to the election board, or they will be purged from the voter rolls.

102.   Thus, the procedures put in place by the Secretary of State and defendant counties put naturalized citizens at unique risk of being removed from the voter rolls, and uniquely burden naturalized citizens with producing, within a narrow window of time, documents to demonstrate their citizenship a second time.

103.   This burden will be substantial, if not insurmountable for many naturalized citizens flagged by this process.  Many individuals may simply not notice a sole mailer from a county registrar and will be deprived of a fundamental right as a result.  Others may not receive the Notice immediately—either because they are traveling, the Notice gets lost in the mail, they have moved, or other reasons—yet within 30 days they must provide one of two documents demonstrating their citizenship.

104.   Not all individuals keep their documents of citizenship at the ready, and the burden of obtaining and submitting one of the required documents is undue.  Even if they receive the Notice in a timely fashion, naturalized citizens of Texas who do not have a passport and who no longer have copies of their naturalization certificates because their certificates were lost, destroyed, damaged, or stolen—or do not otherwise have access to those documents within the specified timeframe—will not be able to produce the requisite documents within the specified time frame and will thus be purged from the rolls and denied the right to vote because they are naturalized and not U.S. born citizens exempted from the purge.

105.   It takes a long time—up to six months—to obtain a replacement naturalization certificate from the USCIS.   Naturalized citizens whose naturalization certificates are lost, stolen, damaged, or destroyed will not be able to

respond to the Notice within 30 days.  These U.S. citizens will be purged from the rolls and denied their right to vote in elections, some of which are set to occur as early as May 2019.

106.   It also takes between four and six weeks to obtain a U.S. passport.

107.   The Advisory process also imposes substantial costs on naturalized citizens who do not have copies of their naturalization certificates or a U.S. passport. The U.S. Citizenship and Immigration Services fee for a replacement certificate and the indirect costs of obtaining a new naturalization certificate is over $555.  The minimum cost for a passport book is $145, which can be a significant financial burden to maintain the right to vote.

108.   Even for individuals who have their naturalization papers or passport on hand, they are still being subject to a heightened burden to vote relative to U.S. born citizens simply because they were at one time not U.S. citizens.

## Texas' History of Discrimination in Voting

109.   The purge program outlined in the Advisory follows a long line of discriminatory tactics to suppress access to the vote in Texas.

110.   Texas has a lengthy history of official discrimination in the realm of voting.  *LULAC v. Perry*, 548 U.S. 399, 439–40 (2006) ("Texas has a long, well-documented history of discrimination that has touched upon the rights of African–Americans and Hispanics to register, to vote, or to participate otherwise in the

electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history."). The *LULAC v. Perry* decision also found that the congressional redistricting plan at issue bore "the mark of intentional discrimination that could give rise to an equal protection violation." *Id*. at 440. Courts have found that the Texas legislature has acted with a discriminatory intent in every congressional redistricting cycle since 1970. *Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016) (en banc). Local jurisdictions within Texas have also implemented discriminatory voting policies in recent history. *See, e.g., Patino v. City of Pasadena*, 230 F. Supp. 3d 667 (S.D. Tex. 2017).

111.   The history of voting discrimination in Texas continues to diminish the ability of minority citizens to participate equally with white citizens in the political process.

112.   Elections at the state and local level in Texas are characterized by racially polarized voting. As with instances of official discrimination, numerous cases have found racially polarized voting across the state of Texas. *See, e.g., LULAC*, 548 U.S. at 427 (concluding that appellants had met the second and third *Gingles* factors—Latino cohesion, majority bloc voting given the District Court's finding of "'racially polarized voting' in south and west Texas, and indeed, 'throughout the State'"); *Veasey*, 830 F.3d at 258 (noting that "the Supreme Court

has previously acknowledged the existence of racially polarized voting in Texas, and that in other litigation, Texas has conceded that racially polarized voting exists in 252 of its 254 counties"); *Perez v. Abbott*, 253 F. Supp. 3d 864, 887 (W.D. Tex. 2017) (noting that "all of the experts agreed that there is racially polarized voting in Texas").

113.   Historically, Texas and its political subdivisions have used voting practices and procedures that have enhanced the opportunity for discrimination against minority groups.  As courts have found, a variety of local at-large election districts in and around Houston, Dallas, San Antonio, El Paso, Irving, and Lubbock have resulted in "a marked dilution of black and Mexican-American votes" as well as "the lack of equal access by blacks and Mexican-Americans to the political processes." *Calderon v. McGee*, 584 F.2d 66, 67-68 (5th Cir. 1978), *vacated in part* 589 F.2d 909 (citing uncontested district court finding).[1]

114.   In *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014), *aff'd in part, vacated in part, remanded sub nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *on reh'g en banc*, 830 F.3d 216 (5th Cir. 2016), upon hearing expert testimony, the court made detailed findings about the history of racial discrimination regarding the right to vote.  Texas's history includes all-white

---

[1] *See also Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir.1984); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667 (S.D. Tex. 2017); *Benavidez v. City of Irving*, 638 F.2d 709, 731-32 (N.D. Tex. 2009); *Lipscomb v. Wise*, 399 F. Supp. 782 (N.D. Tex. 1975); *Sierra v. El Paso Independent School Dist.*, 591 F. Supp. 802 (W.D. Tex. 1984).

elections, poll taxes, requirements that voters re-register, voter purges, discrimination against voting at historically black colleges, and redistricting. *Id*. at 634-636.

115. The laws that sought to prevent minorities from voting were always accompanied by a purported need to prevent voting fraud. *Id*. at 636. Sometimes the laws were explicitly based on a desire to suppress minority voters and sometimes the laws were facially neutral proxies for discrimination. *Id*.

116. The court concluded, "[t]here has been a clear and disturbing pattern of discrimination in the name of combatting voter fraud in Texas." *Id*.

117. "Minorities continue to have to overcome fear and intimidation when they vote," including in-person harassment at the polls in an attempt to suppress minority participation. *Id*.; *see also Rodriguez v. Harris Cty*., 964 F. Supp. 2d 686, 783 (S.D. Tex. 2013) (describing poll workers being hostile to Latinos and requiring them to show driver's licenses to vote even before Texas made that a legal requirement). "The disparity in education, employment, and health outcomes between Anglos, African Americans, and Hispanics is manifest by the fact that the 29% of African Americans and 33% of Hispanics in Texas live below the poverty line compared to 12% of Anglos. The unemployment rate for Anglos is also significantly lower. At trial, the court found that 6.1% of Anglos were unemployed compared to 8.5% of Hispanics and 12.8% of African Americans. Furthermore,

91.7% of Anglo 25-year-olds in Texas have graduated from high school, compared to 85.4% of African Americans, and only 58.6% of Hispanics. Anglos are also significantly more likely to have completed college—33.7% of Anglos hold a bachelor's degree, compared to 19.2% of African Americans and 11.4% of Hispanics." *Veasey*, 830 F.3d at 258 (5th Cir. 2016) (internal citations omitted).

## Texas' Statutory Authority to Maintain Voter Rolls

118.   An individual can only vote in Texas if they meet the eligibility requirements of Chapter 11 of the Texas Election Code. These requirements include, *inter alia*, being a United States citizen and being a registered voter. Tex. Elec. Code §§ 11.002(2), 11.002(6).

119.   In Texas, the county tax assessor-collector is the voter registrar for a county, unless the county has created the position of elections administrator or the county commissioners' court has designated the county clerk as the voter registrar. Tex. Elec. Code §§ 12.001, 12.031.

120.   The county voter registrar has primary authority for receiving and processing voter registration applications, *see* Tex. Elec. Code Ch. 13, maintaining and correcting the list of currently registered voters, *see* Tex. Elec. Code Ch. 15, and cancelling the registrations of voters who are proven to be ineligible for registration, *see* Tex. Elec. Code Ch. 16.

121.   Chapter 16 of the Texas Election Code sets out the specific parameters under which a registrar may cancel an individual's voter registration.

122.   There are only five sets of circumstances that can lead to a voter's registration being cancelled:

- If the registrar receives official notice, based on a variety of other explicit statutory provisions, that the voter has moved, died, or been declared mentally incompetent. Tex. Elec. Code § 16.031.

- If a voter who had been on the suspense list fails to confirm their residential address when voting at one of the previous two general election cycles. Tex. Elec. Code § 16.032.

- If the registrar "*has reason to believe*" that a voter is ineligible, the registrar may send a notice asking for supplementary proof that the voter is eligible. Tex. Elec. Code § 16.033 (emphasis added). If the voter does not respond with the requisite proof within 30 days, the registrar may cancel the registration.

- If a voter requests to have their registration cancelled. Tex. Elec. Code § 16.0331.

- If the registrar receives official notice based on a jury summons that the voter is not a citizen, they may send the voter a notice requesting proof of citizenship "in the form of a certified copy of the voter's birth certificate, United States passport, or certificate of naturalization." If the voter fails to return the requested proof within 30 days, their registration is canceled. Tex. Elec. Code § 16.0332.

123.   The Texas Secretary of State is a constitutionally created executive officer who: "shall authenticate the publication of the laws, and keep a fair register of all official acts and proceedings of the Governor, and shall, when required, lay the same and all papers, minutes and vouchers relative thereto, before the

Legislature, or either House thereof, and shall perform such other duties *as may be required of him by law*." Texas Constitution art. 4 § 21.

124.   In performing its legislatively assigned voter list maintenance activities, the Secretary of State has a history of attempts to unlawfully purge voters from the rolls.  In particular, in 2012, the Secretary of State implemented procedures for matching registered voters to the list of deceased persons obtained from the Social Security Administration, pursuant to the Secretary's statutory authority described therein.  The Secretary of State used an individual's name and the last four digits of their social security numbers to create a list of weak matches. This resulted in roughly 80,000 individuals erroneously receiving notices informing them that they were suspected of being dead and asking them to respond to the county registrar to prove their status as alive.  *Id.*  Pursuant to statute, voters had 30 days to respond to these notices or face having their registration cancelled. Individual registered voters who were mistakenly issued notice letters brought litigation against the Texas Secretary of State and the Travis County Voter Registrar to enjoin the Secretary and county registrars from cancelling any registrations based on non-response to the notices that were sent out. Original Petition, *Moore v. Morton*, No. D-1-GN-12-002923 (261st Dist. Travis County, Sept. 19, 2012).  The court ultimately issued a temporary injunction granting the petitioners' requested relief based on their allegations that the Secretary "had no

legal authority" to carry out or direct the purge under existing statutory provisions, and that the Secretary's directives to counties constituted improper rulemaking under the Texas Administrative Procedures Act.  Temporary Restraining Order at 1-2, *Moore v. Morton*, No. D-1-GN-12-002923 (261st Dist. Travis County, Sept. 20, 2012).  The State subsequently settled the case and agreed to voluntarily halt its deceased matching program until better guidance was formulated.

## CAUSES OF ACTION

### Count I
### Discrimination Based on Citizenship and National Origin
### Violation of the Fourteenth Amendment Equal Protection Clause
### (Against All Defendants)

125.  Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

126.  The Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person within its jurisdiction the equal protection of the laws."

127.  Under the Equal Protection Clause, discrimination based on naturalized citizenship and on national origin is presumptively unconstitutional and subject to strict scrutiny.

128.  The voter purge designed and implemented by the Secretary of State and defendant counties discriminates against naturalized citizens by enacting a process that s singles out naturalized citizens as a group for special burdens to re-

affirm their eligibility to vote, while categorically excluding U.S. born citizens from those burdens.  Defendants treat naturalized citizens who are registered and eligible to vote but who applied for a driver license prior to their naturalization differently from U.S. born citizens, and impose discriminatory burdens upon these naturalized citizens by forcing them to respond to the Notice and prove their citizenship again with specific forms of citizenship documentation under the threat of being removed from the rolls and losing their right to vote.  This requirement, by design, does not apply to U.S. born citizens.

129.  The Secretary of State's method of compiling a list that necessarily targets a large number of naturalized citizens but excludes U.S. born citizens, without taking any steps to ensure that naturalized citizens would not be subjected to the voter purge, demonstrates that the Advisory creates a classification that discriminates against naturalized citizens.

130.  By creating the Purge List based on information that *at some point* people were not U.S. citizens, the Secretary of State has made a classification on the basis of national origin.

131.  This behavior is in keeping with Texas's notable history of official voting-related discrimination on the basis of race, ethnicity and national origin.

132.  The Secretary of State insisted on following through with the purge via the Purge List even after acknowledging that the list will contain naturalized

citizens who are fully eligible to vote, and who previously demonstrated their eligibility in order to be added to the voting rolls.  The removal of voters based on the Advisory and the Purge List will require these registered, naturalized citizens identified by the Secretary of State's list to again prove their citizenship within 30 days of a Notice being sent out, or else they will be purged from the voter rolls.

133.   The classification established by the Purge List is neither justified by nor narrowly tailored to promote substantial or compelling state interests.

134.   Through   the   Advisory   and   Notices,   Defendants   unlawfully discriminate against individuals on the basis of national origin, treating foreign-born U.S. citizens differently from those born within the United States.

135.   Through the Advisory and Notices, Defendants also unlawfully discriminate against a group of citizens—naturalized citizens—with respect to the fundamental right to vote in violation of the Fourteenth Amendment.

### Count II
### Violation of the First and Fourteenth Amendments
### Undue Burden on the Right to Vote
### (Against All Defendants)

136.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs. The Secretary of State and defendant counties have flagged the eligibility of voters without an adequate justification.

137.   The voter purge enacted by the Secretary of State and defendant counties has unlawfully burdened the ability of these persons to vote.

138.   The enactment of the voter purge will require naturalized citizens identified by the Secretary of State's list to demonstrate their citizenship within 30 days of a Notice being sent out, or else they will be purged from the voter rolls. Requiring naturalized citizens who are included in the Secretary of State's list to prove their citizenship imposes an undue burden on the fundamental right of registered voters in Texas to vote that is neither justified by, nor narrowly tailored, to promote substantial or compelling state interests.

**Count III**
**Arbitrary and Disparate Treatment**
**Violation of the Fourteenth Amendment Equal Protection Clause**
**(Against All Defendants)**

139.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

140.   The Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person within its jurisdiction the equal protection of the laws."  The Equal Protection Clause prohibits a State from engaging in arbitrary and disparate treatment which values one person's vote over another's.  *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *see also Young v. Hosemann*, 598 F.3d 184, 189 (5th Cir. 2010).

141.   The Secretary of State has designed and implemented a voter purge program which results in arbitrary and disparate treatment and values one person's vote over another's.  The voter purge program gives county voter registrars a

"choice" and different counties are taking and have taken different actions in response to the program: some counties have sent Notices to voters identified by the Secretary of State as potential non-citizens; others are undertaking independent investigations about the citizenship status of voters identified by the Secretary of State before taking any further action; others are not taking any action in response to the Secretary of State's Advisory.

142.    The lack of any statewide uniform standard for implementing the voter purge, and the arbitrary and disparate treatment of voters in different counties, results in the vote of one person being counted while that of an identically situated voter being excluded, depending solely on the counties in which those voters reside.

### Count IV
### Deprivation of Voting Rights Without Procedural Due Process
### In Violation of the Fourteenth Amendment Due Process Clause
### (Against All Defendants)

143.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

144.   The Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of . . . liberty . . . without due process of law."  The fundamental right to vote is a liberty interest protected by the due process clause.

145.   The procedures used to develop the Purge List create an extreme risk that naturalized citizens will be erroneously identified as non-citizens who are registered to vote.

146.   The process for removing registrants on the Purge List from the voter rolls does not provide voters with notice and an opportunity to be heard at a meaningful time or in a meaningful manner.

147.   The removal procedure narrowly circumscribes the types of responses that will be considered when resolving the claim of ineligibility. Specifically, the procedure requires a registered voter to provide one of three pieces of citizenship documentation, only two of which even apply to naturalized citizens. It does not permit counties to consider any other information the voter may provide as evidence of citizenship.

148.   The Secretary arbitrarily prescribed this inadequate opportunity for voters to rebut the allegations of non-citizenship in apparent violation of Texas Election Code 16.033, which requires counties investigating a registrant's eligibility to send a notice requesting "information relevant to determining the voter's eligibility," not a narrow list of documents, and requires counties to consider the information the registrant provides.

149.   Moreover, pursuant to the advisory, registered voters are removed from the rolls after 30 days even when the individual has been given no notice at

all that his or her voting rights were in jeopardy because the attempted notice was returned as undeliverable.

150.   The procedure set out in the advisory for cancelling registrations thus deprives naturalized citizens of their constitutionally protected voting rights without due process of law.

**Count V**
**Deprivation of Substantive Due Process**
**Violation of the Fourteenth Amendment**
**(Against All Defendants)**

151. Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs.

152.   Defendants issued and acted upon an Advisory based on fatally flawed data and the assumption of non-citizenship.  Defendants failed to consider the plausible, and likely, possibility that individuals on the Purge List became naturalized citizens after acquiring a Driver License.

153.   Defendants assumed non-citizenship in spite of the fact that all applicants must attest to U.S. citizenship upon submission of a voter registration application.   Despite that attestation, when Defendants are unable to locate additional information establishing citizenship, they have encouraged the issuance of or actually issued Notices that will result in disenfranchisement after 30 days. Defendants have placed the burden on the voters to again establish what they have already established or be removed from the rolls.

154.   Defendants have already admitted that large portions of the initial Purge List erroneously included citizens of the United States.

155.   Defendants have employed and are employing indifferent, willfully blind, arbitrary, unreasonable, and fundamentally unfair means to identify and remove supposed non-citizens on the voting rolls in violation of Substantive Due Process under the Fourteenth Amendment to the U.S. Constitution.

### Count VI
### Discriminatory Purpose in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution, and Section 2 of the Voting Rights Act

156.   Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs.

157.   The Advisory was promulgated, at least in part, with the purpose of discriminating against voters on account of their national origin, race and/or ethnicity.   Applying the framework established by the Supreme Court for analyzing discriminatory purpose, *Village of Arlington Heights v. Metro. Housing Devel. Corp.*, 429 U.S. 252, 266-268 (1977), to the Advisory, the indicia of discriminatory purpose include (but are not limited to): the Advisory bears more heavily on naturalized citizens and persons of color in Texas; the advisory was adopted in the context of a long, persistent, and ongoing history of racial discrimination in voting and animus against immigrants in Texas; the Advisory was adopted through a process marked by numerous departures from normal

43

administrative or legislative procedures; the sequence of events leading to the adoption and implementation of the Advisory included a disregard for the accuracy of the information used to remove voters from the rolls and the discriminatory impact of the Advisory on naturalized citizens and voters of color; the defendants have continued to implement the Advisory even after learning that it was based on deeply flawed and inaccurate information about citizenship status; and there is no legitimate non-discriminatory justification for moving forward with removals of persons from the voting rolls based on the Advisory.

158. The Advisory was promulgated and implemented with a discriminatory purpose based on race, color, and/or national origin, in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution, and Section 2 of the Voting Rights Act.

### Count VII
### Denial of Voting Opportunities Based on Race or Color
### Violation of Section 2 of the Voting Rights Act

159. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

160. Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, in relevant part, provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United State to vote on

account of race or color, or [membership in a language minority group].

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

161.   As a result of the actions of the Secretary of State and the defendant counties, and under the totality of circumstances, the political process in Texas is not equally open to participation by citizens based on race or color, or membership in a language minority group, in that such citizens have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, in violation of Section 2 of the Voting Rights Act.

162.   The actions of the Secretary of State and defendant counties have caused a denial or abridgement of the right to vote of U.S. citizens who are residents of Texas on account of their race or color, or membership in a language minority group, in violation of Section 2 of the Voting Rights Act.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and award the following relief:

A.     Declare that the Advisory's direction to counties to investigate the voter eligibility of individuals and any investigation by counties of individuals included on the Purge List, including the revised lists sent by the Secretary of State, any substantially similar lists or any lists derived using the same or a substantially similar methodology, violates the United States Constitution and federal law.

B.     Preliminarily and permanently enjoin Defendants and all Texas counties from sending Notices of Examination of Citizenship Letter to individuals on the basis of the Purge List, including the revised lists sent by the Secretary of State, any substantially similar lists or any lists derived using the same or a substantially similar methodology, or from removing any registered voter from the voter rolls based on a failure to respond to such notices;

C.     Order defendant counties to retract the Notices of Examination of Citizenship Letters that have already been sent out on the basis of the Purge List;

D.     Order defendant counties to place back on the rolls any persons who were removed from the rolls as a result of implementation of the Purge List, until

such time as it can be conclusively proved that such voters are not currently citizens;

E.      Order all Defendants to take such steps as are necessary to alert the public that the Notices are being rescinded;

F.      Enter an order pursuant to Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10301a(c), retaining jurisdiction for such period of time as may be appropriate, and requiring preclearance of voting changes that the State of Texas enacts or seeks to administer with respect to removal of persons from the voting rolls on grounds of non-citizenship, as specified in Section 3(c);

G.      Award Plaintiffs their costs and reasonable attorneys' fees in this action; and

H.      Grant Plaintiffs such other relief as this Court may deem just and proper.

Respectfully submitted,

Mimi Marziani**
Texas Bar No. 24091906
Rebecca Harrison Stevens
Texas Bar No. 24065381
Joaquin Gonzalez**
Texas Bar No. 24109935
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741-3438
Telephone: (512) 474-5073
beth@texascivilrightsproject.org

Jon Greenbaum**
D.C. Bar No. 489887
Ezra D. Rosenberg**
D.C. Bar No. 360927
Brendan B. Downes**
D.C. Bar No. 187888
Lawyers' Committee for Civil Rights
Under Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Fax: (202) 783-0857

Sophia Lin Lakin**
New York Bar No. 5182076
Dale E. Ho**
New York Bar No. 4445326
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 519-7836
Fax: (212) 549-2654

*/s/ Andre Segura*
Andre Segura (Attorney-in-Charge)
Texas Bar No. 24107112
S.D. Tex. Bar No. 3123385
Thomas Buser-Clancy
Texas Bar No. 24078344
S.D. Tex. Bar No. 1671940
Edgar Saldivar
Texas Bar No. 24038188
S.D. Tex. Bar No. 618958
Brian Klosterboer
Texas Bar No. 24107833
S.D. Tex. Bar No. 3314357
American Civil Liberties Union
Foundation of Texas
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 325-7011
Fax: (713) 942-8966
asegura@aclutx.org

Chiraag Bains** †
Massachusetts Bar No. 673627
Dēmos
740 6th Street NW, 2nd Floor
Washington, DC 20001
Telephone: (202) 864-2746

Stuart C. Naifeh**
California Bar No. 233295
Brenda Wright**
New York Bar No. 1863240
Dēmos
80 Broad Street, 4th Floor
New York, NY 10004
Telephone: (212) 485-6055
Fax: (212) 633-2015

ATTORNEYS FOR PLAINTIFFS

** Pro hac vice application forthcoming
† Admitted in Massachusetts, not D.C.; practice consistent with D.C. App. R. 49(c)(3).