**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| MOVE TEXAS CIVIC FUND; | ) | |
| JOLT INITIATIVE; | ) | |
| LEAGUE OF WOMEN VOTERS | ) | |
| OF TEXAS; and NIVIEN SALEH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-00041 |
| | ) | |
| DAVID WHITLEY, Texas Secretary of | ) | |
| State, in his official capacity; KEITH | ) | |
| INGRAM, Texas Director of Elections, | ) | |
| in his official capacity; CHERYL | ) | |
| JOHNSON, Voter Registrar for Galveston | ) | |
| County, in her official capacity; PAMELA | ) | |
| OHLENDORF, Elections Administrator for | ) | |
| Caldwell County, in her official capacity; | ) | |
| KIRSTEN SPIES, Tax Assessor and | ) | |
| Voter Registrar for Blanco County, in her | ) | |
| official capacity; TERRI HEFNER, | ) | |
| Elections Administrator for Fayette County, | ) | |
| in her official capacity; BETH | ) | |
| ROTHERMEL, County Clerk and Voter | ) | |
| Registrar for Washington County, in her | ) | |
| official capacity; JANET TORRES, | ) | |
| District and County Clerk for Hansford | ) | |
| County, in her official capacity; Elections | ) | |
| Administrator for Harrison County in his | ) | |
| or her official capacity; and | ) | |
| KAREN NELSON, Elections Administrator | ) | |
| for Smith County, in her official capacity. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT............................1

NATURE AND STAGE OF THE PROCEEDINGS .......................................3

SUMMARY OF ISSUES ...............................................................................3

FACTUAL BACKGROUND...........................................................................4

ARGUMENT.................................................................................................12

I.       Plaintiffs have standing to seek a preliminary injunction ...................12

II.      Plaintiffs are entitled to a preliminary injunction to preserve the status quo while this case proceeds ........................................................................14

A.       Plaintiffs are likely to succeed on the merits of their claim that the voter purge process required by the Advisory violates the Fourteenth Amendment....................................................................................................14

B.       Plaintiffs and their members are likely to suffer irreparable harm. .....19

C.       Vindicating Plaintiffs' constitutional rights is in the public interest, and will not harm Defendants. ............................................................................22

CONCLUSION.............................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Action NC v. Strach*,
216 F. Supp. 3d 597 (M.D.N.C. 2016)................................................................22

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) ............................................................................9

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
178 F.3d 350 (5th Cir. 1999) ..............................................................................13

*Boustani v. Blackwell*,
460 F. Supp. 2d 822 (N.D. Ohio 2006) ........................................................ 16, 17

*Byrum v. Landreth*,
566 F.3d 442 (5th Cir. 2009) ................................................................................4

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*,
447 U.S. 530 (1980) ............................................................................................16

*De Leon v. Abbott,*
791 F.3d 619 (5th Cir. 2015) ..............................................................................23

*De Leon v. Perry*,
975 F. Supp. 2d 632 (W.D. Tex. 2014) ..............................................................23

*Dunn v. Blumstein*,
405 U.S. 330 (1974) ............................................................................................15

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) ............................................................................20

*Graham v. Richardson*
403 U.S. 365 (1971) ............................................................................................14

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ............................................................................................13

*Hunt v. Wash. State Apple Advertising Comm'n*,
  432 U.S. 333 (1977) ...........................................................................................13

*Huynh v. Carlucci*,
  679 F. Supp. 61 (D.D.C. 1988)................................................................. 16, 20

*Ind. State Conf. of the NAACP v. Lawson*,
  WL 2752564 (S.D. Ind. June 8, 2018) ................................................................22

*Jackson Women's Health Org. v. Currier*,
  760 F.3d 448 (5th Cir. 2014) ..............................................................................23

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010) ...........................................................................................23

*League of Women Voters of Fla. v. Browning*,
  863 F. Supp. 2d 1155 (N.D. Fla. 2012) ..............................................................22

*League of Women Voters of Missouri v. Ashcroft*,
  336 F. Supp. 3d 998 (W.D. Mo. 2018)........................................................ 21, 22

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ..............................................................................23

*League of Women Voters U.S. v. Newby*,
  838 F.3d 1 (2016) ...............................................................................................23

*Lujan v. Defenders of Wildlife*,
  504 U.S. 55 (1992) .............................................................................................12

*Miller v. Blackwell*,
  348 F. Supp. 2d 916 (S.D. Ohio 2004)................................................................21

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ....................................................................... 21, 23

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ..............................................................................13

*Opulent Life Church v. City of Holly Springs, Miss.*,
    697 F.3d 279 (5th Cir. 2012) ........................................................................ 19, 23

*Plyler v. Doe*,
    457 U.S. 202 (1982) ........................................................................................15

*Project Vote, Inc. v. Kemp*,
    208 F. Supp. 3d 1320 (N.D. Ga. 2016) .............................................................22

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ............................................................................................23

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ..........................................................................................1

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ..........................................................................................12

*Schneider v. Rusk*,
    377 U.S. 163 (1964) ........................................................................................14

*Serna v. Texas Dep't of State Health Servs.*,
    No. 1-15-CV-446 RP, WL 6118623 (W.D. Tex. Oct. 16, 2015) ........................20

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ....................................................................................12

*Taylor v. Louisiana*,
    419 U.S. 522 (1975) ........................................................................................22

*U.S. Student Ass'n Found. v. Land*,
    546 F.3d 373 (6th Cir. 2008) ..................................................................... 18, 24

*United States v. Florida*,
    870 F. Supp. 2d 1346 (N.D. Fla. 2012) .................................................. 9, 18, 24

*United States v. Knauer*,
    328 U.S. 654 (1946) ........................................................................................14

*Wesberry v. Sanders,*
   376 U.S. 1 (1964) ............................................................................ 15, 23

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) .............................................................................14

## Texas Statutes

Tex. Admin. Code § 15.30 ..........................................................................6, 17

Tex. Elec. Code Chapters 15 ..................................................................... 18, 24

Tex. Elec. Code Chapters 16 ..................................................................... 18, 24

Tex. Transp. Code §§ 521 .............................................................................6

### INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants have taken—and have explicitly stated that they intend to continue taking—actions that threaten to strip naturalized citizens of their right to vote.  "[S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."  *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

On Friday, January 25, 2019, the Texas Secretary of State announced, via a press release and an official "Advisory" to counties, that he was sending local election officials a list of registered voters who had been flagged as "Possible Non U.S. Citizens" because, at some point, they purportedly provided a document indicating they were a noncitizen to the Department of Public Safety ("the Purge List").  Almost immediately, many local officials, including Defendant county voter registrars, began mailing notices to those flagged by this review, informing them that they must submit one of three specified documents demonstrating citizenship within 30 days or their voter registration would be automatically cancelled.  This exercise was deeply flawed from its inception and has been demonstrably riddled with errors in its execution.

While the Secretary of State initially claimed to have identified approximately 95,000 noncitizens who had registered to vote and 58,000 who voted, those numbers have already tumbled significantly after only minimal scrutiny.  The Secretary has now admitted that tens of thousands of citizens were falsely identified.  In at least one county,

the entire list of individuals initially flagged for review was rescinded due to a simple coding error.  Yet even after correction of these errors, Defendant Whitley's purge program remains fatally flawed at its core—the State's methodology will inevitably result in the identification of naturalized citizens who are eligible to vote but who naturalized sometime after obtaining a driver license.

The 30-day clock is already running for any flagged eligible citizens in Defendant counties, at the end of which they will be purged from the voter rolls.  A preliminary injunction to preserve the status quo and prevent citizens from being removed from the voting rolls is necessary.  Defendants have engaged in conduct that treats naturalized persons as second-class citizens, directly infringing on their right to vote and violating their right to equal protection and equal treatment under the United States Constitution. The likelihood of severe harm is high.  The first notices went out to registered voters on January 28, meaning properly registered voters could be removed from the voter rolls as soon as February 27.  Defendant counties sent additional notices in subsequent days and more letters will go out this week, leading to additional voters potentially being purged into March and beyond.  Texas is holding uniform general elections on May 4, 2019, for which the registration deadline is April 4, 2019.  Eligible voters who are purged through this program will thus have very limited time—if any—to re-register before those elections.  Naturalized citizens who are unable to timely provide documentary proof of citizenship—if they even receive those notices—will be purged from the voter rolls for no other reason than the fact they were at one point not a citizen.  Meanwhile, Plaintiffs MOVE and LWV will have to redirect considerable resources from their voter

2

registration, education, and get-out-the-vote activities to help individuals who have been wrongfully purged to get back on the rolls.  Plaintiff Saleh lives with the threat that at any moment, she could be deprived of her right to vote.

Plaintiffs ask that, to preserve the status quo and to prevent disenfranchisement of qualified voters, this Court prohibit any removals or demands for documentary proof of citizenship pursuant to the Purge List until such time as the Court may fully evaluate the lawfulness of Defendants' voter purges based on the Advisory.  Therefore, Plaintiffs seek a preliminary injunction to (1) order Defendant Secretary of State David Whitley to instruct all counties to abstain from taking any actions that would result in the removal of individuals on the basis of the Purge List; (2) order Defendants counties to take all steps to retract Notices of Examination of Citizenship Letters ("Notices") that have already been sent out on the basis of the Purge List until further notice; and (3) enjoin Defendant counties from sending Notices to individuals on the basis of the Purge List or removing any registered voter rolls based on a failure to respond to such notices.

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs filed their Complaint in this action on February 4, 2019 (Dkt. No. 1), and their Amended Complaint on February 6, 2019 (Dkt. No. 7).  Through this Motion, Plaintiffs now seek a preliminary injunction against Defendants.

## SUMMARY OF ISSUES

To obtain a preliminary injunction the movant must show:

(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened

injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).  Plaintiffs are entitled to a preliminary injunction.  Plaintiffs are virtually certain to succeed on the merits because the purge program by its very nature distinguishes between voters based on naturalization status and thus, national origin, and it is in no way narrowly tailored to achieve a compelling governmental interest.  It threatens to irreparably harm Plaintiff organizations by causing them to divert significant amounts of their limited resources to ensuring their members and other Texas voters are not deprived of their fundamental right to vote, and Plaintiff Saleh who could be deprived of her right to vote merely because she was not born a citizen of the United States.

## FACTUAL BACKGROUND

On January 25, 2019, Defendant David Whitley, the Texas Secretary of State, issued a press release (hereinafter, "the Press Release") announcing that his office had identified approximately 95,000 individuals whom he claimed were "Possible Non U.S. Citizens" registered to vote (hereinafter, "the Purge List").  Decl. of Christopher Clay (hereinafter "Clay Decl."), Ex. 1.  According to the Press Release, the Purge List had been created in order to facilitate counties purging these individuals from their voter rolls.

Along with this announcement, Defendant Keith Ingram, the Director of Elections, sent the counties an Advisory titled Election Advisory No. 2019-02 (hereinafter, the "Advisory").  Clay Decl., Ex. 2.  The Advisory told the counties that the Secretary's office had attempted to "produce **actionable information** for voter registrars, while

4

producing the least possible impact on eligible voters, meaning we believe the data we are providing **can be acted on in nearly all circumstances**." *Id.* (emphasis added).

The Advisory explains that the list of individuals it acquired from Department of Public Safety ("DPS") was created by reviewing unexpired driver license and non-driver identification card records and identifying individuals who had, at the time that they obtained their driver license or personal identification card, provided DPS with valid documentation indicating they were noncitizens lawfully present in the United States. *Id.*

The Advisory states that the data from DPS was then matched with voter registration records to create the Purge List. *Id.* Underlying the list is the presumption that anyone who was lawfully present in the country, but not a citizen at the time they obtained a driver license or personal identification card is still—as many as six years after they provided the documentation to DPS—a noncitizen and thus ineligible to vote. Individuals must attest to U.S. citizenship, under penalty of perjury, upon registering to vote. The Advisory does not address any other criteria for inclusion on the Purge List, and a spokesperson for Secretary of State confirmed that no additional work was done to determine that these individuals are still noncitizens, stating: "We didn't perform any analysis other than the number registered and the number who had voting history." Clay Decl., Ex. 3.

Although the Advisory acknowledges that the matches should be considered "WEAK," the Advisory provides that counties are permitted to issue a Notice of Examination of Citizenship (Proof of Citizenship) Letter (the "Notice") to the registrants identified with no further investigation. Clay Decl., Ex. 2.

5

The Notice, which was prescribed by the Secretary, states that an individual has 30 days to respond and must re-establish their citizenship by submitting one of three documents: a certified copy of the voter's birth certificate; a U.S. passport; or a certificate of naturalization.  Clay Decl., Ex. 4.  If an individual does not respond to the Notice and submit one of the requisite documents within 30 days, the individual's voter registration will be canceled.  Even if the Notice is returned as undeliverable—meaning the county has knowledge that the individual received no notice at all that his or her registration was in jeopardy—the Advisory instructs the county to cancel the individual's registration. Clay Decl., Ex. 2.  The Advisory does not provide for a hearing or opportunity for an individual who may not have one of the required documents to re-establish citizenship or explain why DPS's information is inaccurate or outdated.

### The Purge List Targets Naturalized Citizens

The primary factor leading to inclusion on the Purge List is that, at some point, the individual submitted documentation to DPS indicating that they were a noncitizen legally residing in the United States.  Many naturalized citizens fall into this category.  Prior to naturalization, as non-citizens lawfully residing in the United States, they were eligible to apply for a Texas driver license or personal identification card.  *See* Tex. Transp. Code §§ 521.142, 521.101.  After naturalizing, these individuals are under no obligation to update the documentation on file with DPS until their license or ID card is up for renewal.  *See* 37 Tex. Admin. Code § 15.46.  In Texas, driver licenses and ID cards need to be renewed only every six years.  *See id.* at § 15.30.

6

At the same time, these naturalized citizens are eligible to register and vote immediately upon naturalizing.  Indeed, it is very common for community groups, including Plaintiffs MOVE and LWV, or county registrars to conduct voter registration drives at naturalization ceremonies.  Decl. of Grace Chimene (Chimene Decl.) at ¶¶ 7-8; Decl. of Drew Galloway (Galloway Decl.) at ¶¶ 5-7.  Thus, it is not only possible, but a near certainty, that many naturalized citizens will validly register to vote long before they are ever required to provide DPS with evidence of their new citizenship status.  Plaintiff Saleh falls squarely into this category.  Ms. Saleh was born in Germany and moved to the United States in 1996 to earn her Ph.D.  Decl. of Nivien Saleh ("Saleh Decl.) at ¶¶ 2-3.  In or around 2007, she obtained a Texas driver license and renewed that license in 2015.  *Id.* ¶ 6.  She became a U.S. citizen in 2018 and registered to vote shortly thereafter.  *Id.* ¶¶ 8-11.  Since that time she has proudly exercised her right to vote without any issues at the polls.  *Id.* ¶ 12.  She is now on the list of purported non-citizen voters in Harris County.  *Id.* ¶ 16.  The Purge List by its design will sweep in these eligible citizens and subject them to a heavy burden to justify their place on the voting rolls.  In contrast, native-born citizens—who, of course, would never have shown noncitizen documents to DPS—are categorically excluded from the Purge List.  Thus, the Advisory singles out naturalized registered citizens—individuals who, in registering to vote, had already attested to their U.S. citizenship under penalty of perjury—and forces them to produce additional documentary proofs of their citizenship or face losing their right to vote solely because, at some date in the past, they were new immigrants to the United States who lawfully applied for a driver license or ID card.

7

Tens of thousands of Texas residents naturalize every year.  In 2015, 65,467 Texas residents became naturalized citizens; in 2016, 63,495; and in 2017, 50,552.  Clay Decl., Ex. 5.  Naturalized citizens in Texas come overwhelmingly from minority racial and ethnic groups, with the largest group of naturalized citizens, by far, coming from Mexico. Over 87% of Texas's naturalized citizens are of Black, Latino, or Asian origin according to data from the U.S. Census Bureau.  *See* Decl. of Dan Smith, ¶ 11; Table 1.

The Secretary of State took no measures to ensure that naturalized citizens were not included on the list.  For instance, the Secretary did not limit the "matches" to only those individuals who registered to vote at a date prior to providing DPS with documentation that they were a noncitizen.  Nor did the Secretary attempt to coordinate with counties or otherwise seek to obtain information about Texas residents who had naturalized in the past 20 years.  The Secretary knew that the methodology employed to create the Purge List would include a large number of naturalized citizens.  Reports indicate that employees within the Secretary's office were aware that using DPS data to identify potential noncitizens was inherently unreliable and had led to disastrous consequences in other states.  Clay Decl., Ex. 6.  These employees voiced their concerns within the office of the Secretary of State and to the news media.  *Id.*

Indeed, Bruce Elfant, Travis County's Tax Assessor, reported that the Secretary's office specifically told him that the Purge List could contain individuals who naturalized sometime after submitting information to DPS and only then registered to vote, stating: "During this call, the Secretary of State's office confirmed that the records we received may include voters who were not citizens at the time they applied for a driver's license

8

but have since become citizens." Clay Decl., Ex. 7.

A February 1, 2019, letter from the Secretary of State also tacitly concedes that many individuals on the Purge List are naturalized citizens by informing counties that they should check the list against their records of naturalization ceremonies (the "Letter"). Clay Decl., Ex. 8. Further, civil rights groups across the country, including Plaintiffs, immediately warned both the Secretary of State and counties that the Secretary of State's methodology would result in many eligible voters being incorrectly flagged for review, a concern that almost immediately proved justified. Clay Decl., Ex. 13, 14.

Recent efforts by other states to purge their voter rolls also demonstrate that the Secretary of State knew or should have known that his methodology of compiling a list would ensnare a large number of naturalized citizens. In 2012, Florida conducted a nearly identical exercise and purported to identify 180,000 noncitizen U.S. voters. Clay Decl., Ex. 9; *see also United States v. Florida*, 870 F. Supp. 2d 1346, 1347-48 (N.D. Fla. 2012). After numerous errors were discovered, only 85 individuals were ultimately removed from the rolls. Clay Decl., Ex. 9. One of the critical errors in the compilation of the list in Florida was that it relied on driver license data from the state's motor vehicle agency to determine citizenship, but many people became citizens after obtaining a driver license. *Id.*; *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1339 (11th Cir. 2014) (describing Florida's program). A similar program in Colorado initially flagged nearly 12,000 supposed noncitizen voters. Clay Decl., Ex. 10, 12. Upon further scrutiny, that list was reduced to just 35, of whom at least 8 were in fact citizens. Clay Decl., Ex. 10.

9

## Naturalized Citizens Are Already Being Targeted

On Monday, January 28, 2019, certain counties, including Defendant counties, began sending out Notices to individuals identified on the lists provided by the Secretary of State without conducting any additional investigation into those individuals' eligibility to vote. Indeed, it appears that counties, including Defendant counties, have issued or will issue Notices either without any additional investigation or when they cannot locate documentation establishing an individual's citizenship. Due to the lack of reliable and comprehensive data to that effect, this is likely to be a common occurrence. As a result, the burden will be placed on individuals to again establish what they already attested to when registering to vote, instead of placing that burden on counties to locate affirmative evidence of non-citizenship.

Based on public reports, Galveston County received a list of 837 voters flagged by the State. Clay Decl., Ex. 11. On Monday, January 28, 2019, Galveston County sent notices to 92 of those individuals. Clay Decl., Ex. 6. The other Defendant counties also began immediately sending out Notices to individuals on the list provided by the Secretary of State without doing any additional investigation or inquiry.

On or before Tuesday, January 29, 2019, the Secretary of State began backtracking on the initial numbers and reports he had distributed regarding supposed noncitizens on the voter rolls. Clay Decl., Ex. 6. The Secretary of State began calling counties on Tuesday to tell them that a coding error had led to citizens being included on the Purge List. That error was not communicated to the counties in writing. Reports indicate that the revised numbers removed tens of thousands of individuals from the

10

Purge List.  For instance, Harris County initially received a list of approximately 30,000 individuals.  Clay Decl., Ex. 7.  The revised list removed approximately 60% of those previously identified (approximately 18,000 individuals).   In Galveston County, at least 64 of the 92 people who had already been sent the Notice on January 28, 2019, turned out to be citizens who were erroneously included on the initial list.  Clay Decl., Ex. 6.

The coding error that led to this initial revision of the Purge List was only one of the flaws in Secretary's methodology and did not account for the prospect that an individual may have received a driver license or personal identification card as a noncitizen and, sometime later, registered to vote as a naturalized U.S. Citizen, as indicated by the fact that the Letter subsequently advised counties to cross-check the Purge List against any records of naturalization ceremonies they might possess.

Even with the knowledge that naturalized citizens are on the Purge List, Defendants have not discontinued the purge program.  Defendant Whitley has not rescinded the list.  Defendant Johnson in Galveston County has indicated that her primary tool to determine whether individuals on the list are naturalized citizens will be forcing them to comply with the Notices or be purged from the rolls.  Clay Decl., Ex. 6.

**The Registration Deadline for May 4, 2019 Elections Is Approaching Quickly**

May 4, 2019 is a uniform election date in Texas, when local subdivisions such as cities, school districts, and water districts have general elections.[1]  For example, League City and Friendswood—both located in Galveston County—will be holding elections on

---

[1] *See* https://www.sos.state.tx.us/elections/voter/2019-important-election-dates.shtml

11

that date.[2]  The voter registration deadline for that election is April 4, 2019.

Individuals who were mailed a Notice on January 28, 2019—the first date Notices were mailed—will be removed from the rolls on February 27, 2019 if they cannot or do not respond with one of the required documents.  These individuals will have only 36 days to reinstate themselves in time for the May 4 elections.  That window for reinstatement will narrow as counties continue sending Notices in the coming weeks.

## ARGUMENT

## I.      Plaintiffs Have Standing to Seek a Preliminary Injunction

To satisfy Article III's "irreducible constitutional minimum" for standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) *citing Lujan v. Defenders of Wildlife*, 504 U.S. 55, 56–61 (1992).  The "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 53 (2006).

Plaintiff Saleh easily satisfies this requirement.  She is a naturalized citizen and has been wrongly included on the Secretary's Purge List.  Although Harris County has not yet sent her a letter, it could do so at any time unless this Court compels the Secretary to rescind the list.  Plaintiffs MOVE and LWV also have standing to seek a preliminary

---

[2] https://www.leaguecity.com/2670/Election-Information; https://communityimpact.com/houston/pearland-friendswood/city-county/2019/02/05/galveston-county-to-handle-friendswood-city-elections/

injunction.  An organization can demonstrate standing in two unique ways: associational standing and organizational standing.  *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).  In associational standing, an organization has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members."  *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  An organization that establishes associational standing can bring suit on behalf of its members even in the absence of injury to itself.  *Id.* at 342.

An organization can also "establish standing in its own name if it 'meets the same standing test that applies to individuals.'"  *OCA-Greater Houston*, 867 F.3d at 610 (*quoting Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)).  If an organization diverted resources to identify or counteract the allegedly unlawful action, or if the challenged action resulted in a tangible frustration of the organization's mission, that organization has standing to bring suit.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  Organizational standing "does not depend on the standing of the organization's members."  *OCA-Greater Houston*, 867 F.3d at 610.

As set forth more fully in the attached declarations, LWV has standing to challenge the actions at issue both on behalf of its members and on its own behalf.  LWV has members who are naturalized citizens registered to vote and are threatened with removal from the voter rolls, and it has had to divert substantial resources to responding

13

to the Advisory and the purge program and away from its other advocacy, education, voter assistance, and lobbying efforts.  LWV Decl. at ¶¶ 5-27.  MOVE likewise has standing on its own behalf because it has had to divert substantial resources to responding to the Advisory and the purge program and away from its other communications, advocacy, voter assistance, and civic engagement activities.  Galloway Decl. at ¶¶ 4-22.

**II.    Plaintiffs are entitled to a preliminary injunction to preserve the status quo while this case proceeds.**

**A.    Plaintiffs are likely to succeed on the merits of their claim that the voter purge process required by the Advisory violates the Fourteenth Amendment**

The Fourteenth Amendment prohibits states from depriving "any person within its jurisdiction the equal protection of the laws."  U.S. Const., Am. XIV.  Under established precedent, "any person" includes persons who have immigrated from abroad and have completed the process of naturalization.  Discrimination based on naturalized citizenship or on national origin, therefore, is presumptively unconstitutional.  "Citizenship obtained through naturalization is not a second-class citizenship."  *United States v. Knauer*, 328 U.S. 654, 658 (1946); *see also Schneider v. Rusk,* 377 U.S. 163 (1964) (explaining that "the rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive").

As the Supreme Court held in *Graham v. Richardson* "classifications . . . based on nationality or race[] are inherently suspect and are subject to close judicial scrutiny."  403 U.S. 365, 372 (1971); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (stating that equal protection guarantees "are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of

14

nationality"). Under these long-established principles, naturalized citizens and native-born citizens are persons similarly situated in the view of the Constitution, and laws that distinguish between them are inherently suspect. Such laws, the Supreme Court has long held, must be "precisely tailored to serve a compelling governmental interest." *Plyler v. Doe*, 457 U.S. 202, 217 (1982).

The command of equal treatment under the Fourteenth Amendment is especially important with respect to the fundamental and foundational right to vote. *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live"); *Dunn v. Blumstein*, 405 U.S. 330, 336 (1974) ("In decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.").

The Secretary's Advisory and purge program run directly afoul of these principles. As set forth above, the voter purge program designed by the Secretary and implemented by Defendant counties singles out naturalized citizens in Texas as a group by imposing burdens on naturalized citizens which categorically do not affect U.S. born citizens. Naturalized citizens who are registered and eligible to vote, but who obtained a driver license or personal identification card prior to being naturalized, are treated differently from registered and eligible U.S. born citizens. These naturalized citizens must respond to the Notice and prove their continued citizenship within 30 days, by producing specific forms of citizenship documentation, under the threat of being removed from the rolls and losing their right to vote. U.S. born citizens, in contrast, are exempted from these

15

burdens. Texas's purge program thus treats persons who have become citizens through naturalization as second-class citizens whose right to vote can be uniquely threatened and burdened solely because, at some point in the past, these individuals were not U.S. citizens but immigrants with origins outside the United States.

Defendants' purge program thus rests on a suspect classification that is subject to strict scrutiny. Accordingly, the purge program must be struck down unless Texas can demonstrate that it is narrowly tailored to serve a compelling governmental purpose. *See*, *e.g.*, *Boustani v. Blackwell*, 460 F. Supp. 2d 822, 825 (N.D. Ohio 2006) (applying strict scrutiny to voting procedure that imposed burdens on naturalized citizens not imposed on native-born persons); *Huynh v. Carlucci*, 679 F. Supp. 61 (D.D.C. 1988) (applying strict scrutiny to regulation that denied security clearances to nationalized persons who had not lived in the United States for a prescribed period).

Defendants' actions in promulgating and implementing the Advisory and purge program based on the Purge List cannot survive either prong of the strict scrutiny analysis. First, they serve no compelling state interest. Although the Secretary's public pronouncements have claimed that his purge program is justified as a means of combatting illegal voting, Clay Decl., Ex. 1, this professed interest cannot satisfy the requirements of strict scrutiny. The compelling interest the government uses in justifying its classification cannot be merely speculative. *See Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 543 (1980) (applying strict scrutiny in the First Amendment context, and holding that "[m]ere speculation of harm does not constitute a compelling state interest"). The Secretary's purge program was not based on

16

evidence of any actual voter fraud, but rather on the Secretary's mere speculation that it might be occurring.  While the Press Release irresponsibly suggests that there are tens of thousands of noncitizens who had voted in Texas, there is no reasonable basis for that claim, which suffers from the same methodological infirmities that undermine the Purge List.  The failed attempts by both Colorado and Florida to deploy similarly-flawed purge programs, as described earlier, also demonstrate the error in relying on unreliable results produced by flawed methodologies.  Invoking the bare specter of "voter fraud" cannot serve to justify subjecting naturalized citizens to the burden of re-establishing their citizenship with specific documentation to remain on the voting rolls, when no such requirement is imposed on native-born persons.  There is no empirical evidence that naturalized citizens pose a greater threat to the integrity of the electoral process than native-born citizens, and thus there is no compelling interest in singling them out for special burdens.  *See Boustani*, 460 F. Supp. 2d at 826 (holding that "since native-born citizens are not required to show any proof of their citizenship under [the challenged statute], the statute creates an unequal application of voting requirements and lacks the justification of promoting a compelling governmental interest").

Second, the Advisory is not narrowly tailored; it is fatally overbroad in at least two ways: (1) many of the purported noncitizens on the Purge List are in fact naturalized citizens; and (2) the procedures used to remove individuals from the voter rolls are substantially overbroad.  The fact that the Advisory has already mistakenly singled out thousands of  Texans who are eligible voters shows that the purge program is not narrowly tailored.  As noted above, a naturalized citizen who obtained a Texas driver

17

license or personal identification card prior to naturalizing is under no obligation to update DPS as to the person's citizenship status at least until the license or identification card expires, which could be as much as six years later. *See* 37 Tex. Admin. Code § 15.30.  Moreover, as the Secretary has acknowledged, no effort was made to ensure that these naturalized citizens were not erroneously included on the Purge List.  Furthermore, in issuing guidance to the few counties who may have the necessary records that they should exclude from their lists individuals who were registered at naturalization ceremonies, the Secretary has acknowledged that such individuals will otherwise be included.  Likewise, the Secretary has offered no explanation of how departing from the procedures established in Texas law for investigating evidence of ineligibility, *see* Tex. Elec. Code § 16.033, and severely constraining the set of documents that will be considered to prove citizenship is necessary to achieve his anti-fraud goals.  Indeed, even Florida's program, which was found to unlawfully discriminate against naturalized citizens, allowed voters to prove their eligibility simply by submitting an affidavit attesting to their citizenship. *Florida*, 870 F. Supp. 2d at 1347.

Although a state has a legitimate interest in being able to maintain accurate voting rolls, "a state cannot remove [registrants] in a way which risks invalidation of properly registered voters." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388 (6th Cir. 2008).  Moreover, Defendants have other means they can use, including the procedures established in Tex. Elec. Code Chapters 15 & 16, to keep the voter registration rolls up to date.  Thus, Defendants' targeting of thousands of eligible naturalized citizens is not sufficiently tailored, even if there were any evidence suggesting it is supported by a

18

compelling state interest.  Accordingly, Plaintiffs have a strong likelihood of success on their claim that Defendants' actions violate the Equal Protection Clause.

**B.      Plaintiffs and their members are likely to suffer irreparable harm.**

Defendant counties have already mailed Notices to an unknown number of individuals on the Purge List.  In Galveston County, nearly two-thirds of the individuals who were mailed Notices on the first day of the purge program were immediately found to be citizens who had been included due to the coding error.  An untold number of other naturalized U.S. citizens are likely to have received Notices because they were included on the Purge List solely because, at some prior point, they were not a U.S. citizen.  Other counties, including Harris County where Plaintiff Saleh resides, could begin sending Notices at any time.  Once these Notices are sent, the clock begins ticking.  If individuals who receive Notices do not respond within 30 days with the appropriate documentation, they will be removed from the rolls, despite the fact that they are citizens who are otherwise eligible to vote.

Absent a preliminary injunction that prevents individuals from being removed from the rolls after 30 days for failure to respond to the Notice, Plaintiff Saleh and Plaintiff LWV's members, in addition to other naturalized citizens residing in Texas, will suffer irreparable harm.  First, any citizen who is on the list and especially those citizens who are forced to undergo the burden of re-establishing their citizenship solely because they are not U.S. born citizens, will suffer the irreparable constitutional and dignitary harm of being treated unequally—as a second-class citizen—from U.S. born citizens. *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012)

("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (citing 11A Federal Practice and Procedure § 2948.1 (2d ed. 1995)); *Huynh*, 679 F. Supp. at 67 (unequal treatment of naturalized citizens constituted irreparable harm to "their own sense of self-worth and well-being and of their constitutional right to the same treatment given other citizens"). *Serna v. Texas Dep't of State Health Servs.*, No. 1-15-CV-446 RP, 2015 WL 6118623, at *4 (W.D. Tex. Oct. 16, 2015) ("The Court thus concludes Plaintiffs need only show a deprivation of a constitutional right to establish the requisite irreparable injury.").

Those citizens who do not provide documentary proof of citizenship within the tight 30-day window will suffer the additional irreparable harm of being removed from the voter rolls and having their right to vote fundamentally jeopardized.  With the May 4 elections right around the corner, this threat is imminent.  The May 4 elections have an April 4 registration deadline, so individuals who are removed from the rolls in late February will have a little over a month to reinstate themselves.  And absent a preliminary injunction, individuals subjected to the purge program in the weeks and months to come will have even less time for reinstatement, or none at all.  For individuals who will be out of town for an extended period of time, such as Plaintiff Saleh, there may be no opportunity to re-register in time for the May elections.  Saleh Decl. ¶¶ 20-21.  This imminent risk of naturalized citizens having their right to vote stripped solely because they at one point were not citizens constitutes a substantial likelihood of irreparable harm. *Fish v. Kobach*, 840 F.3d 710, 751-56 (10th Cir. 2016) (cancellation of eligible voters' registration due to documentary proof of citizenship requirement constituted irreparable

harm); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed.  A restriction on the fundamental right to vote therefore constitutes irreparable injury.").[3]

Plaintiffs MOVE and LWV will need to expend significant resources locating individuals who have received Notices and helping individuals who have received Notices to acquire and submit the required documentation.  Chimene Dec. ¶¶ 24-25; Galloway Decl. ¶¶ 14-22.  Once 30 days elapse and individuals are removed from the rolls either because they missed, received too late, or never received the Notice, or because they could not find or acquire their documents on time, Plaintiff organizations will need to expend additional time and resources helping these individuals to re-register. Chimene Dec. ¶¶ 24-25; Galloway Decl. ¶¶ 14-22.  These resources will inevitably be diverted from Plaintiffs' attempts to conduct other voting-related activities, including signing up more people to vote and providing voter education in the crucial period leading up to the May 4 elections.  Plaintiffs' harm is irreparable because monetary relief cannot adequately remedy the diversion from Plaintiffs' missions.

Courts routinely recognize that organizations suffer irreparable harm when they lose opportunities to conduct voter engagement activities, such as voter registration and education.  *League of Women Voters of Missouri v. Ashcroft*, 336 F. Supp. 3d 998, 1005

---

[3] *See also Miller v. Blackwell,* 348 F. Supp. 2d 916, 922 (S.D. Ohio 2004) ("Because this Court has found that the Defendants' challenged actions threaten or impair both Plaintiffs' constitutional right to due process and constitutional right to vote, the Court must find that Plaintiffs will suffer an irreparable injury if the temporary restraining order does not issue."); *Ashcroft*, 336 F. Supp. 3d at 1005 (threat to right to vote was irreparable injury).

(W.D. Mo. 2018) ("Plaintiffs allege they have diverted resources from other activities crucial to their missions in order to address Defendants' failure to offer voter registration services in connection with mail-in and online change of address transactions. In the Court's view, monetary relief cannot remedy these injuries."); *Ind. State Conf. of the NAACP v. Lawson*, 2018 WL 2752564, at *12 (S.D. Ind. June 8, 2018) (conduct that interferes with an organization's voter registration efforts by forcing it to divert resources constitutes irreparable harm).[4]

## C. Vindicating Plaintiffs' constitutional rights is in the public interest, and will not harm Defendants.

The balance of hardships weighs heavily in favor of Plaintiffs' requested preliminary injunction.  Absent a preliminary injunction, duly registered voters will be removed from the rolls without justification and without time for recourse, depriving them of their fundamental right to vote in the upcoming May 4 elections and potentially other elections that occur during the pendency of this action.  The only harm Defendants would suffer—the administrative inconvenience of pausing implementation of a chaotically rolled out *administratively* created purge program that has been in effect for just 8 days—pales in comparison.  *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975) ("administrative convenience" cannot justify the deprivation of a constitutional right).

---

[4] *See Action NC v. Strach*, 216 F. Supp. 3d 597, 642 (M.D.N.C. 2016) (finding irreparable harm where "Plaintiffs continue to divert resources to voter registration, sacrificing other voter mobilization and voter education efforts"); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016) ("conduct that limits an organization's ability to conduct voter registration activities constitutes an irreparable injury"); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) (plaintiffs' lost opportunity to register voters is irreparable harm).

In addition, "[w]hile states have a strong interest in their ability to enforce state election law requirements, the public has a strong interest in exercising the fundamental political right to vote." *Obama for Am.*, 697 F.3d at 436 (internal quotation marks and citations omitted). Indeed, there is extraordinary public interest in protecting the fundamental right to vote. *See, e.g.*, *Wesberry*, 376 U.S. at 17; *League of Women Voters U.S. v. Newby*, 838 F.3d 1, 12 (2016) ("The public has a 'strong interest in exercising the fundamental political right to vote . . . .'")(quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations); *De Leon v. Perry*, 975 F. Supp. 2d 632, 665 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott,* 791 F.3d 619 (5th Cir. 2015). A preliminary injunction would further that interest by preventing voter disenfranchisement and permitting participation of eligible voters in the upcoming elections. *See, e.g.*, *Newby*, 838 F.3d at 12 (concluding that public interest favors preliminary relief where, absent such relief "there is a substantial risk that citizens will be disenfranchised" in upcoming elections); *Obama for Am.*, 697 F.3d at 437 ("The public interest . . . favors permitting as many qualified voters vote as possible.").[5] The Fifth Circuit has held repeatedly that "'[i]njunctions protecting First Amendment freedoms are always in the public interest.'" *Oppulent Life*, 697 F.3d at 298 (quoting *Christian Legal Soc'y v. Walker*, 453 853, 859 (7th Cir. 2006)).

---

[5] *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 248 (4th Cir. 2014). Voting is a fundamental right and is also the most basic expression of free speech, protected by the First Amendment. *John Doe No. 1 v. Reed*, 561 U.S. 186, 224 (2010).

Defendants' purge program advances only a minimal interest in employing a fundamentally flawed and fatally overbroad means of removing what the historical evidence suggests is at most a tiny number of ineligible voters.  In fact, by advising counties to further investigate the eligibility of registrants before sending a Notice, Defendant Whitley has tacitly admitted that the Purge List includes many eligible voters and contains an unconfirmed number of *potential* noncitizens.  As the Sixth Circuit recognized, "[t]hough the public certainly has an interest in a state being able to maintain a list of electors that does not contain any false or erroneous entries, a state cannot remove those entries in a way which risks invalidation of properly registered voters." *U.S. Student Ass'n Found.*, 546 F.3d at 388; *Florida*, 870 F. Supp. 2d at 1350 ("The Secretary's methodology made it likely that the properly registered citizens who would be required to respond and provide documentation would be primarily newly naturalized citizens. The program was likely to have a discriminatory impact on these new citizens.").  And Defendants have many other existing tools for keeping the voter registration rolls up to date.  *See, e.g.*, Tex. Elec. Code Chapters 15 & 16.

Moreover, allowing Defendants to issue notices and remove voters while this litigation is pending threatens not only those individual voters, but also the integrity of the election process and the voter rolls as whole.  Should Plaintiffs ultimately prevail in this matter, at least one and possibly multiple elections will be marred by excluding eligible voters after which Defendants would be required to identify the eligible voters who were purged improperly and reinstate them to the rolls.  On the other hand, if Defendants prevail, it will be a simple matter for them to begin implementing their purge

24

program at that time.  Pending resolution of this motion, the public interest would be better served by preserving the status quo.

## CONCLUSION

Plaintiffs respectfully request that the Court grant a preliminary injunction that:

(1) orders Defendant Whitley to instruct all counties to abstain from taking any actions that would result in the removal of individuals on the basis of the Purge List, including the revised lists sent by the Secretary of State, any substantially similar lists or any lists derived using the same or a substantially similar methodology;

(2) orders Defendant Whitley to take all steps to retract Notices of Examination of Citizenship Letters ("Notices") that have already been sent out on the basis of the Purge List until further notice; and

(3) enjoins Defendant counties from sending Notices to individuals on the basis of the Purge List, including the revised lists sent by the Secretary of State, any substantially similar lists or any lists derived using the same or a substantially similar methodology, or removing any registered voter rolls based on a failure to respond to such notices.

Respectfully submitted,

/s/ *Andre Segura*

Andre Segura (Attorney-in-Charge)

Texas Bar No. 24107112

S.D. Tex. Bar No. 3123385

Thomas Buser-Clancy

Texas Bar No. 24078344

S.D. Tex. Bar No. 1671940

Edgar Saldivar

Texas Bar No. 24038188

S.D. Tex. Bar No. 618958

Brian Klosterboer

Texas Bar No. 24107833

S.D. Tex. Bar No. 3314357

American Civil Liberties Union

Foundation of Texas

P.O. Box 8306

Houston, TX 77288

Telephone: (713) 325-7011

Fax: (713) 942-8966

asegura@aclutx.org

Chiraag Bains** †

Massachusetts Bar No. 673627

Dēmos

740 6th Street NW, 2nd Floor

Washington, DC 20001

Telephone: (202) 864-2746

Stuart C. Naifeh**

California Bar No. 233295

Brenda Wright**

New York Bar No. 1863240

Dēmos

80 Broad Street, 4th Floor

New York, NY 10004

Telephone: (212) 485-6055

Fax: (212) 633-2015

Mimi Marziani**

Texas Bar No. 24091906

Rebecca Harrison Stevens

Texas Bar No. 24065381

Joaquin Gonzalez**

Texas Bar No. 24109935

Texas Civil Rights Project

1405 Montopolis Drive

Austin, TX 78741-3438

Telephone: (512) 474-5073

beth@texascivilrightsproject.org

Jon Greenbaum**

D.C. Bar No. 489887

Ezra D. Rosenberg**

D.C. Bar No. 360927

Brendan B. Downes**

D.C. Bar No. 187888

Lawyers' Committee for Civil Rights

Under Law

1500 K Street NW, Suite 900

Washington, D.C. 20005

Telephone: (202) 662-8600

Fax: (202) 783-0857

Sophia Lin Lakin**

New York Bar No. 5182076

Dale E. Ho**

New York Bar No. 4445326

American Civil Liberties Union

125 Broad Street, 18th Floor

New York, NY 10004

Telephone: (212) 519-7836

Fax: (212) 549-2654

26

** Pro hac vice application forthcoming
† Admitted in Massachusetts, not D.C.;
practice consistent with D.C. App. R.
49(c)(3).

ATTORNEYS FOR PLAINTIFFS


**CERTIFICATE OF SERVICE**

This Court issued summons on the originally named Defendants in this action on

this date of filing.  Plaintiffs' counsel had not yet received, via mail, those summons.

Upon receipt of those summons (and subsequent summons for the newly named

Defendants), Plaintiffs' Counsel will serve the Original Complaint, First Amended

Complaint, this Motion on Defendants, and file with this Court proof of service.

/s/*Andre Segura*
Andre Segura


**CERTIFICATE OF CONFERENCE**

No Defendant has appeared in this action, and therefore Plaintiffs' counsel has not

yet had an opportunity to confer with Defendants' counsel.

/s/*Andre Segura*
Andre Segura

27