UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| MOVE TEXAS CIVIC FUND;<br>JOLT INITIATIVE;<br>LEAGUE OF WOMEN VOTERS<br>OF TEXAS; and NIVIEN SALEH, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 3:19-cv-00041 |
| DAVID WHITLEY, Texas Secretary of<br>State, in his official capacity; KEITH<br>INGRAM, Texas Director of Elections,<br>in his official capacity; CHERYL<br>JOHNSON, Voter Registrar for Galveston<br>County, in her official capacity; PAMELA<br>OHLENDORF, Elections Administrator for<br>Caldwell County, in her official capacity;<br>KIRSTEN SPIES, Tax Assessor and<br>Voter Registrar for Blanco County, in her<br>official capacity; TERRI HEFNER,<br>Elections Administrator for Fayette County,<br>in her official capacity; BETH<br>ROTHERMEL, County Clerk and Voter<br>Registrar for Washington County, in her<br>official capacity; JANET TORRES,<br>District and County Clerk for Hansford<br>County, in her official capacity; Elections<br>Administrator for Harrison County in his<br>or her official capacity; and<br>KAREN NELSON, Elections Administrator<br>for Smith County, in her official capacity. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF CHRISTOPHER CLAY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

My name is Christopher Clay and I declare:

1.      I am over the age of eighteen, and I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

2.      I am a paralegal with the ACLU Foundation of Texas. I work with the attorneys representing the Plaintiffs in the instant case.

3.      Attached hereto as Exhibit 1 is a true and correct copy of a press release issued by the Texas Secretary of State, David Whitley, entitled *Secretary Whitley Issues Advisory On Voter Registration List Maintenance Activity*, which I downloaded from the following web address: https://www.sos.state.tx.us/about/newsreleases/2019/012519.shtml.

4.      Attached hereto as Exhibit 2 is a true and correct copy of an advisory issued by the Texas Secretary of State, David Whitley, entitled *Election Advisory No. 2019-02*, which      I      downloaded      from      the      following      web      address: https://www.sos.state.tx.us/elections/laws/advisory2019-02.shtml.

5.      Attached hereto as Exhibit 3 is a true and correct copy of an article published by the Dallas Morning News entitled *Texas' top election official: About 58,000 non-citizens cast ballots in state elections since 1996*, which I downloaded from the following      web      address:      https://www.dallasnews.com/news/texas-politics/2019/01/25/texas-top-election-official-since-1996-tens-thousands-non-citizens-voted-state-elections.

2

6.     Attached hereto as Exhibit 4 is a true and correct copy of a form as prescribed by the Texas Secretary of State entitled *Notice To Registered Voter For Proof Of Citizenship*, which I downloaded from the following web address: https://www.sos.state.tx.us/elections/forms/bw1-12.pdf.

7.     Attached hereto as Exhibit 5 is a true and correct copy of an annual report published by the Department of Homeland Security, entitled *U.S. Naturalizations: 2017*, which I downloaded from the following web address: https://www.dhs.gov/sites/default/files/publications/Naturalizations_2017.pdf.

8.     Attached hereto as Exhibit 6 is a true and correct copy of an article as published by the Texas Tribune, entitled *"Someone did not do their due diligence." How an attempt to review Texas' voter rolls turned into a debacle*, which I downloaded from the following web address: https://www.texastribune.org/2019/02/01/texas-citizenship-voter-roll-review-how-it-turned-boondoggle/.

9.     Attached hereto as Exhibit 7 is a true and correct copy of an article as published by the Dallas News, entitled *Tens of thousands removed from potential non-citizen voters list after counties find flawed data*, which I downloaded from the following web address: https://www.dallasnews.com/news/texas-politics/2019/01/30/tens-thousands-removed-potential-non-citizen-voters-list-after-counties-find-flawed-data.

10.     Attached as Exhibit 8 is a true and correct copy of an email entitled, *Mass E-mail (VR/EA/V-661) – Additional information pertaining to Advisory 2019-02*, obtained through public information request.

11.     Attached hereto as Exhibit 9 is a true and correct copy of an article as published by the Los Angeles Times, entitled *No, there is no evidence that thousands of noncitizens are illegally voting and swinging elections*, which I downloaded from the following web address: https://www.latimes.com/politics/la-na-pol-noncitizen-voters-20161025-snap-story.html.

12.     Attached hereto as Exhibit 10 is a true and correct copy of an article published by the Houston Chronicle entitled, *Republican look for fraud, find little*, which I downloaded from the following web address: https://www.houstonchronicle.com/news/politics/article/Republicans-look-for-fraud-find-little-3890687.php

13.     Attached hereto as Exhibit 11 is a true and correct copy of an article published by the Houston Chronicle, entitled *County officials removing some names from flagged voter lists*, which I downloaded from the following web address: https://www.chron.com/neighborhood/galveston/news/article/Galveston-County-sends-out-letters-as-part-of-13570592.php.

14.     Attached hereto as Exhibit 12 is a true and correct copy of an article published by the Denver Post entitled, *Gessler asks 4,000 prove eligibility or get off Colorado voter rolls*, which I downloaded from the following web address: https://www.denverpost.com/2012/08/16/gessler-asks-4000-prove-eligibility-or-get-off-colorado-voter-rolls/.

15.     Attached hereto as Exhibit 13 is a true and correct copy of correspondence issued by various civil rights organizations entitled *Letter to SOS Re Advisory* (January

4

28, 2019), which I downloaded from the following web address: https://www.aclutx.org/sites/default/files/letter-to-sos-re-advisory.pdf.

16.    Attached hereto as Exhibit 14 is a true and correct copy of correspondence issued by various civil rights organizations entitled *Re: Independent Duty And Liability Of County Voter Registrars Notwithstanding Election Advisory No. 2019-02, Dated January 25, 2019* (January 28, 2019), which I downloaded from the following web address: https://www.aclutx.org/sites/default/files/letter-to-counties-re-sos-advisory.pdf.

17.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of February, 2019, in Houston, Texas.

Christopher Clay

5

# Exhibit 1



Election Outlook: Texas Secretary of State Reminds Texans To Plan Their Trip To The Polls  |  More about Identification Requirements for Voting  |  Am I Registered to Vote?  |  Election Night Returns  |  Voter Information  |  Voting Issues for Texas Harvey Evacuees  |  2018 Texas Election Security Update

Note - Navigational menus along with other non-content related elements have been removed for your convenience. Thank you for visiting us online.

# Secretary Whitley Issues Advisory On Voter Registration List Maintenance Activity

### "Integrity and efficiency of elections in Texas require accuracy of our state's voter rolls"

Like 1.1K        Tweet    G+        Share 55

Janauary 25, 2019
Contact: **Sam Taylor**
512-463-6116

**AUSTIN** – Texas Secretary of State David Whitley today issued an advisory to county voter registrars regarding voter registration list maintenance activities, which include identifying any non-U.S. citizens registered to vote in the State of Texas. For the past year, the Texas Secretary of State's office has worked closely with the Texas Department of Public Safety (DPS) to evaluate information regarding persons identified to not be citizens of the United States. This voter registration list maintenance activity is being conducted in accordance with federal and state law to ensure that only qualified voters - who must first and foremost be U.S. citizens - are registered to vote in Texas elections.

Through this evaluation, the Texas Secretary of State's office discovered that a total of approximately **95,000** individuals identified by DPS as non-U.S. citizens have a matching voter registration record in Texas, approximately **58,000** of whom have voted in one or more Texas elections. Voting in an election in which the person knows he or she is not eligible to vote is a second-degree felony in the State of Texas. Upon receipt of this information, the Texas Secretary of State's office immediately provided the data in its possession to the Texas Attorney General's office, as the Secretary of State has no statutory enforcement authority to investigate or prosecute alleged illegal activity in connection with an election.

Secretary Whitley issued the following statement:

"Integrity and efficiency of elections in Texas require accuracy of our state's voter rolls, and my office is committed to using all available tools under the law to maintain an accurate list of registered voters. Our agency has provided extensive training opportunities to county voter registrars so that they can properly perform list maintenance activities in accordance with federal and state law, which affords every registered voter the chance to submit proof of eligibility. I would like to thank the Department of Public Safety for providing us with this valuable information so that we can continue to guarantee the right to vote for all eligible Texas voters, who should not have their voices muted by those who abuse the system."

Going forward, the Texas Secretary of State's office will use information it obtains from DPS on a monthly basis to cross-reference with Texas' statewide voter registration database and match potential non-U.S. citizens who have registered to vote. Once a voter registration is identified as a match, the Texas Secretary of State's office will notify the county in which the person is registered so that the county voter registrar can take action.

The following combinations of matches between information in DPS-provided data and the statewide voter registration database are used to identify possible non-U.S. citizens registered to vote:

- Last Name, First Name, and Full Social Security Number;
- Last Name, First Name, and DPS-issued Driver License, Personal Identification Card, or Election Identification Certificate Number; or
- Last Name, First Name, Last Four Digits of Social Security Number, and Date of Birth

If a registered voter is identified as a non-U.S. citizen, he or she should receive a Notice of Examination (PDF) from the county voter registrar indicating that his or her registration status is being examined on the grounds that he or she is not a U.S. citizen. The registered voter will then be required to provide proof of citizenship in order to stay registered, which may be done by submitting to the voter registrar a copy of one of the following documents:

- A certified copy of the voter's birth certificate
- United States passport; or
- Certificate of naturalization (Citizenship certificate)

If the person responds indicating he or she is not a U.S. citizen, or fails to respond to the Notice within 30 days, then the voter registration will be cancelled by the county voter registrar. County voter registrars have been provided with numerous training opportunities to ensure that list maintenance activities are conducted in accordance with state and federal law so as to not affect eligible voters.

Texas voters who wish to check their registration status can visit the Texas Secretary of State's "Am I Registered?" tool online or contact the voter registrar in their county of registration.

###

# Exhibit 2

Use of Non-U.S. Citizen Data obtained from the Department of Public Safety                Page 1 of 4

**TEXAS SECRETARY OF STATE**

**DAVID WHITLEY**

**Election Outlook:** Texas Secretary of State Reminds Texans To Plan Their Trip To The Polls  |  More about Identification Requirements for Voting  |  Am I Registered to Vote?  |  Election Night Returns  |  Voter Information  |  Voting Issues for Texas Harvey Evacuees  |  2018 Texas Election Security Update

Note - Navigational menus along with other non-content related elements have been removed for your convenience. Thank you for visiting us online.

# Election Advisory No. 2019-02

**To:**     Voter Registrars/Elections Administrators

**From:** Keith Ingram, Director of Elections

**Date:** January 25, 2019

**RE:**     Use of Non-U.S. Citizen Data obtained from the Department
of Public Safety

Pursuant to Section 730.005, Transportation Code, personal information obtained by the Department of Public Safety (DPS) in connection with a motor vehicle record shall be disclosed and used for any matter of voter registration or the administration of elections by the secretary of state. The secretary of state has been working with DPS to obtain and use information regarding individuals who provided documentation to DPS showing that the person is not a citizen of the United States during the process of obtaining or acquiring a Texas Driver License or Personal Identification Card from DPS. The initial set of information provided by DPS is being compared to the voter registration rolls, and we are providing information relating to matches out to counties beginning tomorrow.

**Background**: Beginning in early March 2018, our office began working with DPS to review and refine the data able to be provided by DPS for use in this list maintenance process. The goal was to produce actionable information voter registrars could use to assist in their list maintenance responsibilities. In keeping with general guidelines set out under Section 18.0681, Election Code, our office sought to create the strongest matching criteria that produces the least possible impact on eligible Texas voters while fulfilling the responsibility to manage the voter rolls. To that end, our office and DPS spent time evaluating the data and refining the query to limit the information being provided to us for use in this list maintenance exercise to individuals who provided valid documents indicating the person is not a citizen of the United States at the time the person obtained a Driver License or Personal Identification Card. It is important to note that we are not using information self-reported by the person regarding their citizenship status; rather, we are using documents provided by the person to show they are lawfully present in the United States. As part of the processing for issuing a card, these documents would have been validated by DPS against the Systematic Alien Verification for Entitlements (SAVE) Database, which is administered by the U.S. Citizenship and Immigration Services, a component of the Department of Homeland Security. Once a person's document is validated through SAVE and a card is

issued, then the individual's information will be provided to our office in the next data file to be supplied. Our office has obtained the preliminary data file for all current (unexpired) Driver License and Personal Identification cards that meet this criteria, and we will run that set of information tomorrow evening. After that initial data set has been run, DPS will provide information to our office on a monthly basis of individuals obtaining a Driver License of Personal Identification card since the last data file has been provided. We will run those as they are received by our office.

There is likely to be a law enforcement interest in the data that we are providing to you. If you receive any requests from the public for the information, please contact your local prosecutor and the attorney general, who have jurisdiction over such matters.

**Impact of Data being obtained:** It should be noted that the additional source of data being obtained from DPS does not change or modify the voter registrar's rights or responsibilities under Section 16.033, Election Code. The voter registrar has the right to use any lawful means to investigate whether a registered voter is currently eligible for registration in the county. This section **does not** authorize an investigation of eligibility that is based solely on residence. If the registrar **has reason to believe** that a voter is no longer eligible for registration, the registrar shall deliver written notice to the voter indicating that the voter's registration status is being investigated by the registrar. The notice shall be delivered by **forwardable mail to the mailing address** on the voter's registration application **and to any new address** of the voter known to the registrar. If the secretary of state has adopted or recommended a form for a written notice, the registrar must use that form. The obtaining of information from DPS and providing matching data to the voter registrar merely expands the resources available to the registrar for use in list maintenance. The registrar, ultimately, is responsible for determining whether or not the information provides the registrar with reason to believe the person is no longer eligible for registration. If the registrar determines this standard has been met, the registrar should send a Notice of Examination for Citizenship (Proof of Citizenship) (PDF) Letter.

**Matching Information:** This DPS non-U.S. Citizen data is matched against the TEAM system, and information will be provided to counties if/when a match is identified between the DPS data and a registered voter in the county. Records are identified as Possible Non U.S. Citizens when one of the following combinations matches between a voter record and the DPS data:

- Last Name (including Former Last Name on the Voter Record), First Name, and Full Social Security Number (SSN) (9 digits);
- Last Name (including Former Last Name on the Voter Record), First Name, and Texas Department of Public Safety (DPS)-Issued Driver License, Personal Identification Card, or Election Identification Certificate Number; or
- Last Name (including Former Last Name on the Voter Record), First Name, Last Four Digits of the SSN, and Date of Birth.

These are some of the strongest possible matching criteria used in TEAM and are the current matching criteria used when determining whether or not to transfer a voter to an Offline County when the Offline County submits a new registration application. A match to a new voter registration application submitted by an Offline County to an existing voter using the above listed criteria will result in the transfer of the voter record. The point of this is to emphasize that our goal was to produce actionable information for voter registrars while producing the least possible impact on eligible voters, meaning we believe the data we are providing can be acted on in nearly all circumstances.

All records submitted through this process will need to be treated as WEAK matches, meaning that the county may choose to investigate the voter, pursuant to Section 16.033, Election Code, or take no action on the voter record if the voter registrar determines that there is no reason to believe the voter is ineligible. The county **may not cancel** a voter based on the information provided without first sending a Notice of Examination (Proof of Citizenship Letter) (PDF) and following the process outlined in the letter. In order to help counties make a determination regarding whether or not to send a Notice of Examination or close the task without taking further action, information provided by DPS will be provided to each county for further review and comparison against the voter record.

**Workflow for Possible Non-U.S. Citizen Investigation:** Again, counties are **not** permitted, under current Texas law, to immediately cancel the voter as a result of any non-U.S. Citizen matching information provided. This is applicable to notifications received from jury summons responses, as well as the dataset discussed in this advisory: possible non-U.S. Citizen notifications coming from DPS.

- For matching notifications coming from Jury Summons response devices, the county **must** send the voter a Proof of Citizenship Letter (Notice of Examination).
- For the matching notifications originating from DPS data, the county user has the choice to either:
  1. Send a Proof of Citizenship Letter (Notice of Examination) to the voter; thereby starting the 30-day countdown clock before cancellation, or
  2. Take no action on the voter record and simply close the task as RESOLVED.

A voter may only be cancelled based on possible non-U.S. Citizen matching information if a Proof of Citizenship Letter (Notice of Examination) (PDF) was sent to the voter **and**:

1. The voter responded to the Notice in under 30 days indicating the voter is **not** in fact a U.S. Citizen (you would cancel for not being a citizen – Cancel Reason: Non U.S. Citizen);
2. The voter failed to respond to the Notice within 30 days and is being cancelled for failure to respond to the notice (Cancel Reason: Failure to respond to Notice of Investigation); **or**
3. The notice was mailed and returned as undeliverable to the registrar with no forwarding information available (Cancel Reason: Failure to respond to Notice of Investigation).

To aid in this process, new Dashboard options will be available within the Possible Non U.S. Citizen Dashboard task and a new Event Type has been developed for Offline counties. We are not able to leverage the current Non U.S. Citizen Notification task, which is currently created when a match identifies a voter having responded to a jury summons that he/she is not a United States citizen. We cannot use the current Dashboard line item task/event type because counties are required (by current law) to investigate those records identified as a response to the jury summons response device under the current process. Counties are not, however, required (by current law) to investigate the new DPS data matches if they do not believe that a voter is ineligible to vote. However, our office will provide the data obtained from DPS in order to allow counties all the information necessary to make the determination regarding whether or not to investigate the voter.

**Response needed from the voter:** Once a Notice of Examination for Citizenship (Proof of Citizenship) Letter (PDF) has been issued to a voter, the voter is required to provide proof of citizenship as outlined under Section 16.0332, Election Code. This includes:

- A certified copy of the voter's birth certificate,

- United States passport, or
- Certificate of naturalization

A copy of one of these documents (including a copy of the passport) being returned to the registrar is sufficient to meet the proof requirement. The registrar is required to retain a copy of the notice mailed and any proof of citizenship received by the voter. If the voter comes in person and provides proof, then the registrar should make a copy of the document provided and retain it, along with a copy of the notice that was mailed, with the application file for the voter.

For more information, please contact the Elections Division at 1-800-252-VOTE(8683).

KI:BS

# Exhibit 3

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 15 of 80

2/3/2019          Texas' top election official: About 58,000 non-citizens cast ballots in state elections since 1996 | Texas Politics | Dallas News



≡ ALL SECTIONS

Pro Football Hall of Fame
**Gil Brandt, scouting innovator for Tom Landry's Dallas Cowboys, chosen for 2019 class**

TEXAS POLITICS   JAN 25



*Robert T. Garrett, Austin Bureau chief*

Don't miss a story. Like us on Facebook.   [ Like 437K ]

*Updated at 7:55 p.m.:* *Revised to include additional information from a Secretary of State advisory*

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 16 of 80

2/3/2019          Texas' top election official: About 58,000 non-citizens cast ballots in state elections since 1996 | Texas Politics | Dallas News



ADVERTISEMENT

AUSTIN -- About 58,000 non-U.S. citizens who were legally in the country voted in one or more elections over a 22-year period, Texas Secretary of State David Whitley's office said Friday.

The information was gleaned from Texas Department of Public Safety records of non-citizens with green cards or work visas who obtained driver's licenses and then registered to vote. Though critics said they could have become citizens before they voted -- and before driver's licenses expired -- Whitley expressed confidence in his findings.

ADVERTISING

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 17 of 80

2/3/2019                    Texas' top election official: About 58,000 non-citizens cast ballots in state elections since 1996 | Texas Politics | Dallas News

To a chorus of praise from Republican leaders such as Attorney General Ken Paxton, Whitley announced his office would ramp up an effort to ensure "accuracy" of voter rolls.

But a civil rights group and the top lawyer for the Democratic Party warned that Whitley and the state GOP were trying to alarm citizens with questionable statistics. They predicted Whitley and state leaders would soon conduct an unfair purge of legitimately registered voters.

Sam Taylor, a spokesman for Whitley, though, insisted that "we laid out the process and our methodology very clearly. ... This is all being done in accordance with both state and federal law."

Whitley said in a written statement that "approximately 95,000 individuals identified by [the Department of Public Safety] have a matching voter registration record in Texas, approximately 58,000 of whom have voted in one or more Texas elections."

Texas currently has about 15.8 million registered voters.

However, in an advisory to election administrators and voter registrars on Friday, the secretary of state's director of elections said that 95,000 non-citizens with matching voter registrations should be considered "WEAK" matches. The advisory used all capital letters.

Taylor said non-citizens who show they are lawfully present by providing DPS with work visas and green cards, may obtain driver's licenses and state-issued IDs.

ADVERTISING



Replay

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 18 of 80

2/3/2019          Texas' top election official: About 58,000 non-citizens cast ballots in state elections since 1996 | Texas Politics | Dallas News

Whitley, a former top aide to Gov. Greg Abbott, said he would work closely with DPS and county voter registrars to help them "properly perform" maintenance of voter lists.

He thanked DPS for working with his office over the past year to match a list of non-citizens who have driver's licenses with voter-registration records.

The secretary of state's news release did not specify exactly the years in which the questionable voting occurred.

"The dates in which the [58,000] voted range from 1996-2018," Taylor said in an email.

"We didn't perform any analysis other than the number registered and the number who had voting history," he said, declining to release documentation. Taylor invited a reporter to file an open-records request.

Keith Ingram, the director of elections, said in the advisory to elections officials that in early March 2018, his office began working with DPS to review and refine the data DPS could provide to perform maintenance of voter rolls.

"The goal was to produce actionable information voter registrars could use to assist in their list maintenance responsibilities," Ingram said in the memo.

For those "weak" matches, Ingram said the counties could choose to investigate the voter or take no action if the registrar determined there was no reason to believe the voter was ineligible.

 **Michael Q Sullivan**
@MQSullivan

Texas' Attorney General @KenPaxtonTX says 95,000 non-citizens are registered to vote in the Lone Star State, and that 58,000 of them have voted in at least one election.

34   2:51 PM - Jan 25, 2019

53 people are talking about this

DPS spokeswoman Katherine Cesinger did not immediately respond to a request for comment.

Beth Stevens of the Texas Civil Rights Project said people identified by the analysis could have become

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 19 of 80

2/3/2019          Texas' top election official: About 58,000 non-citizens cast ballots in state elections since 1996 | Texas Politics | Dallas News

In a tweeted statement, Stevens said Whitley's failure to provide a full disclosure of his methodology raises suspicions.

Whitley, who noted that a person who knowingly votes in an election while ineligible commits a second-degree felony, said lawful voters "should not have their voices muted by those who abuse the system."



Lawful voters "should not have their voices muted by those who abuse the system.," says Texas Secretary of State David Whitley. (Ashley Landis/Staff Photographer)

In a statement also issued Friday afternoon, Paxton, the attorney general, stressed that he has authority to prosecute election crimes, and promised his office would work "to solidify trust" in state elections.

"Every single instance of illegal voting threatens democracy in our state and deprives individual Texans of their voice," Paxton said.

Stevens, though, accused Paxton of "using alarmist language that is clearly intended to advance a false political narrative to further restrict access to the ballot box."

Case 3:19-cv-00041    Document 10-1    Filed in TXSD on 02/06/19    Page 20 of 80

2/3/2019          Texas' top election official: About 58,000 non-citizens cast ballots in state elections since 1996 | Texas Politics | Dallas News

The announcement today by the Secretary of State is concerning, but unfortunately similar to efforts around the country to remove eligible voters from the rolls. The Secretary's failure to fully disclose the methodology used to create his list is suspect. Notably, Texas has one of the largest rates of naturalization in the United States, with about 50,000 Texas residents becoming naturalized citizens each year. Whether the status of the persons on the Secretary's list has been

General tweeted about this announcement using alarmist language that is clearly intended to advance a false political narrative to further restrict access to the ballot box. Unfortunately,

The Secretary's actions threaten to result in tens of thousands of eligible naturalized immigrant voters being removed from the roles, most likely those with the least resources to comply with the demand to show papers.



**Texas Civil Rights Project**
@TXCivilRights

Here is our response to the @TXsecofstate's announcement today and the subsequent fanning of the flames by the @TXAG with alarmist language. Their actions threaten to remove thousands of potentially eligible voters from the roles.

49   4:09 PM - Jan 25, 2019

48 people are talking about this

Houston election lawyer Chad Dunn, general counsel to the state Democratic Party, said in an interview that testimony in a long-running lawsuit over the state's voter-ID law showed that the DPS and secretary of state's "databases are such a mess that they couldn't tell anything meaningful from them."

There is no list of U.S. citizens and access is very tightly controlled to the closest approximation of that -- a federal database of Social Security numbers, Dunn said.



**Scott Braddock**
@scottbraddock

The AG, the Texas GOP, and right wing enforcement groups sent press releases about "voter fraud" before or just as the Texas Secretary of State. Seems legit #txlege

51   3:37 PM - Jan 25, 2019

35 people are talking about this

"There's no method to reach their conclusion," he said of DPS and Whitley.

"What it looks like to me is they're setting up a process for purging voters," which will be aimed at voters who lean Democratic, he said.

Matt Angle, a Democratic strategist in North Texas, said if the voter rolls have problems, it's the Republicans' fault.

They "have controlled voter registration in Texas for two decades. Any problems with the rolls are a result of their incompetence," said Angle. "Assuming some non-citizens are mistakenly on the registration rolls, there is no evidence of a meaningful number of non-citizens voting."

Dallas Democratic Rep. Rafael Anchia, who is chairman of the Mexican American Legislative Conference, said he wants to "see the evidence first" before Whitley ramps up his list maintenance.

"Because we have consistently seen Texas politicians conjure the specter of voter fraud as pretext to suppress legitimate votes, we are naturally skeptical," Anchia said in a written statement.

IN THIS COLLECTION...

## What you need to know about Texas' list of non-citizen voters

**Abbott sticks by flawed list of non-citizen voters in Texas, says review should continue**

**Tens of thousands removed from potential non-citizen voters list after counties find flawed data**

**Some names in list of 98,000 potential non-citizen voters included 'in error,' county officials say, citing state**

*See all 5 Stories →*

## MORE FROM DALLAS NEWS

- Carjacker tells Midlothian driver he's 'going to heaven,' so he grabs his own gun and says 'Let's go!'

- Texas child molester who stomped baby's head in wants to fast-track his execution

- Ricky Williams' ex-wife says imprisoned financial adviser stole former Longhorn's fortune: 'All of it'

- Plano man who impregnated 11-year-old gets 60-year prison sentence

# Exhibit 4

Prescribed by Secretary of State
Sections 16.033; 16.0332, Texas Election Code; Sections 521.044, 730.005, Texas Transportation Code; Section 62.114, Texas
Government Code
BW1-12, 12/2018

## NOTICE TO REGISTERED VOTER FOR PROOF OF CITIZENSHIP
*Aviso solicitando comprobante de ciudadanía*

My office has received information concerning your registration to vote. Your registration status is being investigated because there is reason to believe you may not be a United States citizen. This information may have been provided by clerks of the court regarding individuals who were excused or disqualified from jury duty because they are not U.S. citizens and/or the Department of Public Safety ("DPS") for individuals possessing a Driver License or Personal Identification Card who DPS has identified are not citizens of the United States and/or other information derived through lawful means. You are now required to confirm your eligibility for registration by providing proof of citizenship to maintain your registration status. Proof of citizenship must be in a certified form of birth certificate, passport, or citizenship papers. If you fail to provide this proof of citizenship within 30 days from the date of this letter, your voter registration will be cancelled.

Mi oficina ha recibido información en cuanto su inscripción electoral. Estamos investigando su elegibilidad para inscripción en base a que hay causa de dudar su ciudadanía estadounidense. Esta información podría venir bien sea de los oficinistas de la corte a través de la lista de personas disculpadas o descalificadas de prestar servicio como miembro de un jurado debido a que tales personas no son ciudadanos estadounidenses y/o del Departamento de Seguridad Pública ("DPS") en cuanto a personas en posesión de una licencia de conducir o tarjeta de identidad personal quienes DPS ha identificado como no-ciudadanos de los Estados Unidos y/u otra información derivada por medios legales. Ahora se requiere que usted confirme su elegibilidad para inscripción al proveer un comprobante de su ciudadanía para mantener su estado de inscripción. Comprobantes de ciudadanía deben ser o un acta de nacimiento certificada, pasaporte certificado, o documentos de ciudadanía certificados. Si no presenta dicho comprobante de ciudadanía estadounidense dentro de un plazo de 30 días a partir de la fecha de este aviso, su inscripción electoral será cancelada.

_____          _____

Signature of Voter Registrar                                           Date
*Firma del Registrador de Votantes*                              *Fecha*

# Exhibit 5

Annual Flow Report

AUGUST 2018

# U.S. Naturalizations: 2017

**JOHN TEKE**

The naturalization process confers U.S. citizenship upon foreign nationals who have fulfilled the requirements established by Congress in the Immigration and Nationality Act (INA). After naturalization, foreign-born citizens enjoy nearly all the same benefits, rights, and responsibilities the Constitution protects for native-born U.S. citizens, including the right to vote. This Office of Immigration Statistics (OIS) *Annual Flow Report* presents information on the number and characteristics of foreign nationals aged 18 years and over who naturalized during 2017.[1,2]

## SUMMARY

A total of 707,265 persons naturalized in 2017, down 6.1 percent from 2016 (Table 1). The leading countries of birth of new citizens were Mexico (118,559), India (50,802), the People's Republic of China (37,674), the Philippines (36,828), and the Dominican Republic (29,734). The largest number of persons naturalizing lived in California (157,364), New York (86,407), and Florida (69,485) (Table 2).

## TRENDS AND CHARACTERISTICS OF PERSONS NATURALIZING

The number of U.S. naturalizations fell to 707,265 persons in 2017, down 6.1 percent from 753,060 in 2016 and down 3.1 percent from 730,259 in 2015 (Figure 1).[3] Meanwhile, the number of applications for citizenship increased from 972,151 in 2016 to 986,851 in 2017 (1.5 percent). The number of applications exceeds the number of naturalizations because of the lag in processing applications and because 11.8 percent of applications adjudicated in 2017 were denied (Figure 2).[4]

[1] In this report, "years" refer to U.S. fiscal years, which run from October 1 to September 30. For example, fiscal year 2017 began on October 1, 2016, and ended on September 30, 2017.

[2] This annual flow report does not include children acquiring citizenship based upon the citizenship status of a parent. The child of a U.S. citizen parent may acquire U.S. citizenship through his/her parent and is not required to file an application for naturalization. Therefore, the number of naturalized persons presented in this report, obtained from N-400 records, may not represent a complete count of persons who obtained citizenship status during the reporting year.

[3] Naturalization numbers reflect changes in the numbers of naturalization applications received, as well as the number processed, which may be affected by applications pending from previous years and available resources. As a result, caution should be exercised in drawing conclusions from these data about trends in the underlying demand to naturalize. Average naturalization totals over a period of years provide a more accurate indication of long-term trends in naturalization.

[4] See also Table 20: Applications for Naturalization Filed, Persons Naturalized, and Applications for Naturalization Denied in the 2017 Yearbook of Immigration Statistics.

## Historical Trend

The average number of persons naturalizing increased from less than 120,000 per year during the 1950s and 1960s to 210,000 during the 1980s, 500,000 during the 1990s, and to 680,000 between 2000 and 2009. Since 2010, the average annual number of naturalizations has increased to over 712,000 (Figure 1). Overall, naturalizations have gradually increased over time; however, in recent decades, year-to-year numbers have varied due to naturalization spikes around election years, fee increases, legislative changes, and other factors.



**Figure 1.**

**Persons Naturalized: Fiscal Years 1907 – 2017**

Source: U.S. Department of Homeland Security.



**Homeland Security**

Office of Immigration Statistics
OFFICE OF STRATEGY, POLICY & PLANS

## Region and Leading Countries of Birth

Until the 1970s, the majority of persons naturalizing were born in European countries. With increased legal immigration from Asian countries following the 1965 amendments to the INA, the arrival of Indochinese refugees in the 1970s, and a pattern of higher than average naturalization rates among Asian immigrants, Asia has been the leading region of origin of new citizens in most years since that time (Figure 3). However, Mexico has consistently maintained its position in the last several decades as the leading country of origin.

Thirty-seven percent of persons naturalizing in 2017 were born in North America, followed by 36 percent born in Asia, and 9.2 percent born in Europe (Table 1). Mexico was the leading country of birth for persons naturalizing in 2017 (17 percent of the total), followed by India (7.2 percent), the People's Republic of China (5.3 percent), the Philippines (5.2 percent), and the Dominican Republic (4.2 percent). The ten countries with the largest number of naturalizations accounted for 52 percent of all naturalizing citizens in 2017, a three percentage point increase from 2016.

From 2016 to 2017, the number of naturalizations decreased among immigrants from every region. North American naturalizations decreased by the smallest proportion, at just 0.6 percent; but this region-wide number reflected a mixed pattern, with Mexican naturalizations increasing by 14 percent and Caribbean naturalizations decreasing by 12 percent. This pattern partly reflects a reversion to the mean as Mexican naturalizations fell two percent and Caribbean naturalizations increased 13 percent between 2015 and 2016.

The largest numeric increase in naturalizations occurred among immigrants born in Mexico (increase of 15,009 naturalizations), India (4,614), the People's Republic of China (1,880), and South Korea (296). Mexico (14 percent), India (10 percent), and the People's Republic of China (5.3 percent) were also the countries of birth with the largest proportional increases in naturalizations in 2017. With two consecutive years of decline from 14,900 in 2015 to 12,000 in 2016, Iraq had seen a 19 percent decline in naturalizations – a trend which continued with a 35 percent decrease in naturalizations to 7,875 in 2017.

**Table 1.**

**Persons Naturalized by Region and Country of Birth: Fiscal Years 2015 to 2017**

(Countries ranked by 2017 persons naturalized)

| Region and country of birth | 2017 | | 2016 | | 2015 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **REGION** | | | | | | |
| Total . . . . . . . . . . . . . | 707,265 | 100.0 | 753,060 | 100.0 | 730,259 | 100.0 |
| Africa . . . . . . . . . . . . . | 61,851 | 8.7 | 72,338 | 9.6 | 71,492 | 9.8 |
| Asia . . . . . . . . . . . . . . | 255,306 | 36.1 | 271,733 | 36.1 | 261,374 | 35.8 |
| Europe . . . . . . . . . . . . | 65,141 | 9.2 | 74,344 | 9.9 | 78,074 | 10.7 |
| North America . . . . . . . . | 258,371 | 36.5 | 259,845 | 34.5 | 247,492 | 33.9 |
| Caribbean . . . . . . . . . | 92,540 | 13.1 | 105,204 | 14.0 | 92,807 | 12.7 |
| Central America . . . . . | 39,359 | 5.6 | 41,649 | 5.5 | 39,160 | 5.4 |
| Other North America . . | 126,472 | 17.9 | 112,992 | 15.0 | 115,525 | 15.8 |
| Oceania . . . . . . . . . . . . | 3,327 | 0.5 | 3,953 | 0.5 | 3,811 | 0.5 |
| South America . . . . . . . . | 63,063 | 8.9 | 70,821 | 9.4 | 67,927 | 9.3 |
| Unknown . . . . . . . . . . . | 206 | — | 26 | — | 89 | — |
| **COUNTRY** | | | | | | |
| Total . . . . . . . . . . . . . | 707,265 | 100.0 | 753,060 | 100.0 | 730,259 | 100.0 |
| Mexico . . . . . . . . . . . . | 118,559 | 16.8 | 103,550 | 13.8 | 105,958 | 14.5 |
| India . . . . . . . . . . . . . | 50,802 | 7.2 | 46,188 | 6.1 | 42,213 | 5.8 |
| China, People's Republic | 37,674 | 5.3 | 35,794 | 4.8 | 31,241 | 4.3 |
| Philippines . . . . . . . . . | 36,828 | 5.2 | 41,285 | 5.5 | 40,815 | 5.6 |
| Dominican Republic . . . . | 29,734 | 4.2 | 31,320 | 4.2 | 26,665 | 3.7 |
| Cuba . . . . . . . . . . . . . | 25,961 | 3.7 | 32,101 | 4.3 | 25,770 | 3.5 |
| Vietnam . . . . . . . . . . . | 19,323 | 2.7 | 24,848 | 3.3 | 21,976 | 3.0 |
| El Salvador . . . . . . . . . | 16,941 | 2.4 | 17,213 | 2.3 | 16,930 | 2.3 |
| Colombia . . . . . . . . . . | 16,184 | 2.3 | 18,601 | 2.5 | 17,207 | 2.4 |
| Jamaica . . . . . . . . . . . | 15,087 | 2.1 | 16,772 | 2.2 | 16,566 | 2.3 |
| Korea, South . . . . . . . . | 14,643 | 2.1 | 14,347 | 1.9 | 14,230 | 1.9 |
| Haiti . . . . . . . . . . . . . | 12,794 | 1.8 | 15,276 | 2.0 | 14,053 | 1.9 |
| Pakistan . . . . . . . . . . . | 10,166 | 1.4 | 11,729 | 1.6 | 11,912 | 1.6 |
| Peru . . . . . . . . . . . . . | 10,014 | 1.4 | 11,319 | 1.5 | 10,701 | 1.5 |
| Brazil . . . . . . . . . . . . . | 9,701 | 1.4 | 10,268 | 1.4 | 10,516 | 1.4 |
| Guatemala . . . . . . . . . . | 9,131 | 1.3 | 9,764 | 1.3 | 9,344 | 1.3 |
| United Kingdom . . . . . . . | 9,049 | 1.3 | 9,562 | 1.3 | 10,095 | 1.4 |
| Bangladesh . . . . . . . . . | 8,629 | 1.2 | 9,949 | 1.3 | 9,750 | 1.3 |
| Iran . . . . . . . . . . . . . . | 8,324 | 1.2 | 9,507 | 1.3 | 10,344 | 1.4 |
| Iraq . . . . . . . . . . . . . . | 7,875 | 1.1 | 12,130 | 1.6 | 14,899 | 2.0 |
| All other countries . . . . . | 239,846 | 33.9 | 271,537 | 36.1 | 269,074 | 36.8 |

— Figure rounds to 0.0.

Source: U.S. Department of Homeland Security.

**Table 2.**

**Persons Naturalized by State of Residence: Fiscal Years 2015 to 2017**

(States ranked by 2017 persons naturalized)

| State of residence | 2017 | | 2016 | | 2015 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total . . . . . . . . . . . . . | 707,265 | 100.0 | 753,060 | 100.0 | 730,259 | 100.0 |
| California . . . . . . . . . . . | 157,364 | 22.2 | 151,830 | 20.2 | 155,979 | 21.4 |
| New York . . . . . . . . . . . | 86,407 | 12.2 | 93,376 | 12.4 | 90,368 | 12.4 |
| Florida . . . . . . . . . . . . . | 69,485 | 9.8 | 88,764 | 11.8 | 81,960 | 11.2 |
| Texas . . . . . . . . . . . . . | 50,552 | 7.1 | 63,945 | 8.5 | 65,467 | 9.0 |
| New Jersey . . . . . . . . . | 38,611 | 5.5 | 40,344 | 5.4 | 34,857 | 4.8 |
| Massachusetts . . . . . . . | 27,739 | 3.9 | 24,577 | 3.3 | 23,554 | 3.2 |
| Illinois . . . . . . . . . . . . . | 24,933 | 3.5 | 26,003 | 3.5 | 25,722 | 3.5 |
| Virginia . . . . . . . . . . . . | 21,930 | 3.1 | 20,437 | 2.7 | 18,391 | 2.5 |
| Maryland . . . . . . . . . . . | 17,729 | 2.5 | 19,775 | 2.6 | 18,390 | 2.5 |
| Georgia . . . . . . . . . . . . | 16,461 | 2.3 | 18,866 | 2.5 | 20,794 | 2.8 |
| Washington . . . . . . . . . | 16,030 | 2.3 | 21,655 | 2.9 | 14,341 | 2.0 |
| Other* . . . . . . . . . . . . . | 180,024 | 25.5 | 183,488 | 24.4 | 180,436 | 24.7 |

*Includes unknown, U.S. territories, and armed forces posts.

Source: U.S. Department of Homeland Security.



**Figure 2.**

**Applications for Citizenship Processed: Fiscal Year 2017**

- Applications Approved (Civilian Naturalizations)
- Applications Approved (Military Naturalizations)
- Applications Approved (Military Status Not Reported)
- Applications Denied
- Applications Not Processed

Source: U.S. Department of Homeland Security.



**Figure 3.**

**Percent Total of Persons Naturalized per Year by Region: Fiscal Years 2008–2017**

Africa | Asia | Europe | North America | Oceania | South America

Note: Oceania has an average value of 0.5% over the last 10-year period.
Source: U.S. Department of Homeland Security.

## Leading States and Metropolitan Areas of Residence

In 2017, 72 percent of all persons naturalizing resided in 10 states (Table 2). With 157,364 persons, California was home to the largest number of persons naturalizing, representing 22 percent of the total, followed by New York with 86,407 persons (12 percent) and Florida with 69,485 persons (9.8 percent) (Figure 4).

Fifty-one percent of all new citizens in 2017 lived in 10 metropolitan areas (Table 3).[5] The leading metropolitan areas of residence were New York-Newark-Jersey City, NY-NJ-PA having 112,568 persons (16 percent of the total); Los Angeles-Long Beach-Anaheim, CA with 59,356 persons (8.4 percent); and Miami-Fort Lauderdale-West Palm Beach, FL with 44,520 persons (6.3 percent).

[5] The most current Core Based Statistical Area (CBSA) definitions are available from OMB at https://obamawhitehouse.archives.gov/sites/default/files/omb/bulletins/2013/b13-01.pdf.



**Figure 4.**

**Persons Naturalized by State of Residence: Fiscal Year 2017**

Persons Naturalized
- 0–5,000
- 5,001–10,000
- 10,001–25,000
- 25,001–60,000
- 60,001–158,000

Source: U.S. Department of Homeland Security.

**Table 3.**

**Persons Naturalized by Core Based Statistical Area (CBSA) of Residence: Fiscal Years 2015 to 2017**

(CBSAs ranked by 2017 persons naturalized)

| Metropolitan area of residence | 2017 | | 2016 | | 2015 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total................................................. | 707,265 | 100.0 | 753,060 | 100.0 | 730,259 | 100.0 |
| New York-Newark-Jersey City, NY-NJ-PA .................... | 112,568 | 15.9 | 122,156 | 16.2 | 113,758 | 15.6 |
| Los Angeles-Long Beach-Anaheim, CA ...................... | 59,356 | 8.4 | 61,950 | 8.2 | 69,017 | 9.5 |
| Miami-Fort Lauderdale-West Palm Beach, FL................. | 44,520 | 6.3 | 59,227 | 7.9 | 53,448 | 7.3 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV............. | 29,682 | 4.2 | 29,138 | 3.9 | 27,084 | 3.7 |
| Chicago-Naperville-Elgin, IL-IN-WI ........................ | 23,044 | 3.3 | 24,907 | 3.3 | 24,201 | 3.3 |
| Boston-Cambridge-Newton, MA-NH........................ | 22,002 | 3.1 | 19,690 | 2.6 | 18,385 | 2.5 |
| San Francisco-Oakland-Hayward, CA....................... | 21,352 | 3.0 | 23,261 | 3.1 | 20,620 | 2.8 |
| Riverside-San Bernardino-Ontario, CA...................... | 16,748 | 2.4 | 12,113 | 1.6 | 13,695 | 1.9 |
| San Diego-Carlsbad, CA ................................ | 16,638 | 2.4 | 14,764 | 2.0 | 14,189 | 1.9 |
| Houston-The Woodlands-Sugar Land, TX.................... | 15,120 | 2.1 | 23,858 | 3.2 | 25,735 | 3.5 |
| Atlanta-Sandy Springs-Roswell, GA....................... | 14,045 | 2.0 | 15,873 | 2.1 | 17,105 | 2.3 |
| Other, including unknown .............................. | 332,190 | 47.0 | 346,123 | 46.0 | 333,022 | 45.6 |

Notes: Metropolitan areas defined based on the 2013 update of Core Based Statistical Areas (CBSAs) definitions. As a result, numbers for previous years may differ from previously published figures.
Source: U.S. Department of Homeland Security.

The largest percent increases in naturalizations among leading states of residence between 2016 and 2017 occurred in Massachusetts (13 percent), Virginia (7.3 percent), and California (3.6 percent). With 27,737 naturalizations in 2017, Massachusetts saw its highest number of naturalizations since 2008 when it recorded 28,728 naturalizations. While it is not unusual for the number of naturalizations in a state to gradually increase over time, the 13 percent increase from 2016 was a noteworthy development. Among leading metropolitan areas of residence, the largest percent increases from 2016 to 2017 occurred in

Riverside-San Bernardino-Ontario, CA (38 percent) and San Diego-Carlsbad, CA (13 percent). Six of the leading metropolitan areas of residence saw decreases in naturalizations between 2016 and 2017, including Houston-The Woodlands-Sugar Land, TX, which had the largest proportional decrease (37 percent) and Miami-Fort Lauderdale-West Palm Beach, FL, which had the largest numerical decrease (14,707 fewer naturalizations).

## Sex, Age, and Marital Status

The percentage breakdown by sex, age, and marital status remained largely unchanged from recent years (Tables 4, 5, and 6, respectively). In 2017, females accounted for 56 percent of all persons naturalizing (Figure 5). Nearly 50 percent of new citizens were ages 25 to 44 years, about 23 percent were ages 55 years and older, and 7.8 percent were ages 18 to 24 years (Figure 5). The median age of those naturalizing has been increasing in recent years from 41 in 2016 to 42 in 2017 – a trend consistent with the increasing average age of the U.S. population. Marital status also matched recent trends, with about 65 percent of persons naturalizing in 2017 identified as married, and 20 percent as single (Table 6).

**Table 4.**

**Persons Naturalized by Sex: Fiscal Years 2015 to 2017**

| Sex | 2017 | | 2016 | | 2015 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total...... | 707,265 | 100.0 | 753,060 | 100.0 | 730,259 | 100.0 |
| Female ..... | 396,234 | 56.0 | 420,483 | 55.8 | 408,064 | 55.9 |
| Male ....... | 310,987 | 44.0 | 332,563 | 44.2 | 322,164 | 44.1 |
| Unknown .... | 44 | — | 14 | — | 31 | — |

— Figure rounds to 0.0.
Source: U.S. Department of Homeland Security.

**Table 5.**

**Persons Naturalized by Age: Fiscal Years 2015 to 2017**

| Age | 2017 | | 2016 | | 2015 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total................................................. | 707,265 | 100.0 | 753,060 | 100.0 | 730,259 | 100.0 |
| 18 to 24 years........................................ | 55,283 | 7.8 | 67,696 | 9.0 | 66,806 | 9.1 |
| 25 to 34 years........................................ | 162,131 | 22.9 | 188,411 | 25.0 | 186,115 | 25.5 |
| 35 to 44 years........................................ | 189,076 | 26.7 | 194,291 | 25.8 | 190,366 | 26.1 |
| 45 to 54 years........................................ | 137,688 | 19.5 | 139,790 | 18.6 | 133,561 | 18.3 |
| 55 to 64 years........................................ | 94,437 | 13.4 | 92,732 | 12.3 | 87,655 | 12.0 |
| 65 years and over .................................... | 68,649 | 9.7 | 70,140 | 9.3 | 65,756 | 9.0 |
| Unknown............................................ | 1 | — | — | — | — | — |
| Median age(years)..................................... | 42 | X | 41 | X | 40 | X |

X Not applicable.
— Figure rounds to 0.0.
Source: U.S. Department of Homeland Security.

## Years in Immigrant Status

In 2017, persons naturalizing spent a median of eight years in lawful permanent resident (LPR) status before becoming U.S. citizens, up from seven years in 2016 (Table 7). Immigrants born in Africa and Asia spent the least number of years in LPR status (six years), followed by immigrants from South America (eight years), Europe (nine years), North America (11 years), and Oceania (10 years) (Figure 6). Oceania has seen a continual increase in time spent in LPR status since 2011 when the median time spent in LPR status was seven years.

**Table 6.**

**Persons Naturalized by Marital Status: Fiscal Years 2015 to 2017**

| Marital status | 2017 | | 2016 | | 2015 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total . . . . . . | 707,265 | 100.0 | 753,060 | 100.0 | 730,259 | 100.0 |
| Married . . . . . | 457,506 | 64.7 | 477,843 | 63.5 | 463,779 | 63.5 |
| Single . . . . . . | 149,666 | 21.2 | 171,428 | 22.8 | 167,024 | 22.9 |
| Other* . . . . . . | 100,093 | 14.2 | 103,789 | 13.8 | 99,456 | 13.6 |

*Includes persons who were divorced, separated, widowed, or of unknown marital status.
Source: U.S. Department of Homeland Security.

**Figure 5.**

**Naturalizations by Age and Sex: 2017**

**44.0%** of persons naturalized in Fiscal Year 2017 were male

**56.0%** of persons naturalized in Fiscal Year 2017 were female

Source: U.S. Department of Homeland Security.

**Table 7.**

**Median Years in Lawful Permanent Resident Status for Persons Naturalized by Region of Birth and Year of Naturalization: Fiscal Years 2008 to 2017**

| Region of birth | Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 |
| Total . . . . . . . . . . . . . . | 8 | 7 | 7 | 7 | 7 | 7 | 6 | 6 | 7 | 9 |
| Africa . . . . . . . . . . . . . . | 6 | 6 | 6 | 6 | 5 | 5 | 5 | 5 | 6 | 6 |
| Asia . . . . . . . . . . . . . . | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 5 | 6 | 7 |
| Europe . . . . . . . . . . . . . . | 9 | 9 | 9 | 8 | 7 | 7 | 6 | 6 | 7 | 7 |
| North America . . . . . . . . . | 11 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 11 | 12 |
| Oceania. . . . . . . . . . . . . | 10 | 10 | 9 | 9 | 8 | 8 | 7 | 7 | 8 | 9 |
| South America . . . . . . . . . | 8 | 7 | 7 | 7 | 6 | 6 | 6 | 5 | 6 | 8 |

Note: Excludes persons who were not required to be lawful permanent residents prior to naturalization.
Source: U.S. Department of Homeland Security.



**Figure 6.**

**Median Years in LPR Status Before Naturalizing: 2017**

Persons naturalizing in Fiscal year 2017 spent a median of

**8 Years** in lawful permanent resident (LPR) status before becoming citizens.

**Median years in LPR status for persons naturalized in Fiscal Year 2017 was:**

North America — 11 Years
Oceania — 10 Years
Europe — 9 Years
South America — 8 Years
Africa — 6 Years
Asia — 6 Years

Source: U.S. Department of Homeland Security.

## THE NATURALIZATION PROCESS

An applicant for naturalization must fulfill certain requirements set forth in the INA. The general naturalization provisions specify that a foreign national must be at least 18 years of age, must establish that he or she has been lawfully admitted to the United States for permanent residence at the time of filing the naturalization application, and has resided continuously in the United States for at least five years[6] as an LPR, immediately preceding the date of filing the application and up to the time of admission to citizenship. The applicant must be physically present in the United States for at least 30 months out of the five years immediately preceding the date of filing the application and must have lived within the state or U.S. Citizenship and Immigration Services (USCIS) district with jurisdiction over the applicant's place of residence for at least 90 days prior to the date of filing. Additional requirements include the ability to speak, read, and write the English language; knowledge of the U.S. Government and history; attachment to the principles of the U.S. Constitution; and good moral character.

Special provisions of naturalization law exempt certain applicants from some of these general requirements. Applicants who may be eligible for specific exemptions under certain conditions include spouses of U.S. citizens and persons with qualifying military service in the Armed Forces of the United States.

[6] A permanent resident who is married to a U.S. citizen and with evidence of continuous residency is eligible for naturalization after three years instead of the normally required five years as a permanent resident applying for citizenship.

Every applicant for naturalization must file a Form N-400, *Application for Naturalization*. USCIS must interview all applicants to determine their eligibility to naturalize, including reviewing supporting documents. Following approval, USCIS schedules applicants for an oath ceremony before a judge or USCIS official.

## DATA

This report uses data from USCIS administrative records of newly naturalized US citizens[7] in 2017. These records consist of information taken from Form N-400 *Application for Naturalization* applications, such as the date and country of birth, sex, marital status, and state of residence. USCIS Computer Linked Application Information Management System (CLAIMS 4) provides nearly all the data, while a small number of records are from the Electronic Immigration System (ELIS) and the Central Index System of USCIS.

## FOR MORE INFORMATION

For more information about immigration and immigration statistics, visit the Office of Immigration Statistics web page at http://www.dhs.gov/immigration-statistics.

[7] A permanent U.S. resident becomes a naturalized U.S. citizen only after the Oath Ceremony date.

# Exhibit 6

2/3/2019                         Texas went looking for voter fraud. Then everything fell apart. | The Texas Tribune

# "Someone did not do their due diligence." How an attempt to review Texas' voter rolls turned into a debacle

> Texas officials flagged 95,000 voters for citizenship reviews. But after thousands have already been cleared, questions are being raised about how they handled the process.

BY **ALEXA URA**     FEB. 1, 2019   10 AM



"What they have set in motion is going to disenfranchise U.S. citizens and it's going to infringe on their right to vote," said state Rep. Rafael Anchia, D-Dallas.  Michael Stravato for The Texas Tribune

State Rep. Rafael Anchia had been alarmed by the actions of the Texas secretary of state's office for days by the time the agency's chief, David Whitley, walked into the Dallas Democrat's Capitol office on Monday.

The Friday before, Whitley's staff had issued a bombshell press release calling into question the citizenship of 95,000 registered voters in Texas. Soon after, Democratic lawmakers and advocacy groups were raising serious questions about how many people on that list were actually non-citizens who are ineligible to vote.

But before those doubts emerged, Whitley, the top election officer in the state, had handed over information about those registered voters to the Texas attorney general, which has the jurisdiction to prosecute them for felony crimes.

So as Anchia sat at the end of his green, glass-topped conference table, he wanted to know: Did Whitley know for sure that any of the names on his list had committed crimes by voting as noncitizens?

The Texas Tribune thanks its sponsors. **Become one**.

"No," Whitley answered, according to Anchia.

"And I said, 'Well, isn't it the protocol that you investigate and, if you find facts, you turn it over to the AG?'

"I do not have an answer for that," Whitley responded, according to Anchia's recollection of the Monday meeting.

By then, Whitley's press release had already been signal-boosted by top Republican officials — including President Donald Trump — who slapped on unsubstantiated claims of voter fraud and illegal voter registration and pointed to it as proof that voter rolls needed to be purged. And county election officials across the state had gone to work parsing through the records of thousands of registered voters whose citizenship status the state now said they should consider verifying. Some counties were even in the process of sending letters to voters ordering them to prove they were citizens.

Soon after, the citizenship review effort would buckle, revealing itself as a ham-handed exercise that threatened to jeopardize the votes of thousands of legitimate voters across the state. The secretary of state's office would eventually walk back its initial findings after embarrassing errors in the data revealed that tens of thousands of the voters the state flagged were actually citizens. At least one lawsuit would be filed to halt the review, and others were likely in the pipeline. And a week into the review, no evidence of large-scale voter fraud would emerge.

The Texas Tribune thanks its sponsors. **Become one**.

But at their Monday meeting, Whitley argued that his office was following the normal course of upkeep of the voter rolls. That didn't make Anchia — who chairs the Texas House's Mexican American Legislative Caucus — feel much better.

"What they have set in motion is going to disenfranchise U.S. citizens and it's going to infringe on their right to vote," he said days later. "The damage that this is doing … to legitimate U.S. voters is substantial."

### "Lawful presence list"

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 34 of 80

2/3/2019                    Texas went looking for voter fraud. Then everything fell apart. | The Texas Tribune

The citizenship check effort went public this week, but the seeds for it were planted in 2013. That year, Texas lawmakers quietly passed a law granting the secretary of state's office access to personal information maintained by the Department of Public Safety.



**Keep tabs on Texas politics and policy with our daily email newsletter**

Your email address    **SUBSCRIBE**

Browse all newsletters at texastribune.org/subscribe.

During legislative hearings at the time, Keith Ingram, director of elections for the secretary of state's office, told lawmakers that the information would help his office verify the voter rolls. The state had had a recent misstep when it tried to remove dead people from the rolls and ended up sending "potential deceased" notices to Texans who were still alive.

One of the DPS records the secretary of state's office was granted access to under the 2013 law was a list of people who had turned in documentation — such as a green card or a work visa — that indicated they weren't citizens when they obtained a driver's license or a state ID card.

But it appears that the secretary of state's office held off for years before comparing that list with its list of registered voters. Former Secretary of State Carlos Cascos, a self-proclaimed skeptic of Republican claims of rampant voter fraud, said he had no memory of even considering using the DPS data when he served from 2015 to 2017.

The Texas Tribune thanks its sponsors. **Become one**.

"I don't recall it ever coming to my desk," Cascos said. "I don't even recall having any informal discussions of that."

And there was reason to be careful with the "lawful presence list." Driver's licenses don't have to be renewed for several years. In between renewals, Texans aren't required to notify DPS about a change in citizenship status. That means many of the people on the list could have become citizens and registered to vote without DPS knowing.

Other states learned the hard way that basing similar checks on driver's license data was risky.

In 2012, Florida officials drew up a list of about 180,000 possible noncitizens. It was later culled to about 2,600 names, but even then that data was found to include errors. Ultimately, only about 85 voters were nixed from the rolls.

Around the same time, officials in Colorado started with a list of 11,805 individuals on the voter rolls who they said were noncitizens when they got their driver's licenses. In the end, state officials said they had found about 141 noncitizens on the rolls — 35 of whom had a voting history — but that those still needed to be verified by local election officials.

But it was under the helm of former Secretary of State Rolando Pablos, who took over in 2017, that Texas began processing the DPS list. That happened even though at least some people in the office knew the risk. Officials in the secretary of state's office early last year told The Texas Tribune that similar checks in other states using driver's license data had run into issues with naturalized citizens. Pablos didn't respond to requests for comment.

Still, on Dec. 5, Betsy Schonhoff, voter registration manager for the secretary of state's office, told local officials that her office had been working with DPS "this past year" to "evaluate information regarding individuals identified by DPS to not be citizens." In a mass email sent to Texas counties — and obtained by the Tribune — Schonhoff informed them that the secretary of state's office would be obtaining additional information from DPS in monthly files and sending out lists of matches starting in mid-January.

The next day, Pablos announced he would resign after two years in office. In his place, Republican Gov. Greg Abbott appointed Whitley, a longtime Abbott aide who at the time served as the governor's deputy chief of staff.

## "VOTER FRAUD ALERT"

Last Friday, Williamson County Elections Administrator Chris Davis had just wrapped up a staff retreat when he got back to his office in Georgetown. By then, news of the state's list of 95,000 registered voters flagged for review was spreading.

A secretary of state's advisory about the list had landed in his inbox earlier that day, but it didn't include any numbers. He knew the reported total of 95,000 likely included naturalized citizens from the get-go.

But misinformation spread quickly. Some of the statements being released about the list were misleading. Others were downright inaccurate. Texas Attorney

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 36 of 80

2/3/2019                    Texas went looking for voter fraud. Then everything fell apart. | The Texas Tribune

General Ken Paxton, a Republican, took to Twitter within the hour and prefaced the news with the words "VOTER FRAUD ALERT." At that point, none of the counties had any data to verify.



**Greg Abbott**
@GregAbbott_TX

Thanks to Attorney General Paxton and the Secretary of State for uncovering and investigating this illegal vote registration. I support prosecution where appropriate. The State will work on legislation to safeguard against these illegal practices. #txlege #tcot

> **Ken Paxton**    @KenPaxtonTX
> VOTER FRAUD ALERT: The @TXsecofstate discovered approx 95,000 individuals identified by DPS as non-U.S. citizens have a matching voter registration record in TX, approx 58,000 of whom have voted in TX elections. Any illegal vote deprives Americans of their voice.

2,747   3:57 PM - Jan 25, 2019

1,730 people are talking about this

Also on Twitter, Abbott thanked Paxton and Whitley "for uncovering and investigating this illegal vote registration." Later that afternoon, the Republican Party of Texas sent out a fundraising email with the subject line that read "BREAKING: 95,000 Non-Citizens Registered to Vote?!"

The next day, the president chimed in, claiming on Twitter that "58,000 non-citizens voted in Texas" and adding the unsupported claim that "voter fraud is rampant" across the country.



**Donald J. Trump**
@realDonaldTrump

58,000 non-citizens voted in Texas, with 95,000 non-citizens registered to vote. These numbers are just the tip of the iceberg. All over the country, especially in California, voter fraud is rampant. Must be stopped. Strong voter ID! @foxandfriends

141K   7:22 AM - Jan 27, 2019

But when El Paso County's election administrator, Lisa Wise, examined the list of 4,152 names she got from the state on Monday morning, she knew something was wrong. Included on the list was one of her staff members — a naturalized citizen since 2017.

"We had a naturalization party for her," Wise said. "She had gone and gotten her driver's license, I think, four years ago."

The errors didn't end there. By Tuesday morning, secretary of state officials had started calling counties across the state to inform them that they had made a mistake. The office had incorrectly included some voters who had submitted their voting registration applications at DPS offices and who since then had been confirmed to be citizens, county officials said.

Things grew even more confusing for Remi Garza, elections administrator in Cameron County. He had originally received a list with just more than 1,600 people to review. When someone from the secretary of state's office called on Tuesday, Garza was told that weeding out applications labeled as "source code 64" — the code that indicates the origin of the application was a DPS office — would remove "well over" 1,500 names from his list, leaving him with just 30 individuals to investigate.

But his staff was only able to find 300 people whose applications were labeled as such, Garza said. After another call with the secretary of state's office, Garza said he was told that the 1,500 number had also been incorrect. Now, he said he's left with about 85 percent of his list.

"That's a level of accuracy I'm not comfortable with," Garza said on Tuesday. "We're going to be moving through it very cautiously and slowly. We're talking about the franchise and, I'm not in any way going to jeopardize someone's ability to vote unless I have a very serious concern."

Following the secretary of state's calls, the number of registered voters flagged by the state began to plummet. In Harris County alone, the state's flub translated to about 18,000 voters — about 60 percent of the original list — whose citizenship status shouldn't have been questioned.

In Travis County, officials dropped 634 voters off their original list of 4,558. Dallas County's original list of 9,938 dropped by more than 1,700 voters. In Tarrant County, it was about 1,100 voters cleared from the original 5,800.

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 38 of 80

2/3/2019                          Texas went looking for voter fraud. Then everything fell apart. | The Texas Tribune

The secretary of state's office told the McLennan County elections office to disregard its entire list of 366 voters, the Waco-Tribune Herald reported.

But the state's calls came a day too late in Galveston County, where Cheryl Johnson, who oversees the voter rolls as the county's tax assessor-collector, had already sent off the first batch of "proof of citizenship" letters to voters who were on her initial list of more than 830 people.

On Monday, her office had mailed 92 notices, which told voters their registration would be canceled if they didn't prove their citizenship within 30 days. That warning even applied to citizens who missed the notice in the mail or didn't gather their documentation in time. On Tuesday, she learned from the state that 62 of those never should have been sent out. She spent Wednesday preparing follow-up letters to inform those voters that their registration was safe.

## "I don't even have words"

For the better part of 26 years, Julieta Garibay, a Mexican immigrant, was regularly reminded that she better not vote: "'It's fraud. You would never be allowed to become a citizen.' This was ingrained in my mind."

When she finally took her oath of citizenship in a federal building in San Antonio last April, she let only two days go by before registering to vote in Austin, her adopted hometown. She excitedly cast a ballot last November.

But she's been stewing since last Friday when she heard about the secretary of state's announcement. Garibay last renewed her driver's license in 2017 — before she became a U.S. citizen — so she was sure she was on the list. A Travis County official called her to confirm her suspicions on Wednesday, after Garibay had reached out.

Travis County election officials suspected people like Garibay would be on their list. And state officials confirmed to them on Tuesday that the records they provided may include voters who were not citizens when they applied for a driver's license but have since become naturalized citizens, said Bruce Elfant, the county's tax-assessor-collector and voter registrar.

But the secretary of state's office has not confirmed that publicly, and it has not responded to questions about whether it will send updates to the attorney general's office to clear individuals who were on the original list.

Amid the silence, civil rights groups and members of the Mexican American Legislative Caucus have raised questions about whether the secretary of state's office publicized its numbers knowing naturalized citizens would be included — or

worse that they published them because naturalized citizens could be purged from the rolls in the process.

For Cascos, a Republican who said he long struggled to toe the party line when it came supporting claims that voter fraud was "rampant," it's been problematic to watch how the secretary of state's initial announcement seemed to confirm the beliefs of many Republicans.

"I think there's a problem here, and the problem is that, in my opinion, someone did not do their due diligence before they let these numbers out," Cascos said.

On Thursday, Abbott — whose initial reaction to the numbers went as far as vowing a legislative fix — attempted to recast the secretary of state's announcement as a work in progress.

"They were reaching out to counties saying, 'Listen, this isn't a hard-and-fast list," Abbott said at an unrelated press conference. "This is a list that we need to work on together to make sure that those who do not have the legal authority to vote are not going to be able to vote."

But while some election officials are looking for ways to clear naturalized citizens without asking them to verify their citizenship, others are unlikely to follow suit. For instance, Johnson in Galveston County says she has no other way to determine whether the people on her list are citizens other than sending them a notice that starts the 30-day clock for them to provide proof to avoid getting kicked off the rolls.

"They said, 'Use other resources,' and I said, 'What resources are that?'" Johnson said. "They said, 'Well, see if you have any other ways to determine the information.' I really don't."

Secretary of state officials, in conversations with county officials, have gone so far as to express interest in how locals were identifying naturalized citizens on the list.

On Tuesday, the civil rights group League of United Latin American Citizens filed a lawsuit that argued that forcing naturalized citizens to prove they are legitimate voters amounts to a "witch hunt" and a "plan carefully calibrated to intimidate legitimate registered voters from continuing to participate in the election process."

To Democratic state Rep. Victoria Neave of Dallas — who is on the Mexican American Legislative Caucus committee created to scrutinize the citizenship review — the whole effort is "nothing short of a political attack on Latino naturalized citizens."

# Exhibit 7

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 41 of 80

2/3/2019                     Tens of thousands removed from potential non-citizen voters list after counties find flawed data | Texas Politics | Dallas News

TEXAS POLITICS      3 DAYS AGO

## Tens of thousands removed from potential non-citizen voters list after counties find flawed data

 *Texas Bureau Robert T. Garrett ( @RobertTGarrett )*





Don't miss a story



LIKE DALLAS NEWS

**Updated at 6:52 p.m.:** *Revised with new information throughout*

AUSTIN -- At least 20,000 people whom state officials put on a list of potential non-citizen voters have now been removed from those lists after the state told counties that data it provided were flawed, local officials said on Wednesday.

And Secretary of State David Whitley, whose office has gone silent in giving direction to county election administrators and responding to the news media, told civil rights groups late Wednesday that he'll respond to them "within the next week." The 13 groups have asked Whitley, a recent appointee of Gov. Greg Abbott, to withdraw his request for counties to review nearly 100,000 Texans' eligibility to vote.

ADVERTISING

Amid widespread confusion, only fragmentary information on Whitley's flawed data could be learned.

Dallas County Elections Administrator Toni Pippins-Poole said the county's voter-roll database vendor has identified 1,715 people as being incorrectly placed on an initial list of 9,938 registered voters sent to the county over the weekend.

The share that was flawed, 17 percent, hasn't been confirmed by state officials yet but could climb if the officials flag more people as being on the list erroneously, she said.

Officials in Collin and Denton counties said they don't yet know what percentage of the names they were sent shouldn't have been on the list.

In some big urban counties, though, the magnitude of error appeared massive.

Harris County officials told the *Houston Chronicle* that 60 percent -- or about 18,000 -- of the nearly 30,000 people the state had originally put on their list would have to be removed.

Williamson County's Chris Davis, president of the Association of Texas Elections Administrators, said that more than half of the 2,033 voters on his county's list were being removed after the state's revision.

ADVERTISING

"We've removed over half of the names" from the secretary of state's original list, Davis said in an email. "No numbers yet, as we're still working hard to vet the remaining names."

In Travis County, Tax Office spokeswoman Tiffany Seward said the culling will continue and take some time. But so far, she said, 634 -- or 14 percent -- of the

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 44 of 80

2/3/2019                Tens of thousands removed from potential non-citizen voters list after counties find flawed data | Texas Politics | Dallas News

people the state identified for review in Travis County over the weekend have been removed.

## Fast-moving developments

On Friday, Whitley's office sent an advisory to counties saying that about 95,000 people who received driver licenses -- while legally in the country, but not U.S. citizens -- also appeared on Texas voter rolls. Of them, 58,000 voted in one or more elections between 1996 and 2018, Whitley's office said. It asked counties to review the eligibility of people on the list.

The announcement was celebrated by staunch conservatives who for years have sought a tightening of voter-eligibility requirements. Democrats and voting rights advocates, though, denounced Whitley's move as a partisan push by state GOP leaders to purge minorities from the voter rolls. Opponents also questioned the methodology Whitley's office used, dismissing the process as "woefully inadequate."

By Tuesday, the state quietly started to backtrack. Whitley aides began calling individual counties, advising that numbers supplied Saturday night were incorrect. That's because some people on the list already satisfied the Department of Public Safety they were U.S. citizens while registering to vote through the Texas driver's license process.

The biggest burden of removing people from Whitley's original lists will fall on the counties with the biggest populations.

That's because of the peculiar way in which Texas counties transmit voter applicants' information to Whitley's office, with major urban counties required to batch up their applications, officials explained.

On Wednesday, confusion reigned.

In Austin, Travis County Tax Collector Bruce Elfant's office posted on its website a statement recounting that when it received its call from the state Tuesday, the prospect was raised that some people on the list were non-citizens at the time they obtained driver's licenses. But they've been naturalized since, said the site of Elfant, who is Travis County's top election official.

"During this call, the secretary of state's office confirmed that the records we received may include voters who were not citizens at the time they applied for a

driver's license but have since become citizens," it said. "There is no code on these records to help us identify them for removal from the list."

Many counties have asked the state to provide them with a new list of numbers that removes the names of people who registered while obtaining driver's licenses. They have also asked the secretary of state's office to provide a written update to its initial advisory. Whitley's office has not responded publicly to those requests.

On Wednesday, Whitley spokesman Sam Taylor declined to respond to queries. On Tuesday, he initially declined to comment on the advisory and subsequent miscues, citing a lawsuit filed against the office and Attorney General Ken Paxton by the League of United Latin American Citizens. Later in the day, he issued a prepared statement saying that the office would continue to provide counties with information to verify voter eligibility.

In the suit by the Hispanic civil-rights organization, filed in federal court in San Antonio, the group alleged that U.S. citizens, particularly Latinos, are being targeted as part of a "witch hunt."

Despite the missteps, some statewide Republican leaders have remained supportive of the secretary of state's advisory.

Although non-citizens have to prove they're in the country legally to obtain a Texas driver's license, the Republican Attorneys General Association said erroneously in a Wednesday news release that "Paxton recently announced thousands of registered illegal immigrants on voter rolls, many of which voted."

"Every single instance of illegal voting threatens democracy in our state and deprives individual Texans of their voice," Paxton said in a statement issued Friday.

Abbott, who has been Whitley's boss for many years, both in the governor's office and the attorney general's office, has not weighed in on the controversy.

Abbott spokesman John Wittman did not respond Wednesday to a request for comment about mistakes in the list and critics' claims that Whitley's actions are a prelude to an unfair purge of voter rolls that will suppress minorities' participation in Texas elections.

On Monday, Wittman declined to say whether Abbott, who in the past has stressed his high concern that ineligible people are voting in Texas, would

Case 3:19-cv-00041 Document 10-1 Filed in TXSD on 02/06/19 Page 46 of 80

2/3/2019        Tens of thousands removed from potential non-citizen voters list after counties find flawed data | Texas Politics | Dallas News

mention the topic in his state of the state speech next week. In the speech on Tuesday, the Republican governor is expected to declare several "emergency" items, which lets lawmakers vote more quickly on bills on those topics.

"We're not going to discuss any emergency items prior to the actual announcement," Wittman said.

County election officials, who generally are circumspect in discussing their state partners, couldn't completely stifle hints of frustration.

"Williamson County has also received NO written instructions after yesterday morning's call from the" secretary of state, Davis wrote in an email.

Denton County Elections Administrator Frank Phillips, when reached by phone, said: "I'm not doing anything until the state sends me an updated list removing those" voters, he said, referring to the ones who satisfied DPS they were citizens while obtaining driver's licenses.

In Collin County, local elections administrator Bruce Sherbet said he's seen markings indicating such citizens are on his county's list of 4,699 voters, received from Whitley's office Saturday. But he said the Collin office hasn't counted them.

"I don't have anything definitive," Sherbet said. "We just started."

## 'Where is the fire?'

Leaders with the Mexican American Legislative Caucus condemned the state's release of flawed data to local elections administrators, calling the information a "misleading" effort to try to suppress the votes of minorities.

"What is most callous is that these are not trivial rights that we're talking about," said Dallas Rep. Rafael Anchia, a Democrat who is the chairman of the caucus. "This is a voting right. This is a cornerstone of our democracy."

The caucus formed a policy committee that will investigate the release of the "non-citizen voter" list and will monitor suspicions that the secretary of state coordinated with outside conservative grassroots groups on the release of the data. The committee will be led by Austin Democrat Eddie Rodriguez and will include Dallas Democrat Victoria Neave and Fort Worth Democrat Ramon Romero.

Rodriguez said he would ask Whitley to meet with the committee. Officials said they had also asked Whitley's office to preserve written communications between

his office and Paxton's office as well as "outside groups" that are pertinent to this issue.

"There's a lot of mistakes here and we want to be able to look at that," he said.

Austin Democrat Celia Israel called the release of flawed data a "sham" and questioned the motives of the state officials who released the data.

"Where is the fire? Where is this coming from? I can only point to a historic election. Why the new processes and procedure? Why now?" she said.

Anchia said legislators were still trying to glean more information but that if officials had participated in a coordinated effort to fool Texans into believing large numbers of non-citizens voted "then people are going to have to answer for violation of protocols and of rules potentially.

"If we have to ask people to step down, we will." he said.

*Staff writers James Barragán and Robert T. Garrett reported from Austin, and Julieta Chiquillo reported from Dallas.*

# Exhibit 8

| | |
|---|---|
| **From:** | Elections Internet |
| **To:** | Elections Internet |
| **Subject:** | Mass E-mail (VR/EA/V-661) - Additional information pertaining to Advisory 2019-02 |
| **Date:** | Friday, February 01, 2019 11:46:23 AM |
| **Attachments:** | image001.png |

Dear Voter Registrars/Election Administrators-

On Friday, we issued Advisory No. 2019-02 related to your requirement to conduct list maintenance activities. As you know, list maintenance activities are an ongoing process, and we thank you for your collaboration and feedback thus far.  The data we provide to you is the starting point, and your data matches should be reviewed before you send out any Notices of Examination.  Many of you have begun working through the lists to determine whether or not you should issue a Notice of Examination to registered voters who were matched to the data requested from DPS. We are working with DPS as part of our ongoing collaboration between the state and the counties to provide additional information to assist you in making your determinations.  After speaking to a number of counties, we wanted to share some of the tools and resources that we have found counties are using to help identify potential matches that will not have a Notice of Examination issued.

1. **Review your application files**:  Look at the sources you have for the current or previous applications (if available).  Any application electronically transmitted from DPS should indicate citizenship was verified by DPS at the time the voter registration application was submitted. Some county voter registrars or VDRs participate in naturalization ceremonies and maintain lists of naturalized citizens or can identify which applications were completed at a naturalization ceremony. Additionally, a voter may have previously been issued a Notice of Examination for citizenship and provided such documentation.  If you have that documentation on file, you would not need to issue a new Notice of Examination.

2. **Look to other entities that may have verified citizenship**.  As a reminder, under Section 16.033, Texas Election Code,  the voter registrar has the right to use any lawful means to investigate whether a registered voter is currently eligible for registration in the county.  There are other governmental entities in or around your county that may have verified citizenship.   Several counties have informed us that they are reaching out to local immigration offices to determine whether or not they can obtain lists from these sources.

Please note a person may provide proof of citizenship by personal delivery, mail, fax or scanned attachment sent via email.

In addition, several counties have contacted us about receiving public information requests pertaining to Advisory 2019-02 and the data that our office has provided to counties in connection with that advisory. It is our understanding that the Office of the Attorney General ("OAG") believes information related to the advisory, including data provided to the counties by our office and the counties' correspondence with voters, may constitute law enforcement information excepted from disclosure under the Public Information Act (Texas Government Code § 552.108). Information sought in the requests may relate to pending or reasonably anticipated litigation involving the

advisory (Texas Government Code § 552.103). If you receive a public information request, please contact your county attorney to request a ruling from the OAG's Open Records Division and to notify any appropriate third parties (including the OAG's Public Information Coordinator at publicrecords@oag.texas.gov) so that these parties may submit their own arguments regarding disclosure to protect the privacy of those involved. For additional questions related to public information requests, please contact the Open Government Section of the OAG at (512) 478-6736 or Toll Free: (877) 673-6839.

Our goal in this process is two-fold: (1) Maintain accurate voter registration rolls by conducting routine list maintenance activities as required by federal law, and (2) Ensure that eligible voters maintain their registration.  It is our goal to provide you with the tools necessary to meet both of these goals.  The feedback we are getting from you regarding your data is vital to this process.  Like many other election and voter registration activities, we are working together on this.  We thank you for your feedback and continue to welcome any further feedback so that we can work together to ensure an effective and efficient process of maintaining an accurate list of registered voters going forward.


Keith Ingram
Director, Elections Division
Office of the Secretary of State
800-252-VOTE(8683)
www.sos.state.tx.us/elections/index.shtml
**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code.  It is not intended to serve as a legal opinion for any matter.  Please review the law yourself, and consult with an attorney when your legal rights are involved.*

# Exhibit 9

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 52 of 80

2/3/2019                    No, there is no evidence that thousands of noncitizens are illegally voting and swinging elections - Los Angeles Times

# No, there is no evidence that thousands of noncitizens are illegally voting and swinging elections

By JOSEPH TANFANI
OCT 25, 2016  |  WASHINGTON



Election workers in Colorado open mail-in ballots. (Marc Piscotty / Getty Images)

As Donald Trump maintains his incendiary attacks on the legitimacy of the election, one of his favorite themes has been the claim that the results will be tainted by the votes of millions of people in the U.S. illegally.

"They are letting people pour into the country so they can go ahead and vote," he said this month, in a meeting with the head of the union representing border patrol agents.

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 53 of 80

2/3/2019                    No, there is no evidence that thousands of noncitizens are illegally voting and swinging elections - Los Angeles Times

ADVERTISEMENT

"And believe me, there's a lot going on," Trump said at a rally. "People that have died 10 years ago are still voting. Illegal immigrants are voting."

Part of the Republican-led crackdown on supposed voter fraud, battles over measures to guard against noncitizen voters have percolated for years in election offices, state legislatures and federal courtrooms.

PAID CONTENT                                                    What Is This?

SEE MORE



By Nucific

Election 2016 | Live coverage on Trail Guide | Sign up for the newsletter | The race to 270

Records in these fights show that small numbers of noncitizens do end up registered, and a few have cast votes. However, no one has uncovered evidence of thousands of noncitizen voters — and no evidence has emerged to support Trump's theory of a coordinated effort to throw an election by stuffing the voting rolls with ineligible immigrants.

"What we have seen are errors," said Dale Ho, director of the voting rights project of the American Civil Liberties

Case 3:19-cv-00041   Document 10-1   Filed in TXSD on 02/06/19   Page 55 of 80

2/3/2019                No, there is no evidence that thousands of noncitizens are illegally voting and swinging elections - Los Angeles Times

Union. "There's not a horde of people trying to break into
this country so they can vote."

The rule on voting eligibility is simple: Except for a
handful of cities that permit noncitizens to vote in local
elections, everyone who casts a vote in America is
supposed to be a citizen, either by birth or by
naturalization. And although the distinction is sometimes
lost in the loud debates over undocumented immigration,
even green-card holders, who are legal permanent
residents, also are ineligible to vote until they become
citizens.

In most places in the U.S., the question is handled solely
on the honor system. When people register to vote, they
check a box attesting that they are U.S. citizens. Election
administrators verify identity by looking at driver's
license or Social Security numbers, for example, but
under federal guidelines, they may not ask for proof of
citizenship, such as a birth certificate or passport.

Four states — Arizona, Kansas, Georgia and Alabama
— have passed their own citizenship verification rules,
but those requirements have been tangled up for years in
lawsuits by progressive and voting rights groups, who
argue that they present an unfair burden on minority
voters. Thus far, they have prevailed, although the battles
continue.

Georgia and Alabama haven't been enforcing their
requirements, but in the other two states, the fights over
proving citizenship have led to unusual results. Arizona
now recognizes a second class of voters — 6,328 for this
election — who can vote for federal offices, like president,
but not for the governor or other state offices, because
they haven't provided proof of citizenship.

This month, a federal appeals court forced Kansas to accept the registrations of people who had signed up to vote at motor vehicle offices, without providing proof of citizenship. Emergency notices were mailed to these voters, telling them in all capitals to "PLEASE DISREGARD" prior warnings that they weren't eligible to vote.

But nearly 9,000 others, because they signed up using Kansas' own form, still are considered ineligible to vote in this election by state officials unless they come up with citizenship proof by election day, Nov. 8. County election officials have scrambled to keep up.

"It is a mess, and that's the predicament that the judge ultimately put the election system in," said Desiree Taliaferro, spokeswoman for Kansas Secretary of State Kris Kobach, who oversees elections. "It's crazy."

Another case on a similar issue is still pending in federal court in Washington, D.C.

Among the leaders of the conservative push for more citizenship checks is lawyer J. Christian Adams. While working at the civil rights section of the Department of Justice, he filed a voter intimidation case against two members of the New Black Panther Party in Philadelphia; when the department refused to prosecute most charges, the case became a favorite example among conservatives.

ADVERTISEMENT

Now president of the conservative Public Interest Legal Foundation, Adams has pushed this year for measures to find and purge noncitizens from the voting rolls.

As one step, he's sought to show that it's too easy for noncitizens to register to vote. Eight Virginia counties provided records showing that more than 1,000 people had been removed from the rolls since 2011 because they were not citizens, the foundation said. In Philadelphia, a city that has been a focus of Trump's warnings of potential election fraud, 86 people were removed from the rolls after they turned out not to be citizens, and 40 of them voted at least once.

"These are only the people who are caught," Adams said. "It frightens me to think what the actual number is in Virginia. That's the problem here — there's no verification after the box gets checked."

The League of Women voters, progressive groups and others counter by saying that the document rules would unfairly keep out many legitimate voters to deter a few noncitizens.

"Most people see this for what it is: xenophobia masquerading as election integrity," said Ho of the

ACLU.

One elections administrator in Philadelphia also blamed registration drives, where those hired to register voters can, perhaps inadvertently, mislead people who don't know the law.

Some prospective voters "are not proficient in the English language, and they're told out on the street, 'Yeah, you can register to vote, it's no problem,'" said Tim Dowling, deputy commissioner of elections. "If they check they're 18 and a U.S. citizen, we have to accept that. We err on the side of enfranchising the voter."

Past claims that large numbers of ineligible noncitizens are lurking on the voting rolls have fizzled. In 2012, Florida's Republican governor, Rick Scott, pushed for a purge of noncitizen voters. An initial list of 180,000 names was whittled to 2,600, then sent to county election supervisors to check. But the smaller list also turned out to be filled with errors, and in the end, only 85 people were removed from the rolls.

Trump has cited one study by three Virginia academics that estimated that more than 6% of noncitizens illegally voted in 2008 — enough to sway a close election, like the Senate race in Minnesota that year in which Al Franken was elected by a 312-vote margin.

The study arrived at the result by considering responses from a survey of voters, some of whom said they were not citizens. But the findings have been attacked by other researchers, who say they found evidence that many people gave wrong answers to the citizenship question — and that therefore the correct number of noncitizens who voted was probably zero.

ADVERTISEMENT

In any case, experts say, it's unlikely that anyone could find enough noncitizens on the voter rolls to challenge the results in a typical presidential election. In 2012, President Obama won Pennsylvania by 310,000 votes and Virginia by 149,000. The closest margin was in Florida, where Obama won by 74,000 votes.

Illegal voting is rarely prosecuted, but it can have severe consequences. Someone in the country illegally who is caught voting would be declared ineligible to become a citizen and could even be deported.

Lori Edwards, elections supervisor in Polk County, Fla., said she rarely encountered such cases in the 16 years she's held the job.

"If you were here as an undocumented person, or even someone who has a green card," she asked, "why would you risk that status for what would be a minimal benefit?"

joseph.tanfani@latimes.com

# Exhibit 10

# Republicans look for fraud, find little

ASSOCIATED PRESS
Sep. 24, 2012  |  Updated: Sep. 24, 2012 9:51 p.m.



1 of 3     ● ● ●

This photo taken Sept. 21, 2012, shows Colorado Secretary of State Scott Gessler leaving
his office in Denver. Republican election officials who were swept into office on promises
to root out voting fraud say they're doing just that. But they're not finding much so far.
After some digging, state officials in key presidential battleground

Photo: Ed Andrieski

DENVER - Republican election officials who promised to root out voter fraud so far are finding little evidence
of a widespread problem.

State officials in key presidential battleground states have found only a tiny fraction of the illegal voters they
initially suspected existed.

Democrats say the searches waste time and, worse, could disenfranchise eligible voters.

## Unlimited Digital Access as little as $0.99

Read more articles like this by subscribing to the Houston Chronicle

SUBSCRIBE

"I find it offensive that I'm being required to do more than any other citizen to prove that I can vote," said Samantha Meiring, 37, a Colorado voter and South African immigrant who became a U.S. citizen in 2010. Meiring was among 3,903 registered voters who received letters from the Colorado Secretary of State's office questioning their right to vote.

Republicans argue that voting fraud is no small affair, even if the cases are few.

The different viewpoints underscore a divide between the parties: Are the small numbers of voting fraud evidence that a problem exists? Or do they show that the voter registration system works?

## *Colorado*

Last year, Gessler estimated that 11,805 noncitizens were on the rolls. But the number kept getting smaller.

The number of noncitizens now stands at 141, based on checks using a federal immigration database. Of those 141, Gessler said 35 have voted in the past. The 141 are .004 percent of the state's nearly 3.5 million voters.

## *Florida*

Florida's search began after the state's Division of Elections said that as many as 180,000 registered voters weren't citizens.

Florida eventually narrowed its list of suspected noncitizens to 2,600 and found that 207 of them weren't citizens.

The state has more than 11.4 million registered voters, so the 207 amounts to .001 percent of the voter roll.

## *North Carolina*

In North Carolina, the nonpartisan state elections board last year sent letters to 637 suspected noncitizens after checking driver's license data. Of those, 223 responded showing proof they were citizens, and 79 acknowledged they weren't citizens and were removed from the rolls along with another 331 who didn't respond to repeated letters.

State officials found there were only 12 instances in which a noncitizen had voted. North Carolina has 6.4 million voters.

Iowa

Last week, Iowa's Division of Criminal Investigation filed election misconduct charges against three
noncitizens who voted in gubernatorial and city elections in 2010 and 2011. Among the three are Canadians
who told investigators they thought they were only barred from voting in presidential elections.

# Exhibit 11

# County officials removing some names from flagged voter lists

By Brooke A. Lewis  Updated 4:28 pm CST, Tuesday, January 29, 2019

4



Photo: Jon Shapley, Staff Photographer / Staff Photographer

**IMAGE 1 OF 3**

Chris Daniel, Harris County treasurer, speaks about voter registration problems during a press conference in the parking lot of a UPS store, Tuesday, Oct. 30, 2018, in Houston. State Sen. Bettencourt said 84 ... more

State officials on Tuesday told voter registrars in several Texas counties that some of the nearly 100,000 names on a list of potentially ineligible voters should not have been included because they are U.S. citizens.

Cheryl Johnson, Galveston county's tax assessor-collector, said her county started sending letters Monday asking people on the list to verify their citizenship. But on Tuesday, Johnson said, the Texas secretary of state's office notified her that some on on the list had been verified as citizens.

"We managed to retrieve the second batch of letters that we were going to mail today," said Johnson.  "The ones we sent yesterday, we're going to go back and check those."

Johnson said 837 Galveston County voters were flagged by the state, and her office sent letters to  a little over 85 of them on Monday with plans to mail more on subsequent days. The letters ask that the recipients provide a U.S. passport, birth certificate or citizenship papers to her office within 30 days, she said. Those who fail

Recommended Video

to do so could be
dropped from voter rolls.

Based on the source
code that was given to her by the secretary of state's office, she said her office was
able to pull 37 letters they planned to mail out on Tuesday. They were still planning to
send out 50 letters to registered voters in the area.

"We're not going to infringe on anybody's right to be a registered voter," said Johnson
on Tuesday. "What we are trying to do is ensure the integrity of the voter roll for all
citizens of Texas and all the citizens and voters in my county."

In Fort Bend County, John Oldham, elections administrator, said roughly 8,035 voters
in his county were flagged by the Secretary of State's office. But in a call Tuesday
morning, Oldham said, his office was advised not to send letters to those on the list
"until you review a little more."

The secretary of state's office explained, Oldham said, that some voters went to the Texas Department of Public Safety to submit voter registration applications after a specified date  "so they should not be on the list."

Oldham said his office had not sent letters to any voters yet and would thoroughly review each flagged voter's record before doing so.

Voter registration officials in Harris, Travis, Collin and Williamson Counties got similar calls Tuesday from the secretary of state's office, the Texas Tribune reported.

The secretary of state's office, in a statement, said it was in touch with local counties "to assist them in verifying eligibility of Texas voters. This is to ensure that any registered voters who provided proof of citizenship at the time they registered to vote will not be required to provide proof of citizenship as part of the counties' examination."

In Galveston, Johnson said it's not out of the ordinary to check voters' citizenship status. Voter registrars get monthly lists of jury summonses with information that some residents can't serve on a jury because they're non-citizens or they moved out of the county, she said.

"I do not believe any of this would've affected the outcome of an election in Galveston County, but that would remain to be seen," said Johnson.

In Harris County, officials said they would research more before sending out letters inquiring about citizenship to those on their list.

"We are going to proceed very carefully," said Douglas Ray, a special assistant county attorney in Harris County who specializes in election issues.

As the process unfolds, civil rights groups say the state could be violating federal law. The League of United Latin American Citizens filed a lawsuit Tuesday against Texas Secretary of State David Whitley and Attorney General Ken Paxton, asking for the state to release their data that claims 95,000 registered voters are not U.S. citizens.

# Exhibit 12

# Gessler asks 4,000 prove eligibility or get off Colorado voter rolls

By **SARA BURNETT** | The Denver Post
August 16, 2012 at 11:11 am

**SIGN UP** FOR NEWSLETTERS AND ALERTS

**SUBMIT** YOUR NEWS TIPS OR PHOTOS

MOST POPULAR

**Colorado trail runner attacked by mountain lion choked cat to death with hands, arms and feet**

**Stolen vehicle chase in Littleton leaves two dead at Santa Fe Drive and Mineral Avenue**

**Denver officers disciplined for handcuffing journalist photographing arrest**

**King Soopers ends 24-hour stores in Colorado**

**State of the Union: Colorado reactions to Donald Trump's speech**

**Editorial: Colorado should join movement tying electoral college to popular vote**

Colorado Secretary of State Scott Gessler has mailed letters to about 4,000 registered voters his office suspects may be noncitizens, asking them to either verify that they have become citizens or to voluntarily remove themselves from the state's voter rolls.

The letters, sent Wednesday to people who used a noncitizen identification when they applied for a Colorado driver's license and who also are registered to vote, includes a "verification of voter eligibility" form for people who have become citizens to fill out and return. The letters also include instructions on how noncitizens may withdraw their registration.

"Our approach improves the integrity of our voter rolls," Gessler said in a statement Thursday. "Once we cut through the political noise, voters will see a measured

approach that enforces the law and ensures that legal votes aren't cancelled out by illegal voters."

Critics of the Republican secretary of state's efforts say he is intimidating voters — particularly minorities, who tend to be Democrats — from casting ballots. They also are concerned that eligible voters may be improperly removed from the voter rolls.

"There needs to be a process in place that balances protecting the rights of eligible voters," said Elena Nuñez, director of the voting rights group Colorado Common Cause. "There's no indication from the secretary that kind of process exists."

Gessler said his office will work with county clerks to decide what to do with registered voters who do not respond. He also said Colorado's approach would be "more tempered" than North Carolina and Florida, where officials sent similar letters and canceled unresponsive voters.

Gessler and Attorney General John Suthers threatened earlier this year to sue the Department of Homeland Security in order to get the department to help Colorado verify the citizenship of people it suspected were improperly registered.

DHS eventually agreed to do the checks. But the letters sent Wednesday were done so without that additional level of verification, because Gessler's office and DHS have been unable to come to an agreement about how the arrangement would work.

*Sara Burnett: 303-954-1661, sburnett@denverpost.com or twitter.com/sara_burnett*

# Exhibit 13

    

   

   

January 28, 2019
The Honorable David Whitley                    Via email: secretary@sos.texas.gov
Texas Secretary of State
P.O. Box 12887
Austin, TX 78711

Dear Secretary Whitley,

We write to express alarm regarding your recent publication of Election Advisory No. 2019-02, dated January 25, 2019 ("the Advisory"), relating to the use of Department of Public Safety ("DPS") data to attempt to identify non-citizen registered voters. The methodology your office apparently employed to identify such voters looks deeply flawed, and its origins and intent are highly suspect. *As a result, we demand that you immediately rescind the Advisory before counties take action on it.*

First, the procedures you've outlined in the Advisory for conducting this investigation and mass purge are woefully inadequate to ensure that only ineligible voters are removed from the rolls. As it currently stands, counties taking action based on the advisory will likely be in violation of federal law. Indeed, when Florida attempted similar measures, the state had to abandon them under threat of litigation.

The Advisory explains that you compiled this list of potential non-citizens by relying on documents that Texans submitted to DPS "indicating the person is not a citizen of the United States *at the time the person obtained a Driver License or Personal Identification Card*" (emphasis added). Using such a data set to review the *current* citizenship status of anyone is inherently flawed because it fails to account for individuals who became naturalized citizens and registered to vote *at any point after having obtained their driver license or personal identification card.* Given that Texas Driver Licenses and ID Cards do not expire for a full six years after they are issued, the odds are quite high that this list of purported non-citizens includes tens of thousands of people who are now US citizens entitled to vote. Indeed, each year, between 52,000-63,000 Texans become naturalized citizens (roughly the same number of potential

non-citizens you claim have voted in Texas elections over a 22-year period).[1] Given that newly naturalized citizens have voter registration rates around 50%,[2] it is reasonable to conclude that at least 25,000 newly naturalized Texans are lawfully registering to vote each year. Even if one assumes that not all naturalized citizens previously obtained driver licenses, and not all registered naturalized citizens registered immediately, it is easy to see how this would result in your office obtaining over 90,000 incorrectly identified matches.

A fundamentally identical purge effort in Florida illustrates the inherent danger with your methodology. There, Florida's Secretary of State created a list of approximately 180,000 registered voters that he claimed were non-citizens based on records from when they obtained driver licenses.[3] The Secretary then distributed the list to county election officials, suggesting that they "send[] a letter to each person on the list directing the person to send back a form swearing, under penalty of perjury, that the person was or was not a citizen, and, if a citizen, either requesting a hearing or attaching documents showing citizenship." The letter further "included a statement that if the person failed to respond within 30 days, the person might be removed from the voter roll." Similarly, you suggest that Texas county election officials send a "Proof of Citizenship Letter" to those on the list you have compiled of potential non-citizens, demanding that they supply proof of citizenship within 30 days or be taken off the voter rolls.

The Florida results were a failure: out of an initial list of 180,000 flagged registrations, only 85 ultimately proved actionable.[4] ***That means that under a nearly identical program, less than .0005% of flagged registrations turned out to be non-citizens.*** It should be no surprise, then, that a federal judge admonished the Florida election officials: "The Secretary's methodology made it likely that the properly registered citizens who would be required to respond and provide documentation would be primarily newly naturalized citizens. The program was likely to have a discriminatory impact on these new citizens…. A state cannot properly impose burdensome demands in a discriminatory manner."[5]

Even after rescinding the Advisory, your office must not issue any future such advisories until you have addressed serious questions about the methodology, origin, and timing of the Advisory. Some relevant questions that the public deserves transparency on include:

---

[1] Department of Homeland Security, Persons Naturalized By State Or Territory Of Residence: Fiscal Years 2007 To 2016, DHS.Gov (Nov. 14, 2017), https://www.dhs.gov/immigration-statistics/yearbook/2016/table22.

[2] *See, e.g.,* Center for the Study of Immigrant Integration, *Rock the (Naturalized) Vote: The Size and Location of the Recently Naturalized Voting Age Citizen Population,* USCDornsife (2012), https://dornsife.usc.edu/csii/rock-the-naturalized-vote.

[3] *United States v. Fla.,* 870 F. Supp. 2d 1346 (N.D. Fla. 2012).

[4] *See* Steve Bosquet & Amy Sherman, *Florida Suspends Non-citizen Voter Purge Efforts,* Miami Herald (March 27, 2014), https://www.miamiherald.com/news/politics-government/article2087729.html.

[5] *United States v. Fla.,* 870 F. Supp. 2d at 1347-48.

- Who made the decision that this avenue of investigation should be a top priority, and ultimately approved this new process (your predecessor or another senior state official)? Was this person aware of the dismal accuracy of a similar program instituted and then ultimately abandoned by the State of Florida around 2012?

- What are the bases for the claims in your press statement "that a total of approximately 95,000 individuals identified by DPS as non-U.S. citizens have a matching voter registration record in Texas, approximately 58,000 of whom have voted in one or more Texas elections"? What number of votes were there and in which elections? If the underlying 95,000 number is largely inaccurate, the 58,000 number is false and inflammatory.

- What steps does your office plan to take to ensure that any further investigation or mass purges does not become a vehicle for any kind of profiling on the basis of race, ethnicity, or political affiliation?

Please advise by the close of business on Wednesday, January 30, 2019, whether you intend to take the steps we have outlined above, and any additional steps you intend to take on this matter.

We are also sending a copy of this letter to the voter registrars of all 254 Texas counties in order to alert them of the flaws in your data and to ask each of them to refrain from taking action regarding your advisory until you provide additional information regarding the methodology used. As you are well aware, each registrar is independently responsible for maintaining their voter rolls in a non-discriminatory way.

Sincerely,

Beth Stevens
Voting Rights Legal Director
Texas Civil Rights Project
(361) 437-9081
Beth@Texascivilrightsproject.org

Andre Segura
Legal Director
ACLU Foundation of Texas
(713) 942-8146 ext. 1013
asegura@aclutx.org

Margaret Fung
Executive Director
Asian American Legal Defense and Education Fund (AALDEF)

Anthony Gutierrez
Executive Director
Common Cause Texas

Stuart Naifeh
Senior Counsel
Demos

Christina Tzintzun Ramirez
Executive Director
Jolt Texas

Ezra Rosenberg,
Co-Director, Voting Rights Project
Lawyers' Committee for Civil Rights Under Law

Grace Chimene
President
League of Women Voters of Texas

Carlos Duarte
Texas State Director
Mi Familia Vota

Drew Galloway
Executive Director
MOVE Texas

Leah Aden
Deputy Director of Litigation
NAACP Legal Defense & Educational Fund

Michelle Tremillo
Executive Director
Texas Organizing Project

Jose Garza
Execute Director
Workers Defense Action Fund

cc:     Keith Ingram                                Via email: kingram@sos.texas.gov
        Director of Elections

        Adam Bitter                                 Via email: Abitter@sos.texas.gov.
        General Counsel

# Exhibit 14

    

   

   

January 28, 2019

### RE: INDEPENDENT DUTY AND LIABILITY OF COUNTY VOTER REGISTRARS NOTWITHSTANDING ELECTION ADVISORY NO. 2019-02, DATED JANUARY 25, 2019

Dear County Election Official,

We write on behalf of non-profit organizations in Texas dedicated to protecting the voting rights of Texans, including the below listed organizations. This letter concerns Election Advisory No. 2019-02, dated January 25, 2019 ("the Advisory"), relating to the use of Department of Public Safety ("DPS") data to attempt to identify non-citizens who are registered to vote.

As you will see from the attached letter sent to the Secretary of State, we are demanding that the Secretary of State rescind the advisory before any counties take action on it. Notwithstanding our demand to Secretary of State, we write separately to you to remind you of your independent obligations under Chapter 16 of the Texas Election Code regarding the investigation of whether a registered voter is eligible for registration in your county.

Under the Texas Election Code, responsibility for investigating whether a registered voter is eligible to vote is vested with the County Voter Registrar, not with the Secretary of State. Importantly, under the Texas Election Code no action may be taken in relation to the voter's registration unless the Voter Registrar has reason to believe that the voter is no longer eligible for registration and the voter receives notice and an opportunity to demonstrate their eligibility. The Advisory does not and cannot supplant your independent responsibilities under the Code.

As set forth in more detail in the attached letter to the Secretary of State concerning the Advisory, the Advisory is deeply flawed and does not provide a reliable or sufficient reason to believe that any voter identified by the Secretary of State is ineligible to vote. Indeed, the Advisory makes plain that the matching process undertaken by the Secretary of State has resulted in only "WEAK matches" for ineligibility.

Further, any actions taken based on this list are likely to violate federal law. As a reminder, under the National Voter Registration Act, a Voter Registrar is not alleviated of their duties to perform list maintenance in a non-discriminatory fashion and in compliance with the Voting Rights Act simply because they rely on lists provided by another party. 52 USC 20507(b)(1). Additionally, under the NVRA, you have a responsibility to ensure that eligible voters remain on the rolls and are not removed erroneously. We urge you to not take any action on this matter unless and until the Secretary of State has provided greater transparency on its procedures and ensured there are adequate safeguards for not identifying lawfully registered naturalized citizens.

## PUBLIC INFORMATION ACT REQUEST:

Additionally pursuant to the Texas Public Information Act, Chapter 552 of the Texas Government Code, please consider this letter a request for all records relating to the Advisory, including but not limited to the list of all individuals identified by the Secretary of State or Department of Public Safety as potential non-citizens, the Voter Unique Identifier for each of those individuals, and all communications and correspondence with the Secretary of State concerning the Advisory.

Should you have any questions regarding the Advisory or your responsibilities as outline here, please contact Tommy Buser-Clancy at tbuser-clancy@aclutx.org. or Beth Stevens at beth@texascivilrightsproject.org.

Sincerely,

Thomas Buser-Clancy
Staff Attorney
ACLU Foundation of Texas
(713) 942-8146 ext. 1023
tbuser-clancy@aclutx.org

Beth Stevens
Voting Rights Legal Director
Texas Civil Rights Project
(361) 437.9081
beth@texascivilrightsproject.org

Margaret Fung
Executive Director
Asian American Legal Defense and Education Fund (AALDEF)

Anthony Gutierrez
Executive Director
Common Cause Texas

Stuart Naifeh
Senior Counsel
Demos

Christina Tzintzun Ramirez
Executive Director
Jolt Texas

Ezra Rosenberg
Co-Director, Voting Rights Project
Lawyers' Committee for Civil Rights Under Law

Grace Chimene
President
League of Women Voters of Texas

Carlos Duarte
Texas State Director
Mi Familia Vota

Drew Galloway
Executive Director
MOVE Texas

Leah Aden
Deputy Director of Litigation
NAACP Legal Defense & Educational Fund

Michelle Tremillo
Executive Director
Texas Organizing Project

Jose Garza
Execute Director
Workers Defense Action Fund