# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| MOVE TEXAS CIVIC FUND; JOLT INITIATIVE; LEAGUE OF WOMEN VOTERS OF TEXAS; and TEXAS STATE CONFERENCE OF NAACP UNITS, | § § § § § § | |
| | § | |
| *Plaintiffs,* | § § | |
| | § | |
| v. | § | |
| | § | |
| DAVID WHITLEY, Texas Secretary of State, in his official capacity; KEITH INGRAM, Texas Director of Elections, in his official capacity; CHERYL JOHNSON, Voter Registrar for Galveston County, in her official capacity; PAMELA OHLENDORF, Elections Administrator for Caldwell County, in her official capacity; KIRSTEN SPIES, Tax Assessor and Voter Registrar for Blanco County, in her official capacity; TERRI HEFNER, Elections Administrator for Fayette County, in her official capacity; BETH ROTHERMEL, County Clerk and Voter Registrar for Washington County, in her official capacity, | § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 3:19-CV-00041 |
| *Defendants.* | | |

---

## DEFENDANTS DAVID WHITLEY AND KEITH INGRAM'S
## MOTION TO DISMISS OR IN THE ALTERNATIVE
## STAY LITIGATION OR TRANSFER VENUE

---

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

SUMMARY OF THE ARGUMENT ........................................................................... 1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ................... 3

   I.   Texas's Election System .................................................................................. 3

   II.  Election Advisory No. 2019-02 .................................................................... 7

   III. Plaintiffs' Allegations Against Secretary Whitley and Director Ingram ............... 10

STATEMENT OF ISSUES ........................................................................................ 10

STANDARD OF LAW .............................................................................................. 11

   I.   Rule 12(b)(1) ................................................................................................ 11

   II.  Rule 12(b)(3) ................................................................................................ 11

   III. Rule 12(b)(6) ................................................................................................ 12

ARGUMENT ............................................................................................................ 12

   I.   The Court Lacks Jurisdiction Because Plaintiffs Do Not Have Standing ............ 12

       A. Conduct at Issue ...................................................................................... 14

       B.  Plaintiffs Lack Standing ......................................................................... 17

   II.  Venue Is Improper Under the First-to-File Rule ........................................... 20

   III. Plaintiffs Fail to State a Claim on Which Relief May Be Granted ..................... 24

       A.  Plaintiffs' Fourteenth and First Amendment Claims Must Fail ...................... 24

           1. The Character and Magnitude of Plaintiffs' Alleged Injuries Do Not
               Qualify as a Substantial Burden on the Right to Vote ............................... 25

           2. The State's Interest in Safeguarding the Integrity of the Electoral Process
               Outweighs the Alleged Burdens to Plaintiffs ............................................ 26

       B.  Plaintiffs Have Failed to State a Fifteenth Amendment Claim ....................... 28

       C.  Plaintiffs Have Failed to State Any Due Process Claims ............................... 28

           1. Substantive Due Process .......................................................................... 29

           2. Procedural Due Process ........................................................................... 30

       D.  Plaintiffs Have Failed to State a Claim Under 52 U.S.C. § 10301 ................. 31

       E.  Plaintiffs Have Failed to Allege Facts About Discriminatory Purpose ............ 33

   IV. Alternatively, the Court Should Transfer This Case to the Western District of
       Texas, San Antonio Division .......................................................................... 34

CONCLUSION ........................................................................................................... 36

CERTIFICATE OF CONFERENCE ............................................................................ 38

CERTIFICATE OF SERVICE ....................................................................................... 39

## SUMMARY OF THE ARGUMENT

State and federal law require the Texas Secretary of State to assist county election officials in maintaining the accuracy of Texas's voting rolls. To that end, the Texas Legislature has mandated that the Texas Department of Public Safety ("DPS") share information with the Secretary of State in order to assure voter registration records are accurate and maintain the integrity of elections. The Secretary of State does not investigate voter eligibility or cancel a voter's registration for non-citizenship, however, as that authority lies solely with county election officials. Rather, the Secretary's role is limited to providing guidance and information to the counties to ensure that only eligible citizens can cast ballots.

Consistent with his clear statutory duty, starting in March 2018, former Secretary of State Rolando Pablos began working with DPS to obtain data regarding the citizenship of individuals at the time they applied for Texas driver's licenses or identification cards so that it could be compared to the list of registered voters. On January 25, 2019, Secretary of State David Whitley's office provided counties the names of the registered voters who had presented evidence of non-citizenship when they obtained a driver's license or identification card. In doing so, his office carefully described the nature of the information, and the limitations on counties' ability to cancel voter registrations based on that information:

> All records submitted through this process will need to be treated as WEAK matches, meaning that the county may choose to investigate the voter, pursuant to Section 16.033, Election Code, or take no action on the voter record if the voter registrar determines that there is no reason to believe the voter is ineligible. The county **may not cancel** a voter based on the

1

information provided without first sending a Notice of Examination (Proof of Citizenship Letter) and following the process outlined in the letter. In order to help counties make a determination regarding whether or not to send a Notice of Examination or close the task without taking further action, information provided by DPS will be provided to each county for further review and comparison against the voter record.

Election Advisory No. 2019-02[1] ("Election Advisory") (emphasis in original).

Secretary Whitley has now been sued in three different federal courts for fulfilling his statutory obligation.[2] Moreover, Plaintiffs in this case also named the Secretary of State's Director of Elections Keith Ingram as a defendant. Thus, Plaintiffs ask this Court to enter an injunction that would prevent two State officials from performing their roles as required by the Texas Constitution, Texas statutes, and federal law.

Defendants respectfully request that all claims against Secretary Whitley and Director Ingram be dismissed. Defendants are not responsible for canceling any voter's registration for non-citizenship. That role belongs to the counties. And even if the Plaintiffs had sued all 254 counties in Texas, they still have not alleged that they received notices of examination, let alone that any eligible voter has been removed from the rolls as a result of the Election Advisory. If Plaintiffs do receive a notice of examination, they can prevent

---

[1] Election Advisory No. 2019-02, "Use of Non-U.S. Citizen Data obtained from the Department of Public Safety" (dated January 25, 2019), *available at* https://www.sos.state.tx.us/elections/laws/advisory2019-02.shtml (last visited February 8, 2019).

[2] The filing of the original complaint in this Court on February 4, 2019, was preceded by the filing of two related cases: one in the Western District of Texas, San Antonio Division, *LULAC v. Whitley*, No. 5:19-cv-00074-FB (filed Jan. 29, 2019); and another in the Southern District of Texas, Corpus Christi Division, *Garibay v. Whitley*, No. 2:19-cv-00040 (filed Feb. 2, 2019). The plaintiffs in those cases also lack standing, and their complaints suffer from a number of similar defects as Plaintiffs' First Amended Complaint.

cancellation by proving their citizenship within 30 days after receiving the notice and can contest cancellation should it occur, and county registrars must add names back to the rolls if they were wrongfully canceled. Further, if a citizen's registration is cancelled, their registration is required to be reinstated immediately if they subsequently present proof of citizenship to the voting registrar. This can happen at any time, including on election day if a citizen discovers this cancellation when casting a ballot. Thus, Plaintiffs have not suffered an injury that is fairly traceable or redressable by an injunction against Defendants, and therefore Plaintiffs lack standing and have not stated a claim upon which relief can be granted. Moreover, this Court is not the proper venue for this dispute, as two other groups of plaintiffs have already filed challenges to the Election Advisory in other courts.

Secretary Whitley and Director Ingram, each in their official capacities, hereby move to dismiss with prejudice all of Plaintiffs' claims against them pursuant to Rules 12(b)(1), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

### I.     Texas's Election System

Secretary Whitley's constitutional role requires him to assist county election officials and ensure the uniform application and interpretation of election laws throughout Texas. *See, e.g.*, Tex. Const. art. 4, § 21; Tex. Elec. Code § 31.001. Secretary Whitley's Elections Division provides assistance and advice to election officials and the general public on the proper conduct of elections, including hosting seminars and election schools, providing calendars, prescribing forms, certifying ballots, funding primary elections, and providing legal interpretations of election laws to election officials. *See, e.g.*, Tex. Elec.

3

Code §§ 31.003 (duty to maintain uniformity of application of election laws), 31.004 (duty to provide assistance and advice to all election authorities), 31.005 (authority "to protect the voting rights of the citizens of this state"), 31.0055 (duty to maintain a voting-rights hotline), 31.006 (duty to refer complaints alleging criminal conduct to the Attorney General). Secretary Whitley also is required by law to maintain a computerized voter registration list that accurately reflects the official voter roll of the State for use by election officials in Texas. *See id.* § 18.061.

Local election officials, in turn, are charged with conducting elections in Texas, including maintaining voter rolls as the voter registrar. *See, e.g.*, *id.* § 12.001 (designating a local official as the voter registrar). Each county can assign the duties of the voter registrar to the county clerk, an elections administrator, or the tax assessor-collector. *See id.* Each registrar is authorized by statute to use any lawful means to investigate registration eligibility. *Id.* § 16.033. And only the registrar—that is, the local election official—can cancel any individual's voter registration. *See id.* §§ 16.031-.0332.

The process for cancelling a voter's registration is codified in statute and entails a number of protections to ensure that eligible voters do not forfeit the right to vote. The registrar must first investigate whether the registered voter is currently eligible to vote. Tex. Elec. Code § 16.033. The law further directs the registrar to take certain actions if he or she "has reason to believe that a voter is no longer eligible for registration." *Id* § 16.033(b). The registrar is not permitted to cancel a voter's registration before notifying the voter, in writing and sent by forwardable mail to the voter's mailing address and any other addresses known to the registrar, that the voter's registration status is under

4

investigation. *Id*. The notice of examination, as it is called, must specify what information is needed to determine the voter's eligibility. *Id*. § 16.033(c)(1). And the notice must advise the recipient that the requested information must be received within thirty days or the voter's registration will be subject to cancellation. *Id*. § 16.033(c)(2).

In the event that a voter's registration is investigated because the registrar has reason to believe that the voter is a non-citizen, the notice of examination will ask for proof of citizenship. A voter may prove his or her citizenship by submitting a birth certificate, United States passport, certificate of naturalization, or any other form prescribed by the Secretary of State. *Id*. § 16.0332(a). And state law allows voters to submit responsive documentation by "personal delivery, mail, telephonic facsimile machine, or any other method of transmission." *Id*. § 1.007(c).

State law requires the registrar to cancel a voter's registration if the registrar determines that the voter is ineligible based on the voter's reply to the notice of examination. *Id*. § 16.033(d). Registration is automatically cancelled if the voter does not respond within 30 days of the notice, or if the notice is returned undeliverable with no forwarding information available. *Id*. But a voter whose registration is cancelled could still submit proof of citizenship and be reinstated immediately by the registrar. *Id*. § 16.037(a), (d).

Voters whose registration is cancelled can also request a hearing with the registrar. *Id.* § 16.061. Upon submitting a signed request for a hearing, an individual's voter registration is reinstated and a hearing is scheduled within 10 days. *Id.* §§ 16.037, 16.064. At the hearing, the voter may appear personally or submit an affidavit without appearing.

5

*Id.* § 16.064. And if the voter disagrees with the registrar's determination at the hearing, the voter can seek judicial review of the decision, during which time any cancellation of the individual's voter registration is delayed. *See id.* § 17.005. Only after a district court rules on the appeal is an individual finally subject to cancellation of their voter registration. *See id.* § 17.008.

Finally, an individual whose voter registration is cancelled can cast a provisional ballot. Election officials at polling locations must provide provisional ballots to voters who claim to be eligible voters but whose names are not on the list of registered voters. 52 U.S.C. § 21082 (requiring provisional ballots); Tex. Elec. Code § 63.011 (same); 1 Tex. Admin. Code § 81.172(a)(5) (same). The voter can submit proof of citizenship to the registrar and be reinstated immediately or at any time before the provisional ballots are counted. Tex. Elec. Code § 16.037(d). Upon receipt of the necessary documentation, the registrar would note that the voter was erroneously removed from the rolls, 1 Tex. Admin. Code § 81.175(c)(4)(E), and restore him or her to the rolls, *id*. § 81.175(c)(7) ("For purposes of voter registration, the copied Provisional Ballot Affidavit Envelope serves as an original voter registration application or change form.").

The Office of Attorney General (OAG) has statutory authority to investigate and prosecute election offenses statewide. Tex. Elec. Code §§ 273.001, 273.021. These offenses include the misdemeanor offense of unlawful registration, *id*. § 13.007, and the felony offense of illegal voting, *id*. § 64.012. OAG can investigate election matters on its own initiative. *Id*. § 273.001(b). OAG can also receive notices of unlawful voting from registrars, *id*. §§ 15.028, 273.001(c), and referrals of election-related complaints from the

6

Secretary of State, *id*. § 273.001(d). OAG does not have statutory authority to conduct list maintenance or remove registered voters from voter rolls. *See id*. §§ 273.001 *et seq*.

## II.   Election Advisory No. 2019-02

An individual must be a United States citizen to vote in Texas. Tex. Elec. Code § 11.002(a)(2).  By statute, personal information contained in DPS motor vehicle records must be disclosed to the Secretary of State and used "in connection with any matter of . . . voter registration or the administration of elections by the secretary of state." Tex. Transp. Code § 730.005(9); *see also id*. § 521.044(a)(6) (separately authorizing disclosure of social security number information). The Texas Legislature has manifested its intent that this information be used to ensure the integrity of Texas' voter rolls.

The bill requiring DPS to disclose motor vehicle data to the Secretary of State—codified under section 730.005 of the Texas Transportation Code—was enacted in 2013. The law passed the Texas Senate unanimously and secured approval in the Texas House by a broadly bipartisan vote of 123 to 14. Acts 2013, 83rd Leg., ch. 1012 (H.B. 2512). The leaders of the Texas Democratic Party and the Republican County Chairs Association testified in favor of the bill. Tex. B. Ann., H.B. 2512 (May 3, 2013). The bill's supporters explained that the Secretary of State's office is "required to maintain the accuracy of the voter rolls and does not currently have all the necessary tools at its disposal." *Id*. They contended that the bill's purpose was to help solve that deficiency. By requiring DPS to share the personal data that it receives when individuals apply for driver's licenses and personal identification cards, they maintained, the bill would "improve accuracy in verifying the voter rolls." *Id*.

7

Pursuant to this legislative directive, Secretary Whitley obtained from DPS information "regarding individuals who provided documentation to DPS showing that the person is not a citizen of the United States during the process of obtaining or acquiring a Texas Driver License or Personal Identification Card." Election Advisory at 1. Looking at data only from "current (unexpired) Driver License and Personal Identification cards" that met matching criteria described in the Election Advisory, Secretary Whitley compiled the list of individuals registered to vote who had previously been determined by DPS not to be citizens. *Id.*

Secretary Whitley did not tell the counties that ***any*** individual on the list was an illegally registered voter. In fact, the Election Advisory stresses that "counties are ***not*** permitted, under current Texas law, to immediately cancel the voter as a result of any non-U.S. Citizen matching information provided." *Id.* at 2-3. The Election Advisory unequivocally advises the registrar to "determin[e] whether or not the information provides the registrar with reason to believe the person is no longer eligible for registration." *Id.* at 2. Indeed, under this matching and information-sharing process, there is no obligation for the registrar to do anything at all; the registrar must treat all records submitting via this process "as WEAK matches, meaning that the county ***may*** choose to investigate the voter, pursuant to Section 16.033, Election Code, ***or take no action*** on the voter record if the voter registrar determines that there is no reason to believe the voter is ineligible." *Id.* at 2 (emphasis added).[3] That is despite those same matching criteria justifying an automatic

---

[3] *See also* Election Advisory at 3 ("For the matching notifications originating from DPS data, ***the [registrar] has the choice to*** either . . . Send a Proof of Citizenship Letter (Notice

transfer of registration among counties in certain circumstances. Tex. Elec. Code § 18.0681. The Election Advisory makes clear, however, that county voter registrars who received the data from this matching process are ***not*** required to conduct any investigation "if they do not believe that a voter is ineligible to vote." Election Advisory at 3. And if a voter registrar does choose to investigate, they have "the right to use any lawful means to investigate whether a registered voter is currently eligible." *Id*. at 2. As with other list-maintenance activities, this is an iterative process involving collaboration between the State and counties to assist counties in fulfilling their investigative role.

Contrary to Plaintiffs' gross mischaracterization of the Election Advisory as a "voter purge," this matching process is simply an effort to provide additional information to voter registrars throughout the State—at the behest of the Legislature—to help election officials discharge their obligations to safeguard the integrity of the State's voter rolls by preventing ineligible persons from casting votes. As described above, this process of investigating citizenship status is mandated by statute and affords the individuals at issue ample opportunity to provide the necessary documentation to prove that they are eligible voters. *See* Tex. Elec. Code § 16.0332. Accordingly, the Election Advisory does not mandate that any action be taken against any voter. It merely outlines the process by which DPS data will be shared with local election officials, and leaves to them the decision whether to investigate any particular voter.

---

of Examination) to the voter; thereby starting the 30-day countdown clock before cancellation, or . . . ***Take no action on the voter record and simply close the task as RESOLVED***.") (emphases added).

9

### III.    Plaintiffs' Allegations Against Secretary Whitley and Director Ingram

Notwithstanding Plaintiffs' soaring rhetoric, Secretary Whitley and Director Ingram are not alleged to have done anything other than issue the Election Advisory. *See, e.g.*, 1st Am. Compl. ¶¶ 36-39. As described above, Plaintiffs' allegations that Secretary Whitley and Director Ingram are implementing a "voter purge" program—or doing anything other than providing data to local election officials, who will then decide whether to investigate pursuant to state law—are flatly contradicted by the clear language of the Election Advisory. *Cf., e.g.*, Compl. ¶¶ 1-20. Secretary Whitley is also alleged to have issued a press release. *See* Compl. ¶¶ 40-42. Finally, Plaintiffs allege that Secretary's Whitley's office has been in further contact with county officials regarding the Election Advisory and voter data. *See, e.g.*, Compl. ¶ 80. Plaintiffs do not allege that Secretary Whitley or Director Ingram sent a single letter to a voter or that they cancelled any voter's registration.

### STATEMENT OF ISSUES

1.    Does the Court lack jurisdiction to proceed because Plaintiffs have failed to allege facts showing that they have suffered an injury in fact, that their alleged injuries are fairly traceable to Defendants' conduct, or that the alleged harm is redressable by a ruling against Defendants, and therefore, Plaintiffs have failed to demonstrate standing?

2.    Is this Court the proper venue for resolution of this dispute where it is the third case filed regarding substantially similar conduct, claims, and issues?

3.    Does Plaintiffs' Complaint fail to allege facts sufficient to state a claim upon which relief can be granted?

4.    If the Court does not dismiss Plaintiffs' claims, should it transfer this matter to the U.S. District Court for the Western District of Texas, San Antonio division?

## STANDARD OF LAW

### I.    Rule 12(b)(1)

When the court lacks the statutory or constitutional power to adjudicate a case, the case is properly dismissed for lack of subject-matter jurisdiction. *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction," so that "the plaintiff constantly bears the burden of proof that jurisdiction does, in fact, exist." *Raj v. La. State Univ.*, 714 F.3d 322, 327 (5th Cir. 2013). Under this rule, this Court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009).

### II.    Rule 12(b)(3)

"On a Rule 12(b)(3) motion to dismiss for improper venue, the court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007) (citing *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004)). The Supreme Court has ruled that a court may dismiss a case based on forum "without first resolving a threshold issue of jurisdiction." *Wellogix, Inc. v. SAP Am., Inc.*, 648 F. App'x 298, 400 (5th

Cir. 2016) (citing *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007)).

### III.    Rule 12(b)(6)

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations, quotation marks, and alterations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "mere conclusory statements[] do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

### ARGUMENT

### I.    The Court Lacks Jurisdiction Because Plaintiffs Do Not Have Standing

Subject-matter jurisdiction is a threshold question that this Court must determine before addressing the merits of a case. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."). Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to challenge the subject-matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1); Wright & Miller, 5B Federal Practice and Procedure § 1350 (3d. ed) (explaining that a Rule 12(b)(1) motion "raises the fundamental question whether the federal district court has subject matter jurisdiction over

the action before it"). The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction, *Ramming*, 281 F.3d at 161, and courts must presume that federal jurisdiction is lacking "unless the contrary appears affirmatively in the record." *DaimlerChrysler Corp.*, 547 U.S. at 342 n.3.

In determining whether federal jurisdiction exists, the fundamental question is whether the dispute presents a "case" or "controversy" within the meaning of Article III. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."). "[T]hat a litigant have standing to invoke the authority of a federal court 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *DaimlerChrysler Corp.*, 547 U.S. at 342 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To establish standing, a claimant must present (1) an actual or imminent injury that is concrete and particularized, (2) fairly traceable to the defendant's conduct, and (3) redressable by a judgment in the claimant's favor. *Id.*

Here, Plaintiffs' claimed injuries satisfy none of the three elements that comprise the "irreducible constitutional minimum of standing." *Id.* The alleged injuries fail to satisfy the injury-in-fact component because they are not "actual or imminent," but at best merely "conjectural and hypothetical." *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). Their claims are not traceable to Defendants because the injury they complain of is the result of "the independent action of some third party not before the court." *Id.* (quoting *Simon*, 426 U.S. at 41-42). And it is entirely "speculative" that a favorable

13

decision would redress the injuries that Plaintiffs alleged. Because standing is lacking in this case, this Court should dismiss for want of jurisdiction.

### A.    Conduct at Issue

Plaintiffs allege that they are injured by the disclosure of voter data required by state laws aimed at protecting the integrity of the electoral process. Along with Congress and state legislatures across the country, the Texas Legislature has sought to safeguard the voting rights of legal voters by equipping state and local officials to stop voter fraud. *See, e.g.*, 42 U.S.C. § 1973gg-3(b) (explaining that confirming accurate voter registration "protect[s] the integrity of the election process"). The Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James A. Baker III noted that measures to ensure accurate voter registration lists are necessary because "[t]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud." Building Confidence in U.S. Elections § 2.5 at 18 (Sept. 2005), *available at* https://www.eac.gov/assets/1/6/Exhibit%20M.PDF. And the Supreme Court has stated that the protection of election integrity "is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982).

Numerous election-integrity laws are pertinent to the facts surrounding Plaintiffs' claims. To begin, DPS is mandated to disclose motor vehicle records "in connection with any matter of . . . voter registration or the administration of elections by the secretary of state." Tex. Trans. Code § 730.005(9). Likewise, the voter registrar in each county is authorized to "investigate whether a registered voter is currently eligible for registration in

14

the county." Tex. Elec. Code § 16.033. The law further directs the registrar to take certain actions if he or she "has reason to believe that a voter is no longer eligible for registration." *Id.* § 16.033(b). Under such circumstances, the registrar must notify the voter in writing that the voter's registration status is under investigation. *Id*. Among other things, such notice must include "a warning that the voter's registration is subject to cancellation if the registrar does not receive an appropriate reply on or before the 30th day after the notice is mailed." *Id*. § 16.033(c). If the voter does not reply within the statutory period or the notice is returned undelivered and no forwarding address is available, the law requires the registrar to remove the voter from the rolls. *Id*. § 16.033(d).

Moreover, Texas law requires a matching process to ensure the accuracy of the voter rolls. As the supervisor of this process, the Secretary of State is required to "periodically compare the information regarding voters maintained as part of the statewide computerized voter registration list to determine whether any voters have more than one voter registration record on file." *Id*. § 18.0681. And as part of the matching process, the Secretary is further instructed to create matching criteria that "produce the least possible impact on Texas voters; and fulfill [the Secretary's] responsibility to manage the voter rolls." *Id*. § 18.0681(b). Finally, the law provides guidance based on whether the matches are "weak" or "strong." Relevant here, the Secretary "may inform the county of the voter's residence that a weak match exists." *Id*. § 18.0681(c).

Plaintiffs allege no more than the operation of the State's election integrity laws. Last year, former Secretary of State Pablos began working with DPS to obtain information about non-citizen holders of driver's licenses or personal identification cards. Election

15

Advisory at 1. DPS is required to share such records in connection with the Secretary's duty to administer elections and maintain accurate voter registration lists. Tex. Trans. Code § 730.005(9). The Secretary of State's office and DPS worked together to disseminate information using the strongest matching criteria to "produce the least possible impact on Texas voters." Tex. Elec. Code § 18.0681(b). For example, the information was limited to individuals with active driver's licenses or identification cards who provided documentation to DPS showing they were non-citizens within the last six years. Election Advisory at 1.

After the matching process was complete, Secretary Whitley provided information related to the matches to the voter registrar in each applicable county. In his advisory to registrars, Secretary Whitley emphasized that the sharing of the voter data obtained from DPS did not change or modify the registrar's rights and responsibilities under the Texas Election Code. Election Advisory at 1. Secretary Whitley cited the statutory provision authorizing the registrar to investigate based on a reasonable belief that a voter is no longer eligible for registration. *Id.* (citing Tex. Elec. Code § 16.033(b)). And he pointed to the legislatively-provided framework for conducting these investigations, noting that the notice should be delivered by forwardable mail and that non-responses within the prescribed period and notices returned as non-delivered would result in the voter's removal from the rolls. *Id.* at 1-2 (citing Tex. Elec. Code § 16.033(c)-(d)).

Secretary Whitley underscored the point that the purpose of the information sharing was to expand the data set available to the registrars. Election Advisory at 1. As state law makes clear, the registrar is ultimately responsible for determining whether there is a

16

reasonable basis for investigating a voter's eligibility. *Id*. Secretary Whitley noted that the matching process produced only "weak" matches—again, even though the matching criteria itself was robust—and advised the registrars accordingly that they may choose to investigate or take no action at all. *Id*. at 2. Secretary Whitley issued a statement indicating that "[i]ntegrity and efficiency of elections in Texas require accuracy of our state's voter rolls, and my office is committed to using all available tools under the law to maintain an accurate list of registered voters." Secretary Whitley Issues Advisory on Voter Registration List Maintenance Activity (Jan. 25, 2019), *available at* https://www.sos.state.tx.us/about/newsreleases/2019/012519.shtml.

### B.    Plaintiffs Lack Standing

None of the Plaintiffs here have alleged facts to satisfy their burden to establish standing. As organizations, Plaintiffs can establish their standing through either "associational standing" or "organizational standing." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Only Plaintiff League of Women Voters of Texas (LWVTX) alleges standing to sue on behalf of its members who "would otherwise have standing . . . in their own right," *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). LWVTX claims that it has members who provide voter registration services and that some of its members were identified by the matching process. Compl. ¶ 27. But neither of these allegations satisfies the necessary components of the standing requirement.

LWVTX complains that Defendants' actions somehow impair voter registration. To identify a cognizable injury based on Defendants' vague and conclusory allegation requires piling "inference upon inference" in a manner that would extend federal jurisdiction far

beyond its Article III limitations. *Cf. United States v. Lopez*, 514 U.S. 549, 567 (1995). Defendants have taken no actions that harm a naturalized citizen's right to vote or an organization's ability to register citizens.  Secretary Whitley merely made available a data set. Registrars are prohibited from unilaterally removing a voter from the rolls without notice. Tex. Elec. Code § 16.033(c)-(d). And Secretary Whitley emphasized that the matches were "weak" matches, and that registrars could take no action at all based on the DPS data. Election Advisory at 2. Further, he advised the registrars of their prerogative to make an independent determination and reiterated the legal notice requirements. There is simply no "real and immediate" threat any person's right to vote or register someone to vote will be violated. *Lyons*, 461 U.S. at 102.

LWVTX's members also fail to satisfy the other necessary elements of constitutional standing. Their alleged injuries are not traceable to Defendants. There is no "causal connection" between Secretary Whitley's advisory and the ability of LWVTX's members to register naturized citizens to vote. *Lujan*, 504 U.S. at 560. Nor is there any link between the Defendant county officials and the harm to LWVTX's members. The pleadings merely allege that these local election officials are responsible for maintaining the local voter registrations lists. Compl. ¶¶ 31-35. None are claimed to have made an independent determination that violated an individual's right to vote. Thus, LWVTX's members have no suffered no alleged harm that is traceable to Defendants.

Finally, the alleged injury to LWVTX's members are not redressable by a decision in its favor. Plaintiffs ask this Court to declare unlawful the matching process and the Election Advisory, and to prevent Defendants or local election officials from taking any

action based on the advisory. But this relief would require this Court to strike down state law without redressing any actual harm to LWVTX's members. And, in any event, Secretary Whitley's advisory and Defendants' related statements did not direct local election officials to take any action. Thus, even if the Court were to take the extraordinary step of declaring an advisory statement to be unlawful, LWVTX's members would be no better off. With or without the Secretary's advisory, the registrars can still make an independent determination whether to investigate the eligibility of voters across the state, including LWVTX's members and those registered by LWVTX's members. Therefore, the claimed injuries are also not redressable.

To demonstrate standing, then, Plaintiffs must show that they have "organizational standing." This requires satisfying the same three-part standing applicable to individual plaintiffs. *OCA-Greater Houston*, 867 F.3d at 610. Plaintiffs complain that the State Defendants' actions caused their organizations to divert resources to educating members about the matching process. Compl. ¶¶ 25-28. But, as already explained, DPS was mandated to disclose the voter data at issue to the Secretary. Tex. Trans. Code § 730.005(9). Secretary Whitley simply made the data set available to the registrars, who are prohibited from unilaterally removing a voting from the rolls without notice. Texas Elec Code § 16.033(c)-(d). Further, Secretary Whitley emphasized that the matches were "weak" matches. And he indicated that any action by a registrar to investigate a voter must be based on the registrar's reasonable belief that the voter may be ineligible, and that registrars could take no action at all based on the DPS data. Election Advisory at 2. Even if a registrar were to investigate an individual, it is therefore purely "conjectural" to

19

conclude that he or she would be removed or that Plaintiffs would have to divert resources as a result of the investigation. *See Lujan*, 504 U.S. at 560.

Furthermore, complying with the notice is merely a function of following the procedures set forth in statute. *See* Tex. Elec. Code § 16.033. Thus, this case is wholly distinguishable from *OCA-Greater Houston*, where the organizational plaintiffs had to engage in "in-depth conversations" because the pertinent state and federal law requirements were not identical. *OCA-Greater Houston*, 867 F.3d at 608, 610. Here, Plaintiffs would at most have to point to state law, which clearly sets forth the standards and processes that control the maintenance of accurate voting rolls to ensure election integrity. And in the event that anyone is investigated, there would be no "causal connection" between Plaintiff's alleged injury and Defendants' conduct. *See Lujan*, 504 U.S. at 560. As explained, the basis for the investigation would be the registrar's independent determination, not Defendants' advisory and public statements. For that same reason, ruling against Defendants would not redress the harm Plaintiffs claim because they could still be approached by individuals with inquiries concerning their voting registration status. Because Plaintiffs fail to meet each of the standing requirements, this Court lacks jurisdiction over their claims.

In sum, Plaintiffs fail to satisfy any of the standing components and, therefore, their claims must be dismissed for want of jurisdiction under Rule 12(b)(1).

## II.   Venue Is Improper Under the First-to-File Rule

A lawsuit regarding the Election Advisory had previously been filed in the Western District of Texas, San Antonio Division. *See Tex. League of United Latin Am. Citizens v.*

*Whitley*, No. 5:19-cv-00074-FB (W.D. Tex. filed Jan. 29, 2019) ("First Proceeding"). There has already been significant litigation activity in the first-filed case. Plaintiffs have moved for a preliminary injunction, and Defendants have moved for dismissal under Rules 12(b)(1) and 12(b)(6). Judge Biery has set Plaintiffs' motion for hearing on February 19, 2019 and ordered that Defendants' motion to dismiss be argued that same day. *See id*. [ECF No. 8, 13, 20, 21]. Defendants have moved to dismiss, or in the alternative to stay or transfer, the second-filed case, *Garibay v. Whitley*, No. 2:19-cv-00040 (S.D. Tex. filed Feb. 2, 2019), based in part on the existence of the first-filed case in the Western District. Judge Ramos has ordered that "the applicability of the first-to-file rule should be determined before any other issue in this case," and gave the plaintiffs until February 21, 2019, to file a responsive brief on that point. *See id.* [ECF No. 12]. Thus, Plaintiffs in this case are the third group to file a challenge to the Election Advisory.

The Fifth Circuit has adopted a first-to-file approach when separate actions are filed in different district courts. In such instances, the principle of comity requires federal district courts to exercise care to avoid interference with each other's affairs. *Youngblood v. JTH Tax Servs., Inc.*, No. SA:06-CA-380-XR, 2006 WL 1984656, at *2 (W.D. Tex. July 17, 2006) (citing *W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir. 1985)). As between federal district courts, the general principle is to avoid duplicative litigation, and the concerns are to avoid the waste of duplication, to avoid rulings that may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result. *Id.* In the absence of compelling circumstances, the court initially seized of a controversy should be the one to decide whether it will try the case. *Youngblood*,

2006 WL 1984656 at *2 (citing *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407 (5th Cir. 1971)).

"Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999). The Court in which the second action was filed must determine where the action was first filed, *i.e.*, whether the cases are so duplicative or involve substantially similar issues that one court should decide the subject matter of both actions. *See Lear Siegler Servs. v. Ensil Int'l. Corp.*, No. SA-05-CA-0679-XR, 2005 WL 2645008, at *2 (W.D. Tex. Sept. 20, 2005) (citing *Mann Mfg.*, 439 F.2d at 408). In determining whether to apply the first-to-file rule, the court must also determine whether sufficiently "compelling circumstances" exist to avoid the rule's application. *Am. Security Ins. Co. v. Berry*, No. 1:01CV180-D-D, 2002 WL 449065 at *1 (N.D. Miss. Jan. 31, 2002). Importantly, the first-to-file rule does not require that the issues involved in the two cases be *identical*; rather, the crucial inquiry is whether the issues involved in the two cases "substantially overlap." *Save Power Ltd. v. Syntek Finance Corp.*, 121 F.3d 947, 950 (5th Cir. 1997); *see, e.g.*, *Mann Mfg.*, 439 F.2d at 408 n. 6 ("[R]egardless of whether or not the suits here are identical, if they overlap on the substantive issues, the cases would be required to be consolidated in . . . the jurisdiction first seized of the issues.").

The issue before this Court is whether this case and the First Proceeding are so duplicative or involve such substantially similar issues that one court should decide the subject matter of both actions. *See Lear*, 2005 WL 2645008, at *2. The issues involved in

22

this case and the First Proceeding substantially overlap—among other things, both are challenging the matching procedure described in the Election Advisory, both are brought by individual residents of the State of Texas and nonprofit organizations who allege they have been injured as a result of the Election Advisory and Defendants' public statements, both assert claims under 42 U.S.C. § 1983 and the Voting Rights Act, and both seek declaratory and injunctive relief asking the court to enjoin Defendants from continuing to use the matching procedure. *Cf.* First Am. Compl., *Tex. League of United Latin Am. Citizens v. Whitley*, No. 5:19-sv-00074-FB (W.D. Tex. filed Feb. 1, 2019) [ECF No. 2]. Moreover, there are no "compelling circumstances" that would preclude application of the first-to-file rule in this case. *See Berry*, 2002 WL 449065 at *1. Accordingly, venue in the Southern District of Texas is improper, and the Court should dismiss the above-captioned matter.

Even if the Court declines to dismiss Plaintiffs' claims, it should, at a minimum, stay the litigation pursuant to the first-to-file rule (or transfer the case to the Western District of Texas pursuant to 28 U.S.C. § 1404, as explained below, *see* Section IV, *infra*). Because important principles of comity and sound judicial administration are at stake, *Cadle Co.*, 174 F.3d at 603, and because Defendants are being forced to litigate in multiple forums that could result in Defendants being bound by conflicting injunctions from different courts, the Court should not compel Defendants to proceed with this duplicative litigation.

III.     **Plaintiffs Fail to State a Claim on Which Relief May Be Granted**

A.     **Plaintiffs' Fourteenth and First Amendment Claims Must Fail**

Plaintiffs fail to plead any facts in support of their broad, conclusory assertion that the matching process imposes a severe discriminatory burden on naturalized citizens, and do not otherwise offer facts to overcome the neutral, non-discriminatory interests advanced by the State as justification for the matching process. A court evaluating a constitutional challenge to an election regulation must "weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203 (2008). To do this, courts apply a balancing test derived from two Supreme Court decisions, *Anderson v. Celebrezze*, 420 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). "When evaluating a neutral, nondiscriminatory regulation of voting procedure, [the Court] must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *See Crawford*, 553 U.S. at 203.

In passing judgment, the court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). State rules that impose a severe burden on constitutional rights must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434. "Lesser burdens, however, trigger less exacting

24

review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal citations omitted).

### 1. The Character and Magnitude of Plaintiffs' Alleged Injuries Do Not Qualify as a Substantial Burden on the Right to Vote

"To deem ordinary and widespread burdens severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of the States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Crawford*, 553 U.S. at 197. "The Constitution does not require that result, for it is beyond question that the States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id* (internal quotations omitted).

Plaintiffs complain that having to provide proof of their citizenship within thirty days from the date they received notice is "exceedingly strict." *See, e.g.*, Compl. ¶¶ 95, 99-104, 134. However, the Supreme Court has already established that, although a somewhat heavier burden may be placed on a limited number of persons, inconveniences such as making an extra trip to the DMV, and gathering additional required documents for voter registration, do not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting. *Crawford*, 553 U.S. at 198-99. Such requirements are wholly justified and, therefore, would not pose a constitutional problem. *See id*. at 199-200. Even assuming that the burden may not be justified (Defendants contend

it is), that conclusion is by no means sufficient to establish the right to invalidate the matching process. *See id*.

Plaintiffs also speculatively allege, without substantiating facts, that the matching process will deprive them of their right to vote. *See, e.g.*, Compl. ¶ 99. Plaintiffs are simply wrong. As set forth in Section I, *supra*, Texas allows multiple safeguards to ensure properly registered voters remain on the voting rolls, including immediate, same-day reinstatement upon presentation of citizenship verification, and provisional voting pursuant to Texas Election Code §16.037(d) and § 63.011. *See Crawford*, 553 U.S. at 197-98 (the availability of the right to cast a provisional ballot provides an adequate remedy for burdens arising from life's vagaries). In other words, even if Plaintiffs' names do not appear on the list of registered voters and their registration status cannot be determined, multiple statutory provisions secure qualified voters their rightful place on the voting rolls. *See id*.

Because the Complaint fails to properly plead any facts showing the matching process imposes "excessively burdensome requirements" on any class of voters, Plaintiffs cannot show that the character or magnitude of their alleged injuries qualify as a substantial burden on their right to vote. *Id.* at 203-04.

## 2. The State's Interest in Safeguarding the Integrity of the Electoral Process Outweighs the Alleged Burdens to Plaintiffs

The Supreme Court has acknowledged that not only is the risk of voter fraud real, it could affect the outcome of a close election. *See Crawford*, 553 U.S. at 194-97. Accordingly, the electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. *Id.* at 194 (citing Building

Confidence in U.S. Elections § 2.5 (Sept. 2005), App. 136-37 (Carter-Baker Report) (footnote omitted)). The Court has further stated:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

*Id*. at 196. The Supreme Court has also stated that "[w]hile [the interest in the integrity and legitimacy of representative government] is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Id*. at 197.

It is well-established that the State of Texas has a significant interest in protecting voter confidence in the integrity and legitimacy of the electoral process. *See id*. at 194-97. As part of its mission to safeguard voter confidence, Texas also has an interest in deterring and detecting voter fraud. *See id.* at 196 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). On its own, the fact that voter rolls may be inflated with individuals, such as non-citizens, who are not eligible to vote provides a neutral and nondiscriminatory reason supporting the State's decision to implement the matching process. *See id*. at 196-97. Moreover, the State has a valid interest in participating in a nationwide effort to improve and modernize election procedures. *See id*. at 194-97. Further, the State has an interest in the uniform application and interpretation of election laws throughout Texas. *See*, *e.g.*, Tex. Const. art.

4, § 21. Under the law, Texas's important interests enumerated above are enough to justify implementation of the matching process.

Plaintiffs' First and Fourteenth Amendment claims must therefore be dismissed.

### B.    Plaintiffs Have Failed to State a Fifteenth Amendment Claim

The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," and it gives Congress the "power to enforce this article by appropriate legislation." *Shelby County, Alabama v. Holder*, 570 U.S. 529, 536 (2013). The Amendment is not designed to punish for the past; its purpose is to ensure a better future. *Id.* at 553 (citing *Rice v. Cayetano,* 528 U.S. 495, 512 (2000) ("Consistent with the design of the Constitution, the [Fifteenth] Amendment is cast in fundamental terms, terms transcending the particular controversy which was the immediate impetus for its enactment.")).

As discussed above, Plaintiffs' Complaint is entirely devoid of any factual support for their conclusory assertions that discriminatory, non-neutral considerations motivated Defendants' conduct. The Court must therefore dismiss Plaintiffs' Fifteenth Amendment claims.

### C.    Plaintiffs Have Failed to State Any Due Process Claims

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." This Court has held that the Due Process Clause protects individuals against two types of government action. So-called "substantive due process" prevents the government from engaging in

28

conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172 (1952), or interferes with rights "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325-26 (1937). When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). This requirement has traditionally been referred to as "procedural" due process.

### 1.  Substantive Due Process

"Substantive due process 'bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.'" *Marco Outdoor Adver., Inc. v. Reg'l Transit Auth.*, 489 F.3d 669, n.3 (5th Cir. 2007) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (internal quotations omitted)). "[It] requires only that public officials exercise professional judgment, in a nonarbitrary and capricious manner, when depriving an individual of a protected [life, liberty, or] property interest." *Lewis v. Univ. of Tex. Med. Branch at Galveston*, 665 F.3d 625, 631 (5th Cir. 2011) (citing *Tex. v. Walker*, 142 F.3d 813, 819 (5th Cir.1998)). Accordingly, "[t]o establish a violation of substantive due process, 'a plaintiff must prove that (1) he was deprived of a life, liberty, or property interest (2) in an arbitrary or capricious manner.'" *Aragona v. Berry*, No. 3:10-CV-1610-G, 2012 WL 467069, at *7 (N.D. Tex. Feb. 14, 2012) (internal citations omitted).

In support of their substantive due process claim, Plaintiffs merely assert the conclusory allegation that "[t]he Secretary arbitrarily prescribed this inadequate opportunity for voters to rebut the allegations of non-citizenship in apparent violation of Texas Election Code 16.033." Compl. ¶ 144. However, the Complaint does not assert any

facts showing that any of the alleged actions taken by the Defendants were arbitrary or rose to such a level as to "shock the conscience." Accordingly, Plaintiff's substantive due process claim fails.

### 2. Procedural Due Process

There are "three distinct factors for a court to weigh in considering whether the procedural due process provided is adequate: 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Meza v. Livingston*, 607 F.3d 392, 402 (5th Cir. 2010). "Procedural due process considers not the justice of a deprivation, but only the means by which the deprivation was effected." *Caine v. Hardy*, 943 F.2d 1406, 1411 (5th Cir. 1991). Thus, the injury that stems from a denial of due process is not the liberty or property that was taken from the plaintiff, but the fact that it was taken without sufficient process. *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 220 (5th Cir. 2012). A due process injury is therefore complete at the time process is denied. *Id.* (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (stating that "the constitutional violation actionable under § 1983 is complete when the wrongful action is taken")).

In support of their procedural due process claim, Plaintiffs assert that "[t]he process for removing registrants on the [list] from the voter rolls does not provide voters with notice and an opportunity to be heard at a meaningful time or in a meaningful manner." Compl.

¶ 142. However, Plaintiffs assert in the Complaint that Texas counties have mailed letters to individuals notifying them of the need to prove their citizenship (notice) and providing them with an opportunity to provide the requested proof of citizenship (an opportunity to be heard), and they also acknowledge that the Secretary of State's webpage has a form for individuals to respond to an investigation into their citizenship status. *See, e.g.*, *id.* ¶¶ 54, 56, 57, 61. Other than baseless, unsubstantiated assertions, the Complaint does not provide any facts showing such actions do not constitute notice and an opportunity to be heard, or that they are not meaningful in time or manner. Nor do Plaintiffs offer any facts showing their private interests outweigh those of the State or that additional statutory procedural safeguards are available. Critically, Plaintiffs have not pled and cannot plead that any voters have been removed from the voter rolls as a result of Defendants' actions. Plaintiffs fail to properly plead a valid procedural due process claim; therefore, the claim must be dismissed.

### D.    Plaintiffs Have Failed to State a Claim Under 52 U.S.C. § 10301

Plaintiffs allege that the matching process has a discriminatory effect in violation of Section 2 of the Voting Rights Act, which proscribes any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a). But because Plaintiffs have failed to allege facts to support their claims, Plaintiffs' Voting Rights Act claims must be dismissed.

"To prove that a law has a discriminatory effect under Section 2, Plaintiffs must show not only that the challenged law imposes a burden on minorities, but also that 'a

certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'" *Veasey v. Abbott*, 830 F.3d 216, 243-44 (5th Cir. 2016) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (internal quotations omitted)). The Fifth Circuit has adopted a two-part framework to evaluate Section 2 "results" claims:

> (1) The challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, and

> (2) That burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Id*. at 244.

"The first part of this two-part framework inquires about the nature of the burden imposed and whether it creates a disparate effect in that 'members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice'—this encompasses Section 2's definition of what kinds of burdens deny or abridge the right to vote." *Id*. at 244-45. The second part of the two-part framework "provides the requisite causal link between the burden on voting rights and the fact that this burden affects minorities disparately because it interacts with social and historical conditions that have produced discrimination against minorities currently, in the past, or both." *Id*. at 245.

As discussed in the preceding sections, Plaintiffs fail to plead facts showing the matching process imposes a discriminatory burden on them, much less one such that provides them with less opportunity than other members of the electorate to participate in the political process or to elect representatives of their choice. Nor have Plaintiffs pled facts showing minorities are disparately affected by the matching process. Further, Plaintiffs do not plead facts that tie each Defendant to their Section 2 claim. Even assuming such facts have been pled (they have not), the Complaint does not contain any facts establishing a causal link between the purported discriminatory burden on voting rights and the fact that this burden affects minorities disparately *because* it interacts with social and historical conditions that have historically produced discrimination against minorities. *Veasey*, 830 F.3d at 244. Because Plaintiffs fail to plead facts sufficient to satisfy the required two-part framework, their Voting Rights Act claims must be dismissed.

### E.    Plaintiffs Have Failed to Allege Facts About Discriminatory Purpose

Plaintiffs also have stated a separate count claiming that the State Defendants acted for a discriminatory purpose. Compl. ¶¶ 152-54. Although this count appears to be merely support for Plaintiffs' other claims, and does not appear to be a separately alleged cause of action, Plaintiffs' allegations here are similarly completely meritless.

U.S. citizenship is a requirement for voter eligibility in Texas. Tex. Elec. Code § 11.002(a)(2). Secretary Whitley has the obligation and responsibility to ensure that Texas election laws are being enforced throughout the State, including this citizenship requirement. *See, e.g.*, Tex. Elec. Code § 31.003. The Texas legislature has directed DPS

to provide this data to the Secretary of State. Tex. Transp. Code § 730.005(9). And the Election Advisory is explicit that the purpose of the matching process was to "produce[] the least possible impact on eligible Texas voters while fulfilling the responsibility to manage the voter rolls." Election Advisory at 1. The information was based on "documents provided by [each] person to show they are lawfully present in the United States," and the stated "goal was to produce actionable information for voter registrars while producing the least possible impact on eligible voters." Election Advisory at 1-2.

In contrast to these unambiguous statements and statutory requirements, Plaintiffs have offered nothing other than their own unsupported speculation and conclusory opinions that all these indicia of good faith should be ignored. According to Plaintiffs, the State Defendants cannot fulfil their duties to safeguard and secure the validity of elections in Texas as allowed by law, and state officials are constitutionally prohibited from maintaining the integrity of voter rolls in a way that the law allows.

The Court should reject Plaintiffs' claims of discriminatory purpose, which are wholly devoid of any supporting factual allegations in the Complaint.

## IV.    Alternatively, the Court Should Transfer This Case to the Western District of Texas, San Antonio Division

If the Court does not dismiss all of Plaintiffs' claims in their entirety—which it should—the Court should transfer this litigation to the Western District of Texas, San Antonio Division, for consolidation with the First Proceeding. Pursuant to § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

34

28 U.S.C. § 1404(a). The purpose of § 1404(a) is to protect litigants against unnecessary inconvenience and expenses and to promote the judicious use of time, energy, and money. *See Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). In determining a motion to change venue, the Court considers both private and public interest factors. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc). The private factors the Court should consider are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses and (4) all other practical problems that make the trial of a case easy, expeditious and inexpensive. The public factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law." *Id*.

The Western District of Texas, San Antonio Division, is an appropriate venue. Pursuant to § 1404(a), a case may only be transferred to a "district or division where it might have been brought." 28 U.S.C. § 1404(a). This lawsuit could have been brought in the Western District of Texas, San Antonio Division, because a substantial part of the events or omissions giving rise to the claims alleged by Plaintiffs occurred there. 28 U.S.C. § 1391(b). Moreover, all but one of the Defendants are employed or reside in the Western District of Texas.

A consideration of the private interest factors weighs in favor of transfer. First, regarding ease of access to sources of proof, the evidence pertaining to the State's matching

process is likely located entirely within the Western District. Second, regarding the availability of witnesses, to the extent they are needed, the State employees who may be witnesses reside or are employed in the Western District. Venue in the Western District, San Antonio Division would also be more convenient for most if not all non-party witnesses. These would include, among others, Department of Public Safety and Secretary of State personnel. Third, regarding practical considerations, trial of this case will be much easier, more expeditious, and less expensive because all of the parties, witnesses, and documents could be consolidated with the First Proceeding. Further, the location of the alleged "wrong" is an important factor that weighs in favor of transfer. *See*, *e.g.*, *Ray Mart, Inc. v. Stock Bldg. Supply of Tex., L.P.*, 435 F.Supp.2d 578, 593 (E.D. Tex. 2006). Here, the alleged wrong is not forum or venue-specific, as it pertains to the legislatively required dissemination of data throughout Texas, but the Election Advisory and the matching process were designed and initiated in the Western District. Accordingly, if the Court will not dismiss the Complaint or stay the litigation, the Court should transfer this case to the Western District, San Antonio Division, for further proceedings.

## CONCLUSION

For the foregoing reasons, the Defendants request that the Court dismiss Plaintiffs' claims.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFERY C. MATEER
First Assistant Attorney General

RYAN BANGERT
Deputy Attorney General for Legal Counsel

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Associate Deputy for Special Litigation
Texas Bar No. 00798537
TODD DISHER
Special Counsel for Civil Litigation
Texas Bar No. 24081854
MICHAEL TOTH
Special Counsel for Civil Litigation
Texas Bar No. 24100608
ROLA DAABOUL
Assistant Attorney General
Texas Bar No. 24068473
CHRISTOPHER D. HILTON
Assistant Attorney General
Texas Bar No. 24087727

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
FAX: (512) 320-0667
Patrick.Sweeten@oag.texas.gov
Todd.Disher@oag.texas.gov
Michael.Toth@oag.texas.gov
Rola.Daaboul@oag.texas.gov
Christopher.Hilton@oag.texas.gov

**Counsel for Defendants Secretary of State
Whitley and Director Ingram**

37

## CERTIFICATE OF CONFERENCE

I certify that I conferred with opposing counsel regarding Defendants' Motion to stay or transfer this case to the Western District of Texas, and Plaintiffs oppose such relief.


*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on **February 12, 2019**, and that the person(s) identified below was served by CM/ECF:

Mimi Marziani**
Rebecca Harrison Stevens
Joaquin Gonzalez**
**Texas Civil Rights Project**
1405 Montopolis Drive
Austin, TX 78741-3438
beth@texascivilrightsproject.org

Jon Greenbaum**
Ezra D. Rosenberg**
Brendan B. Downes**
**Lawyers' Committee for Civil Rights Under Law**
1500 K Street NW, Suite 900
Washington, D.C. 20005

Sophia Lin Lakin**
Dale E. Ho**
**American Civil Liberties Union**
125 Broad Street, 18th Floor
New York, NY 10004

Andre Segura (Attorney-in-Charge)
Thomas Buser-Clancy
Edgar Saldivar
Brian Klosterboer
**American Civil Liberties Union Foundation of Texas**
P.O. Box 8306
Houston, TX 77288
asegura@aclutx.org

Chiraag Bains** †
**Dēmos**
740 6th Street NW, 2nd Floor
Washington, DC 20001

Stuart C. Naifeh**
Brenda Wright**
**Dēmos**
80 Broad Street, 4th Floor
New York, NY 10004

**\*\*Pro Hac Vice application forthcoming*

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN

39